UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

          -against-                        19 CR 575 (AMD)

JOHN SIMONLACAJ,

              Defendant.

---

**SENTENCING MEMORANDUM AND EXHIBITS
ON BEHALF OF JOHN SIMONLACAJ**

**ARENT FOX LLP**
Glenn C. Colton
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Tel: (212) 484-3900
Fax: (212) 484-3990
glenn.colton@arentfox.com
*Attorneys for Defendant John Simonlacaj*

# TABLE OF CONTENTS

**Page**

Preliminary Statement ............................................................................................... 1

Statement of Facts ..................................................................................................... 4

    A.    John's Childhood and Education ................................................................ 4

    B.    John's Career and Work Ethic .................................................................... 5

    C.    John Legacy of Devotion to Family, Friends, and Those in Need ............ 6

        1.    John is Always There for His Family ........................................ 6

        2.    John as the Source of Guidance and Support ............................ 9

        3.    John's Commitment to Charitable Endeavors ......................... 11

        4.    A True Measure of John's Character: His Support to Struggling Families ................................................................... 14

    D.    John's Health Challenges ......................................................................... 17

    E.    The Indictment, Offense and Plea Agreement ....................................... 18

        1.    The Indictment ......................................................................... 18

        2.    The Offense to Which John Plead Guilty ................................ 19

        3.    The Plea and Plea Agreement .................................................. 20

        4.    The Presentence Report ("PSR") and Recommended Sentence ............... 21

Argument ................................................................................................................ 23

I.    The Court Must Make an Individualized Assessment and Impose a Sentence No Greater Than Necessary to Achieve the Goals of Sentencing ......................................... 23

II.    The Court Should Impose a Probationary/Non-Incarceratory Sentence ......................... 23

    A.    Analysis of The Section 3553(a) Factors ............................................... 23

        1.    Section 3553(a)(1): Nature and Circumstances of the Offense and the History and Characteristics of the Defendant ................................... 24

            a.    John's History and Characteristics ............................... 24

            b.    The Nature and Circumstances of the Offense ............ 26

        2.    Section 3553(a)(2): The Need for the Sentence Imposed ....................... 26

        3.    Section 3553(a)(3): The Kinds of Sentences Available .......................... 29

        4.    Section 3553(a)(4): The Advisory Guidelines Calculation .................... 29

        5.    Section 3553(a)(6): The Need to Avoid Unwarranted Sentencing Disparities ............................................................... 32

        6.    Section 3553(a)(7): The Need to Provide Restitution ............................. 34

B.    The 3553(a) Factors Demonstrate That a Probationary/Non-Incarceratory Sentence Should be Imposed ............................................................................. 34

Conclusion ....................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
  552 U.S. 38 (2007).................................................................................23

*Kimbrough v. United States*,
  552 U.S. 85 (2007)..................................................................23, 26, 28

*Nelson v. United States*,
  555 U.S. 350 (2009)..............................................................................23

*U.S. v. Locascio*,
  357 F.Supp.2d 536 (E.D.N.Y. 2004) ..................................................19

*United States v. Archer*,
  671 F.3d 148 (2d Cir. 2011)..................................................................30

*United States v. Booker*,
  543 U.S. 220 (2005)..............................................................................23

*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)..................................................................23

*United States v. Cohen*, 19 CR. 741 (WHP) (S.D.N.Y. 2020) ....................34

*United States v. Floyd*,
  No. 1:10-CR-00309 (VM) (S.D.N.Y. Apr. 2, 2013)..............................33

*United States v. Nikc*, 20 CR. 00173 (NSR) (S.D.N.Y. 2020)......................33

*United States v. Park,* 12 Cr. 344 (FB) (E.D.N.Y. October 3, 2014), ..................27, 32

*United States v. Scott*,
  1:16-CR-00034 (AMD) ........................................................................32

*United States v. Shokler*,
  No. 12-CR-415 (JBW), 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013)................................33

*United States v. Taffaro*,
  919 F.3d 947 (5th Cir. 2019) ................................................................33

*United States v. Villela*,
  No. 07 Cr. 287-02 (RWS), 2007 WL 2845290 (S.D.N.Y. Sept. 25, 2007) ............................33

*United States v. Yun,*
  1:19-CR-00131 (AMD) ................................................................................................. 32, 33

**Statutes**

18 U.S.C. § 3553(a) ....................................................................................................... *passim*

26 U.S.C. 7206 .......................................................................................................................... 20

U.S.S.G. § 2K2.0 ................................................................................................................. 22, 29

U.S.S.G. §§ 2T1.1 and 2T4.1(D) ............................................................................................ 29

U.S.S.G. § 2T1.1(c)(1)(A) ......................................................................................................... 30

U.S.S.G.§2T4.1(B) .................................................................................................................... 30

U.S.S.G. § 3E1.1(a) ................................................................................................................... 29

**Other Authorities**

Sixth Amendment ...................................................................................................................... 23

Fed. R. Crim. P. 32(i)(3)(B) ..................................................................................................... 22

# INDEX OF EXHIBITS

Letter of Jonathan Clark.................................................................................................Exhibit 1

Letter of Zef Frrokaj ...................................................................................................Exhibit 2

Letter of Michael Gabbamonte ....................................................................................Exhibit 3

Letter of Terezina Gega ...............................................................................................Exhibit 4

Letter of Kolja Gjonaj ..................................................................................................Exhibit 5

Letter of Maria Gjonaj .................................................................................................Exhibit 6

Letter of Simon Gjonaj ................................................................................................Exhibit 7

Letter of Nikolin Gjoni ................................................................................................Exhibit 8

Letter of Tom Gjoni .....................................................................................................Exhibit 9

Letter of Augustine Gojcaj.........................................................................................Exhibit 10

Letter of Edoardo Gojani ...........................................................................................Exhibit 11

Letter of Sr. Elizabeth Hogan ....................................................................................Exhibit 12

Letter of Bridget Jankovic .........................................................................................Exhibit 13

Letter of Thorsten Kiefer ...........................................................................................Exhibit 14

Letter of ███████ ...................................................................................................Exhibit 15

Letter of Victoria Kolndreu ........................................................................................Exhibit 16

Letter of Manush Kraja...............................................................................................Exhibit 17

Letter of Renis Lami ...................................................................................................Exhibit 18

Letter of Paulin Lufaj .................................................................................................Exhibit 19

Letter of Diela Lulgjuraj .............................................................................................Exhibit 20

Letter of John Lulgjuraj ..............................................................................................Exhibit 21

Letter of Zef Lulgjuraj ...............................................................................................Exhibit 22

Letter of Eugene Jackson Mancusco...........................................................................Exhibit 23

Letter of Skender Marku ...................................................................................Exhibit 24

Letter of Dr. Sanjay D. Naik ............................................................................Exhibit 25

Letter of Joseph Nikci ......................................................................................Exhibit 26

Letter of Joseph Nikci ......................................................................................Exhibit 27

Letter of Andrew Nrekaj ..................................................................................Exhibit 28

Letter of Marie Nrekaj .....................................................................................Exhibit 29

Letter of Nikolette Nrekaj ................................................................................Exhibit 30

Letter of Antoinette Nrekic ..............................................................................Exhibit 31

Letter of Lisa Nrekic ........................................................................................Exhibit 32

Letter of Alvaro Progni .....................................................................................Exhibit 33

Letter of Gilbert Radoina .................................................................................Exhibit 34

Letter of Rita Radoina ......................................................................................Exhibit 35

Letter of Kathleen Sheridan .............................................................................Exhibit 36

Letter of Ryan Sheridan ...................................................................................Exhibit 37

Letter of Stephen Sheridan Jr. ..........................................................................Exhibit 38

Letter of Stephen A. Sheridan ..........................................................................Exhibit 39

Letter of Thomas Sheridan ...............................................................................Exhibit 40

Letter of Drita Simonlacaj ...............................................................................Exhibit 41

Letter of Nikolas Simonlacaj ...........................................................................Exhibit 42

Letter of Brighid Solotruk ................................................................................Exhibit 43

Letter of Patrik Solotruk ..................................................................................Exhibit 44

Letter of Lee Stern ...........................................................................................Exhibit 45

Letter of Marel Ujka ........................................................................................Exhibit 46

Letter of Fran Vataj .........................................................................................Exhibit 47

Letter of Nikoll Vataj .......................................................................................Exhibit 48

Letter of Zef Vataj .............................................................................................Exhibit 49

Letter of Samuel Votta.........................................................................................Exhibit 50

Letter of John Vukel ............................................................................................Exhibit 51

Letter of Martin Vuksanaj....................................................................................Exhibit 52

Letter of Edward Yung .........................................................................................Exhibit 53

Letter of George Zadrima .....................................................................................Exhibit 54

Letter of Tommy Zadrima ....................................................................................Exhibit 55

Letter of Vinny Zadrima ......................................................................................Exhibit 56

Letter of Norma Zagreda ......................................................................................Exhibit 57

Letter of Viktor Zagreda .......................................................................................Exhibit 58

Letter of Mikal Zekaj ……………………………………………………………...Exhibit 59

Declaration of Joel Sickler ……………………………………………………………Exhibit 60

**Preliminary Statement**

John Simonlacaj stands before this Court having lived a life filled with good deeds, hard work, helping those in need and most of all, devotion to family. John also stands before this Court knowing he made a mistake and committed a crime for which he must be sentenced. He takes responsibility for and admits that he consciously avoiding learning that a very modest amount of income should have been reported and tax paid related to his 2018 tax return instead of the 2019 return – the return on which the income was reported and for which the tax paid. He accepts responsibility for his crime. Unfortunately, the presentence report prepared for John's case includes over 100 paragraphs indisputably irrelevant to John and John's case. The presentence report notwithstanding, we respectfully submit that John should be sentenced for the tax crime to which he plead and not for either (a) the unrelated and more sensational allegations against co-defendants or (b) the count against him which the Government has properly agreed to dismiss.

John was charged in only two of the twenty-six counts of the Indictment and, as noted, all parties agree that one of those two charges should be dismissed. We respectfully submit that the fact the Government aggressively and prejudicially joined an allegation of economic crime against John into a case alleging threats of violence, RICO, organized crime and extortion against other defendants – *allegations that indisputably have nothing to do with John* -- should not enter into the Court's decision. John should be sentenced only for what he did do – consciously avoid learning that he would owe in 2018 (rather than 2019 when payment was made) a small amount of tax related to a small portion of free work on a home construction project that reached some as yet unspecified legal definition of "taxability" by the time the clock struck midnight on December 31, 2018.

1

The above recitation of the background of the case leading up to John's sentencing hearing is not meant to diminish the importance and seriousness of his case or the crime for which he takes responsibility, but rather to put focus on what John's case *is not* about. John understands the gravity of his situation and is determined to do everything in his power to make amends in the community and to do right by his family. Imposing a non-incarceratory sentence upon John will allow a good man to see through this commitment and will benefit society in the process.

As the letters from those who know him best show, John's crime is not an accurate reflection of the person he is. The real John is the man who cherishes the time he spends with his family and eagerly arranges activities, from ice skating to apple picking, for his children, nieces, and nephews. The real John is the man who makes daily visits to the hospital when a friend or family member is suffering. The real John is the man on speed dial for whenever his church or its parishioners need assistance. The real John is the man who rushes to your home when a pipe freezes and then stays shivering throughout the night, using hairdryers and anything else he can think of to keep the pipe from bursting and your home from being damaged. The real John is the man who goes to Costco, loads up his truck and drives to local food pantries and charitable organizations to deliver the sorely needed food and supplies – food and supplies paid for out of his own pocket. The real John is the man who finds employment and housing for relatives and strangers alike as they struggle to assimilate, learn the language and put food on the table upon arriving tentative and afraid in the United States. The real John does all of this, not in search of credit or accolades, but because doing right and helping people is what matters to him.

John poses no danger to society. Imposing a sentence of imprisonment upon him will not make the community a safer place. To the contrary, society would be deprived of a man who is

2

devoted to doing everything in his power to better the lives of others, as the letters submitted herewith describe in poignant detail. What imposing such a sentence would do is create the unwarranted sentencing disparities the law seeks to avoid. As demonstrated below, in case after case, the Courts have imposed probationary sentences upon defendants for tax crimes involving exponentially higher amounts than even the disputed approximately $16,000 of taxes the Government contends John paid, but paid a year too late. What even a relatively short prison sentence would also do is impose a very harsh punishment. In the age of the pandemic, on average, prisoners are quarantined in solitary confinement for three weeks both upon entry and exit. In other words, six weeks or more in what is known as the "hole" -- a windowless 8'x10' prison cell -- 24 hours a day, 7 days a week. We respectfully submit that such a punishment is not necessary to achieve the goals of the sentencing statute for a person such as John whose life has been filled with good deeds but who has committed, even in the Government's high estimation, the crime of paying $16,000 in taxes in the wrong tax year.

Moreover, given John's health issues – issues that include a congenital heart valve defect, frequent kidney stones that can require surgical intervention (and did most recently last year), and a penchant for severe allergic reactions -- imposing a sentence of imprisonment could severely jeopardize his health and would surely burden the prison system. Indeed, his cardiologist notes that given John's conditions, contracting COVID-19 could be fatal – a risk that is patently much higher in a prison setting.

Based on these factors and others, we respectfully submit that a just sentence would be one of probation with the conditions of strict home confinement and community service so that he can support his family, make amends to those close to him, and continue his lifetime of good works.

## Statement of Facts

### A.      John's Childhood and Education

In 1967, John's parents, Simon and Sante Simonlacaj, immigrated to the United States

seeking to escape ethnic oppression in their native Albania.  John and his three siblings – Lisa,

Victoria, and Rita – were raised in New York where their parents worked long hours at multiple

jobs in order to provide for the family.  John stepped in at this critical time to provide care for his

sisters.  John's younger sister, Victoria, recalls how John rose to the occasion by taking on the

responsibility of many parental tasks:

> [John] led by example and showed me what it meant to be reliable, trustworthy and kind.
> It was John who walked me to and from school daily including my first day of
> kindergarten.  It was my first school experience and I recall being very anxious.  He
> assured me all would be okay and we would leave early so that we could meet the teacher
> before school began.  I vividly recall him standing in the school yard waving as I walked
> in apprehensively, but knowing that when school let out he would be there.  That's who
> John always was and is, someone who leads his life with integrity no matter the situation.

Letter of Victoria Kolndreu, Exhibit 16.  John's youngest sister, Rita, similarly recalls: "Growing

up my parents often worked long hours and I was left to my siblings to look after.  John always

took his role very seriously, in fact some of my earliest memories are of John brushing my hair

into a ponytail and taking me into the park across the street from the building we lived in."

Letter of Rita Radoina, Exhibit 35.

John also pitched in by helping his father with his work as a superintendent in their

apartment building.  As John's older sister, Lisa, notes: "At just 12 years old, my brother saw

that my father was so perpetually tired, so John began taking out the garbage by himself before

our father came home, sacrificing countless hours of his own time to help where he saw the

opportunity."  Letter of Lisa Nrekic, Exhibit 32.

John's parents instilled in him the values of family, hard work, and compassion for

others, all of which he has continued to embody throughout his life.  Letter of Lisa Nrekic,

4

Exhibit 32.  Beginning at the age of 15 and continuing throughout his college years, John held part-time jobs while attending school full-time so that he could support himself and assist his family while also obtaining the education that he recognized as key to achieving success in America.

## B.     John's Career and Work Ethic

For over 23 years since graduating from Iona College in 1996 (and until the filing of the instant case), John worked in the real estate development industry.  John started as a Property Manager at Property Markets Group and, through hard work and dedication to his career, worked his way up until ultimately becoming the Managing Director of Development at HFZ Capital Group.  John is proud of the work that he has performed.  As Norma Zagreda highlights: "John lights up when he talks about his job and takes great pride in having a hand in changing the famed New York City Skyline.  John is passionate about his work and is a devoted leader and employee."  Letter of Norma Zagreda, Exhibit 57.

As his career progressed, John took it upon himself to act as a model leader to those who worked under his supervision.  Letter of Thorsten Kiefer, Exhibit 14 ("He has been nothing but a generous and caring leader to the entire team which reported to him, with the sole purpose of allowing all of us to succeed in our roles.").  Letter of Jonathan Clark, Exhibit 1; ("[D]uring my time working for John, I found him to be a great leader, a role model, dedicated, hardworking, always looking out for the best interest of the company and his staff. . . John always pushed us (me) to strive for excellence never settling for mediocracy.").  John was the type of supervisor who supported those who worked with him in all facets of their careers and personal lives. Letter of Edward Yung, Exhibit 53 ("John had an open door policy at the office, and it made everyone feel comfortable with approaching him with whatever challenges they may have at work or in their personal lives . . .").

John also consistently went of his way offer opportunities to individuals in order to help them learn and advance in their careers. Letter of Michael Gabbamonte, Exhibit 3 ("During our interview, I let him know that I did not go to college and John did not shun me off like most employers would do."). Jonathan Clark reflects that, after 6 years of learning and working under John's mentorship, he was able to grow in the field of construction management and development, particularly when John provided him with the "experience of a lifetime" to run his own 25-story renovation project. Letter of Jonathan Clark, Exhibit 1. Jonathan recalls that John supported him throughout the highs and lows of the construction process, ultimately ensuring that the project succeeded. Letter of Jonathan Clark, Exhibit 1 ("I never had anyone believe in me like John and can't thank him enough for the opportunity and the confidence he gave me.").

C.      **John Legacy of Devotion to Family, Friends, and Those in Need**

The letters submitted herewith paint a vivid picture of John Simonlacaj as a man who has earned a place in the hearts of his friends and family through sheer force of personality and a constant stream of good deeds. If John's character were to be summarized into one word, it would be "devoted," as his friend Norma emphasizes: "John is a devoted son, husband, father, brother, uncle, friend, and employee." Letter of Norma Zagreda, Exhibit 57. Victor Zagreda, John's friend of over 20 years, agrees by noting that John holds a "high standard of integrity, a strong moral compass, and most notably, an unshakeable devotion to his family." Letter of Viktor Zagreda, Exhibit 58.

1.      **John is Always There for His Family**

John's devotion is best exemplified by how attentive and loving of a father, husband, son, uncle, and brother he is. To this day, John and his family live with his parents where John provides his mother and father with close attention and necessary care as they age. John chose this living arrangement not just because it is a cultural tradition, but also because he takes pride

6

in providing for those that he loves.  As John's wife notes, "Tradition is very important to [John], and looking after his parents as they grow old is not only common in our culture, but a duty he takes on with pride."  Letter of Drita Simonlacaj, Exhibit 41.  Drita describes that, as John's parents have aged, they now rely on their son "immensely" to the point where he assists them with performing basic functions such as taking them to doctor appointments.  Letter of Drita Simonlacaj, Exhibit 41.

John's devotion also echoes through his partnership with his wife to whom he has been married for over 26 years.  Together, John and Drita are a team, devoted to raising their three children: Nikolas (22), █████ (17), and █████ (10).  As his friend and NYPD Officer, Stephen Sheridan Jr., notes:

> John is first and foremost a family man, serving as an excellent role model and caretaker for his three children.  He has instilled in them qualities and characteristics that will shape them into becoming strong principled adults who will without question be valued members in their community.  The love and attention John exhibits onto his children is truly heartwarming.

Letter of NYPD Officer Stephen Sheridan Jr., Exhibit 38.  John is a "hands-on dad" who cherishes the time he spends with his children.  Letter of Martin Vuksanaj, Exhibit 52.  Those who know John describe that his "heart is fullest when his children are happy . . ."  Letter of Norma Zagreda, Exhibit 57.  This is why John is always eager to organize memorable activities for his children.  Letter of Norma Zagreda, Exhibit 57 ("I always chuckle about how the moment ONE leaf changes color, John is setting up an apple picking Sunday Funday as we[] call it."), Letter of Samuel Votta, Exhibit 50 (retired NYPD officer who notes he "has always admired [John] for the love of his family . . .").

John has a unique bond with each of his three children.  Letter of Drita Simonlacaj, Exhibit 41 ("I'm amazed at how John has developed an individual relationship with each of our children – they all have their own unique bond with their father that they all cherish.").  His son,

Nikolas, a law school student, describes how much he adores his father: "He's my role model – a superhero, a kind, and generous man, who loves and cares for his family and friends more than he cares for himself." Letter of Nikolas Simonlacaj, Exhibit 42.

Separately, John has cultivated "a calm and patient way" of reaching his daughter ███, in the midst of her teenage years. Letter of Drita Simonlacaj, Exhibit 41; *see also* Letter of Norma Zagreda, Exhibit 57 ("I am always learning when I watch John interact with ███; he is always able to turn tough teen situations into teaching moments."). John's youngest daughter, ████, is much younger than her siblings and in a different phase of her childhood. Cognizant of this age difference, John dedicates his weekends to spending time and participating in activities with ████. Letter of Drita Simonlacaj, Exhibit 41 ("Given the age difference between her and my other children, she often finds herself searching for someone to spend time with. This is where John steps in. He spends most of his weekends spending time with her, taking her tubing, ice skating or to see a movie."). ████ simply adores her father, as Drita notes, John is ████ "hero, her Superman." Letter of Drita Simonlacaj, Exhibit 41.

John also maintains close relationships with his nieces and nephews, providing care and support for them as if they were his own children. Letter of Marie Nrekaj, Exhibit 29 ("[Uncle John] was always the one I turned to when I was upset and needed a shoulder to lean on. He would tell me funny jokes to make me laugh and offer words of encouragement until I was feeling better."); Letter of Antoinette Nrekic, Exhibit 31 ("My uncle is a man that everyone looks to when you need advice or feeling lost in the world. He is the man that has been there for me all of my life, the man who picked me up when I fell off my bike in his driveway, who made me laugh when I was crying, and the man that walked me out of my house in my wedding dress."). His niece, ████, recalls how her Uncle John helped develop her from a shy child into the

person she is today: "We stopped at Cracker Barrel for breakfast, where [John] encouraged me to order my own food, something I would have never done voluntarily. As I look back on moments like these, the way my uncle cherished my opinions and pushed me outside my comfort zone has translated into the type of person I am right now, thoughtful and strong willed, similar to him." Letter of ███████████, Exhibit 15.

Simply put, at bottom, John is the type of man who always puts his family first. Letter of Rita Radoina, Exhibit 35 ("John puts family first always, and is the first one there to celebrate an accomplishment as well as the first one if you're in need."); *see also* Letter of NYPD Detective (ret.) Lee Stern, Exhibit 45 (describing how John's life revolves around his family and how in the 15 years he has known John, he has proven to be a "loving, generous, caring family man").

### 2.      John as the Source of Guidance and Support

Throughout the years, John has earned his place in the hearts of friends and family as someone who will provide support, mentorship, and guidance. John is often the first person that his friends and family will turn to for advice. Letter of Tommy Zadrima, Exhibit 55 ("He is the first person I seek when I need help with any problem I come across. I can always go to him with anything I encounter in life knowing I will always get advice that always seem[s] to work out and ease my life. He has affected every aspect in in my life."). As John's nephew reflects: "As a kid and teenager, I always remember John as making a positive difference in my life. The moments that stick out to me the most is when we had our one-on-one time. He would always ask how he could help, and if I needed anything. He would always answer my questions, and give good advice." Letter of Simon Gjonaj, Exhibit 7.

John also encourages those who are close to him to succeed in their goals. Letter of Nikolin Gjoni, Exhibit 8 ("He pushed me to be the best version of myself, focus on my studies, and work harder in all areas of my life."). For example, John's niece, Nikolette, recalls how

supportive her Uncle John has been toward her achieving her goal of going to law school:

"Whenever I doubted myself, he was there to push me along the application path and kept my attention on the things that truly matter in life: family and education. Whenever I need someone to turn to for inspiration, I turn to my [Uncle John]." Letter of Nikolette Nrekaj, Exhibit 30.

John's cousin, George, similarly recalls how John pushed him to succeed in college:

> After my first semester, I received a letter stating if I did not get my grades up, I would lose the scholarship. I did not know what to do. I was so scared to tell my parents because they would have been so disappointed in me. So here comes John. We had a conversation and he set me straight. He explained to me losing this scholarship would affect my future, financially and in my future endeavors. During my second semester, John would ask me all the time how I was doing in my classes and if I needed any help. He really pushed me to better myself and it paid off. I graduated on the Dean's List and became a success in my career.

Letter of George Zadrima, Exhibit 54.

John is there for his friends and family, both in good times and in bad. Letter of Nikoll Vataj, Exhibit 48 ("It's easy to find people to show up during the good times in life. However, it is rare to find someone to show up when times get tough. Through thick and thin, John has always been there for me and my family."). Bridget Jankovic recalls how John was there for her family when ▮▮▮▮▮▮▮▮▮ was diagnosed ▮▮▮▮▮▮▮▮▮. Letter of Bridget Jankovic, Exhibit 13. Bridget notes that John would come to the hospital "every morning and night" to be there for her family "just sitting by our side" and was even there the day ▮▮▮▮▮▮ had surgery ▮▮▮▮▮▮▮▮▮. Letter of Bridget Jankovic, Exhibit 13. Bridget recalls that John went out to eat with her husband during the surgery and sprinted back to the hospital with him to hear from the doctor that the surgery was successful: "In fact, I remember hugging John first even before my husband. I often ask myself why I did that. I did that because, as a wife, John helped me give the man I most love the support he needed, and I will forever appreciate the pain he removed from our hearts, just by being present." Letter of Bridget Jankovic, Exhibit 13.

John is always a dependable source of support for those close to him. Letter of NYPD Officer (ret.) Stephen A. Sheridan, Exhibit 39 ("The words honorable, dependable and loyal come to mind when I think of John. From the time we were introduced, he has always been somebody that I can count on."). Regardless of the time of day, John will not hesitate when someone calls to seek his assistance. Letter of Zef Vataj, Exhibit 49 ("Not many people are willing to go out of their way to help. John doesn't think twice about helping people. He is always jumping at the opportunity to help someone."). Stephen Sheridan Jr. recalls how John showed up to his home when a pipe froze that cut off all their water

> John came over and was down under our deck with my dad for hours with heaters and hair dryers trying to get the pipe unfrozen. Even as it got colder and darker out and my dad was insistent on letting it be and trying again tomorrow [] John wouldn't quit, his only concern was that we got our water back and that the pipe didn't burst. He took time out of his day, away from his family, to make sure my family had what we needed.

Letter of NYPD Officer Stephen Sheridan Jr., Exhibit 38. Officer Sheridan emphasizes that this example showed the type of person John really is: "always putting others before himself." Letter of NYPD Officer Stephen Sheridan, Jr. Exhibit 38; *see also* Letter of NYPD Detective (ret.) Lee Stern, Exhibit 45 (describing how in 15 years he has never seen John put his interests above society's).

### 3. John's Commitment to Charitable Endeavors

Perhaps the greatest testament to John's character is the devotion that he exhibits toward helping those in need. John regularly volunteers his time and donates resources to the charitable endeavors of his local church: "He makes many charitable donations, whether it['] s donating money or physically doing things such as moving pianos to different locations or moving around furniture for the church." Letter of Drita Simonlacaj, Exhibit 41. John's support has reached the point where the church depends on him for assistance. Letter of Drita Simonlacaj, Exhibit 41 ("It seems that John is one of the first people the nuns at the church call when they need help

11

with something."); Letter of Thomas Sheridan, Exhibit 40 ("John is someone who the local clergy depend on to distribute meals to their community members in need. He is someone they can always depend on to give assistance.").

One of the many ways that John provides this assistance is by bringing canned goods to food pantries run by the church throughout the year. Letter of Augustine Gojcaj, Exhibit 10 ("John takes his children and has taken my son along with other children 3 or 4 times a year, every year to donate canned goods and necessary items to local churches. He picks up the kids and goes shopping, loading up his truck and making rounds helping the less fortunate."). Sr. Elizabeth Hogan, CFR, a religious sister and member of the Franciscan Sisters of the Renewal emphasizes how John has been a "tremendous" support to the church's food pantries:

> Responding to the notice in the church bulletin, he called offering help. To our incredible surprise, he brought us an entire truckload of non-perishable food! Throughout the last two years John has always been prompt, cheerful and extremely generous every time I have asked for assistance. On two occasions the shelves in our food pantry were empty, and I feared we would have to decline helping the families who were asking for help. Both times John came within days of my call, and each time he brought an entire truckload of food. *Simply put, our food pantry would have temporarily closed in the middle of the pandemic were it not for John Simonlacaj's help.*

Letter of Sr. Elizabeth Hogan, CFR, Exhibit 12 (emphasis supplied); Letter of Stephen A. Sheridan, Exhibit 39 ("He is on speed dial for a Catholic Sister in East Harlem and is [there] when she calls to say the food bank needs more supplies. He rushes to re stock and with great expense to himself which he never asked for help with and he delivers the supplies himself.").

John's brother-in-law, Gilbert Radoina, who has joined John on trips to donate to the church, emphasizes the extent to which the church now depends on John: "The last time we were there, I overheard him telling one of the sisters there to please call him when they are running low on things." Letter of Gilbert Radoina, Exhibit 34. Importantly, Gilbert notes that John "doesn't do these things for show," but instead "because it is a part of who he is." Letter of

Gilbert Radoina, Exhibit 34; Letter of Thomas Sheridan, Exhibit 40 ("I truly believe John does this solely out of the kindness of his heart and I [] admire that quality of him."). Indeed, John does not expect recognition in return for his charitable endeavors, he simply acts out of the goodness of his heart. As his sister, Victoria, notes: "He never boasts or even casually mentions the many times he has donated resources or his time to many charitable organizations or a family member or friend in need." Letter of Victoria Kolndreu, Exhibit 16.

John has made an effort to pass on the value of giving to the less fortunate to the next generation. John brings his children, nieces, and nephews along with him on trips to the food pantry so that he can teach them "the true meaning of helping." Letter of Drita Simonlacaj, Exhibit 41 ("He gathers up the kids, makes his way to Costco, then delivers to the church with the kids having them physically unload the truck so that they feel the true meaning of helping."); *see also* Letter of ████████, Exhibit 15 ("Twice or so a year, John takes a couple of us cousins in his pickup truck to the nearest BJs, or Costco, and we spend countless hours and thousands of dollars in the store picking up hundreds of boxes of canned foods and cases of water to load into the back of [John's] truck. We then take the ride to a Catholic missionary in the Bronx, one that provides food daily to the homeless and to those in need.") As his niece, ████, appreciates: "Lifting all those boxes that my uncle bought with the money out of his pocket seemed like a chore at first, but as he explained the good it would do for that community I was eager to continue. As I grow older and gain an income of my own, I hope to continue this tradition my uncle has begun . . ." Letter of ████████, Exhibit 15.

In sum, John's friends, family, and the local community recognize the selflessness by which he devotes himself to providing for the less fortunate. As best summarized by his friend and retired New York City police officer, Stephen A. Sheridan, John's charitable endeavors have

13

"proven him[] to be a virtuous man."  Letter of Stephen A. Sheridan, Exhibit 39; *see also* Letter

of Samuel Votta, Exhibit 50 (retired NYPD officer who highlights John's "sense of empathy for

others' welfare").

> ### 4. A True Measure of John's Character: His Support to Struggling Families

The letters submitted herewith leave little room to doubt that John is the type of man who

will go "out of his way to help a stranger."  Letter of Antoinette Nrekic, Exhibit 31.  This is best

exemplified by the countless examples where John has provided support to immigrants upon

their arrival in the United States.  Upon arriving in the United States, these individuals are often

overwhelmed with settling into a new country.  Regardless of whether he has a connection to

these individuals, John will go out of his way to help in any way that he can, including by

coordinating their housing and securing them employment.  In providing this support, John acts

as "the catalyst and creator in securing hopeful futures for many immigrant families of different

backgrounds."  Letter of Patrik Solotruk, Exhibit 44.  Just a few of the many examples of John's

actions in this regard were detailed in the letters submitted herewith:

- Terezina Gega recalls how John helped her secure employment both for her and her husband when they arrived in America: "When I first came to the United States, I was seeking political asylum and came here with literally nothing.  John was there for me.  He helped me find my first job as a live-in nanny. . . When my husband couldn't find a job (he was a mechanic before coming to the US) because he didn't know the language and was older, John helped him get a job as a porter in Manhattan."  Letter of Terezina Gega, Exhibit 4.
- Tom Gjoni appreciates how John provided him with the opportunity to become a superintendent of a building in New York, thereby securing him employment and a place to live: "As an Albanian immigrant who arrived in this country without knowledge of the language, and a family to provide for, [John] gave me an opportunity to become a superintendent of a residential building where I have resided now for 13 years.  This not only secured me a job, but also a place to live, putting a roof over my family's head to support them.  Because of this, my children were given access to a better education and a stable environment.  He then went on to give me a second job opportunity at HFZ Capital Group which I

have been a part of now for 8 years. This allow[ed] me to even further my career and pursuit of a great life." Letter of Tom Gjoni, Exhibit 9.

- Renis Lami similarly appreciates how John offered him his first job in America, while expecting nothing in return: "[W]hen I joined my parents here in the US in 2006, [John] got me my first job just a month after I got here and continued to help whenever needed and never asked for nothing in return." Letter of Renis Lami, Exhibit 18.

- Paulin Lufaj recalls that he was turned down for many jobs upon arriving in America. Despite this language barrier, John was able to secure Paul his first job: "Because I didn't speak English well, it was difficult for me to find a job when I first moved here. People kept turning me down because of the language barrier. Being the good person that he is, John helped me find a job that I would be good at. I was able to become independent because of him." Letter of Paulin Lufaj, Exhibit 19.

- Skender Marku reflects on how John, then a complete stranger to him, provided him with a job as a superintendent: "Twenty-four years ago, I immigrated to America not knowing any English, without any money or home. . . John assisted me in acquiring my first superintendent position which I would have never been able to do without him. This paved the way for every job opportunity for the rest of my life. . . From the moment I met John, he helped me, and my family more than I could ever imagine. He did not have to help me as I was a complete stranger to him but did so from the kindness of his heart and I will always admire him for that." Letter of Skender Marku, Exhibit 24.

- Mare Uka notes that John also secured him a job: "After I moved [to] the States, I had the privilege [of] meeting John. During our morning coffee chats before heading to work, he found out that I had no close relatives here, and a very tough time getting by. It was [John] that offered to help, and got me a stable job." Letter of Marel Ujka, Exhibit 46.

- Fran Vataj appreciates how John assisted him in finding a job that would also provide housing to his family: "When I moved to the United States, John helped me find a great job. He helped me get on my feet so I was able to support my family. Not only did he help me find a job, he also was able to find me an apartment with a superintendent position. This gave me and my family a place to stay. He made my transition to the United States as seamless as possible. What amazes me most is, he didn't even know me all that well when he went out of his way to help me out. Moreover, he never expected anything in return. He just did it because he is a great person that cares." Letter of Fran Vataj, Exhibit 47.

As John's friend of almost 30 years, Patrik Solotruk, summarizes best: "These families looked to John as their beacon for guidance and direction in America. With kindness and unselfishness, he assuaged their concerns and brought relief and comfort to them in their new homeland." Letter of Patrik Solotruk, Exhibit 44.

John does not limit his assistance to those who are arriving in America for the first time. Instead, John also extends his support to those who are struggling through a tough time in their lives. As John's brother-in-law, Gilbert Radoina, summarizes: "There have been many times throughout the years that John has helped people who have been down on their luck. Where he has given an opportunity when nobody else has, and people have been able to turn their whole lives around." Letter of Gilbert Radoina, Exhibit 34. Some of the many examples of John's assistance in this regard include:

- Eugene Jackson Mancuso, who recalls that John provided him with a connection that led to his employment after he could not afford to feed his family or pay his taxes: "When I first met John, I had no idea what kind of person he was. We had a brief conversation and I mentioned that I was down on my luck and could not find work. I could not afford to feed my family, I owed on my taxes. I was down and depressed. . . Once I mentioned my situation, John without hesitation changed everything for me. He gave me a name and number to use and told me to call his friend; he would help me with employment. . . He helped me to find my path in life. By helping me he help[ed] give my kids an opportunity to a better life." Letter of Eugene Jackson Mancuso, Exhibit 23.
- Joseph Nikci, who reflects that John provided him with a chance to prove himself and succeed in his career: "John came into my life at a time when it seemed no one would give me the chance to prove myself, and I was down on my luck. I had all the qualities and skills needed to be where I am today, but it was John who was instrumental in affording me the opportunity to manage the condominium I currently oversee. . . John, being a devoted family man himself, saw my potential and the job I still hold today is solely because of the door John opened for me. He put me in front of an opportunity that changed the course of our lives for the better." Letter of Joseph Nikci, Exhibit 26.
- Vinny Zadrmia, who notes how John helped him find a full-time job after he dropped out of college: "As a young adult dropping out of college due to failing grades and getting engaged, I stressed for my future since I only had a part-time job. [John] managed to find me a job in Manhattan that became my main source of income before committing full time to the Board of Education." Letter of Vinny Zadrima, Exhibit 56.

John's wife affectionately reflects on how her husband has selflessly provided opportunities to others: "These people were struggling, many of whom were immigrants, seeking a better life and

didn't have the credentials or experience to fill the position, but John gave them a chance." Letter of Drita Simonlacaj, Exhibit 41.

### D. John's Health Challenges

John suffers from several critical health conditions that require close care and attention. Since birth, John has required careful monitoring by a cardiologist because he has a bicuspid aortic valve. Letter of Dr. Sanjay D. Naik, Exhibit 25. John is currently able to manage this condition through regularly taking blood thinners, however, eventually, the valve in his heart will need to be replaced. Of particular relevance here, Dr. Naik notes that John is at a higher risk of suffering serious complications, including death, should he be exposed to and contract COVID-19 – a patently increased risk to anyone if they are incarcerated. *See* Letter of Dr. Sanjay D. Naik, Exhibit 25; *see also* https://www.tctmd.com/news/valve-disease-plus-covid-19-often-lethal-combination-registry-shows (last visited May 7, 2021) (noting the substantial percentage of deaths among patients with heart valve issues who contract COVID-19);

John's heart condition and coordinate increased risk from COVID-19 is further complicated by the fact that he is prone to serious anaphylactic allergic reactions which have at various times required that he seek immediate treatment and/or self-administer emergency epinephrine. The COVID-19 vaccines, that by all accounts are safe for the majority of the population, pose a much greater risk to someone who is prone to allergic reactions. *See, e.g.* https://www.cnet.com/health/covid-19-vaccine-allergic-reaction-what-to-know-and-whos-at-risk/ last visited May 7, 2021) ("[T]he biggest risk factor for potentially having an allergic reaction from a vaccine is if you have a history of allergic reactions or anaphylaxis."). Someone who has endured the stress and uncertainty of a severe allergic reaction or anaphylactic event understandably would be very worried about a reaction from the vaccine. Indeed, Dr. Anthony Fauci, director of the U.S. National Institute of Allergy and Infectious Diseases (NIAID), has

recognized the stress that can be caused by such reactions: "[t]he public understandably has been concerned about reports of rare, severe allergic reactions to the Moderna and Pfizer-BioNTech COVID-19 vaccines." https://www.webmd.com/vaccines/covid-19-vaccine/news/20210408/nih-looking-into-rare-allergic-reactions-to-covid-vaccines (last visited May 7, 2021). Thus, if sentenced to a period of incarceration, John would face the Hobson's choice of potentially lethal exposure to COVID-19 due to his heart condition or the increased risk of a severe adverse reaction or worse from the vaccine.

Finally, on top of managing his congenital aortic valve disorder and severe allergic reactions, John has also experienced issues with chronic kidney stones. John has been able to manage some of these issues with stones through medication, however, there were at least two instances where surgery was required to remove the kidney stones. This occurred most recently in November 2020. PSR ¶177. We respectfully submit that there is simply no need to burden the prison system with caring for John's myriad of health conditions which are better suited for monitoring at home by his doctors.

    **E.**    **The Indictment, Offense and Plea Agreement**

        **1.**    **The Indictment**

On December 4, 2019, the Government obtained a 26 count indictment against a dozen defendants, an overwhelming majority of the Indictment is completely unrelated to John or any allegation against him. John, who was out of state at the time the Government sought to execute the arrest warrant, traveled back to New York quickly and, in coordination with authorities, voluntarily surrendered at the courthouse for processing. While the Indictment accuses John of only two counts of economic crime (one of which the Government properly will be moving to dismiss), he was prejudicially joined into the sprawling 26 count Indictment involving allegations of membership in organized crime, RICO violations, extortion and more – all counts

18

and allegations that indisputably *have nothing to do with John*.  Because the Government lumped

John in with 11 other defendants in a case alleging membership in organized crime, John, who is

not even accused of being an organized crime member, was predictably publicly painted as such

with the obvious, predictable and severe ensuing harm.  *See, .e.g.,*

[https://www.thecity.nyc/manhattan/2019/12/9/21210665/mob-looted-tax-break-towers-rising-along-the-high-line-feds](https://www.thecity.nyc/manhattan/2019/12/9/21210665/mob-looted-tax-break-towers-rising-along-the-high-line-feds) (last visited May 6, 2021) (picturing John leaving Court under the

misleading and damaging headline "Mob Looted Tax Break Tower Rising Along the

Highline").[1]

### 2. The Offense to Which John Plead Guilty

John plead guilty to one count of filing a false tax return.  As noted above, the charge

involving alleged honest services fraud will be dismissed at sentencing and the other 24 counts

of the Indictment do not involve John at all.  As to the one count to which John did plead guilty,

the basic facts are as follows.  In or around the latter part of 2018, John's family undertook

improvements to their residence.  A substantial majority of the work was conducted and

completed in 2019.  This work was performed by various contractors, at least one of which John

understood would not be compensated in full for their services.  In an exercise of caution, John's

2019 tax return included as income the value of work done on the residence for which

contractors had not been paid (even work done by contractors to whom payments may be made

---

[1] Had a plea agreement not been reached, severance of John's limited portion of the case
from the rest of the sprawling Indictment would likely have been the result.  *See, e.g., U.S. v.
Loscacio*, 357 F.Supp.2d 536, 543-45 (E.D.N.Y. 2004) (severing non-RICO defendants from
those accused of being organized crime members – including from two defendants charged in
both *Loscacio* and the instant case -- reasoning *inter alia,* "the mere association with a Mafia
family is, in itself, highly prejudicial.")

AFDOCS/23856509.3

in the future). *See* PSR ¶ 206 (noting Government's view that restitution, *i.e.,* all tax due, has been paid in full).

Although a substantial majority of the work on the house was done and/or completed in 2019, and thus would have no effect on his 2018 tax return, a limited portion of the work was performed or started in 2018. At least some of the value of the work performed in 2018 was done by a contractor who did not expect to be paid. John has admitted being aware of the high probability that some limited portion of the limited amount of the work that was performed in 2018 should have been considered income in 2018, rather than 2019, for federal tax purposes and consciously avoided learning that fact. As discussed below, how to determine factually the precise state of the renovations on December 31, 2018 is, at best, a challenge. Moreover, how to determine how much of the work in progress (and the value of that work in progress) met some as yet unspecified legal standard that would require its reporting in 2018 versus 2019 when it *was* reported, is also a significant challenge. To be clear, John does not dispute that a limited amount of income should have been reported in 2018 with respect to the renovations but rather asserts that all (if not more) of the tax due has been paid and that the Government and the PSR (which just repeats the Government's view without analysis) overstates the amount that should have been reported and paid in the earlier year.

### 3. The Plea and Plea Agreement

On January 11, 2021, John entered into a plea agreement (the "Plea Agreement"). As contemplated by the Plea Agreement, John pled guilty on January 12, 2021 to one count of filing a false tax return in violation of 26 U.S.C. 7206. In the Plea Agreement, the Government provided an estimated Guidelines offense level of 8 and a Criminal History Category of II, with the resulting Guidelines recommendation of 4-10 months imprisonment. Under the Plea Agreement, John is entitled to argue *both* that the Guidelines level is lower than that estimated

AFDOCS/23856509.3

by the Government *and* for a downward variance from whatever Guidelines range is ultimately determined by the Court.  As detailed below, because the amount of alleged tax due *for 2018* versus 2019 is much lower than the Government asserts, we contend that the proper Guidelines level is 4, and when combined with a Criminal History Category of II, results in a Guidelines range of 0-6 months imprisonment.

Sentencing is scheduled for June 16, 2021.

### 4.     The Presentence Report ("PSR) and Recommended Sentence

On May 19, 2021, the PSR was provided to defense counsel.  Unfortunately, the PSR contains an overwhelming amount of supposed facts and information that inarguably has nothing to do with John.[2]  Indeed, by our calculation *over 100 of the first 147 paragraphs and approximately 80% of those first 147 paragraphs* (those purporting to deal with "offense conduct") are irrelevant and have nothing *even arguably* to do with John.

As to the alleged honest services scheme the Government will move to dismiss at sentencing, the PSR incorrectly assumes that there was such a scheme despite the fact that not one but *two* independent internal investigations that found no evidence of a *quid pro quo* (the essence of an honest services charge) involving John.  Specifically, as the Government is aware, both "construction company 1" (the alleged victim of the alleged honest services count that is to be dismissed) and the construction manager responsible for the project alleged to be involved in that alleged honest services count – two entities that one would think would have every motivation to find wrongdoing – found no wrongdoing on John's part.  The PSR also seems to

---

[2] We understand why it may be more convenient for Probation to create one alleged set of facts for all defendants charged in an indictment and why that might be the better way to proceed in certain cases.  However, in a case like John's where he plead guilty to one tax count in a 26 count indictment that includes prejudicial and irrelevant allegations that all parties (including Probation) recognize have nothing to do with John, including over 100 paragraphs irrelevant to John in what is supposed to be *his* PSR, renders that PSR unnecessarily voluminous and prejudicial.  We have requested that Probation re-issue a PSR that addresses solely the case against John but as of this writing, do not know if they will do so.

have looked past the Government's admission that it cannot prove any losses to John's then-employer (construction company 1), the supposed victim. PSR ¶ 124. One would think that if there was a *quid pro quo* honest services scheme, there would be *some* provable loss to the supposed victim. That there is not speaks volumes.

All the above said about the PSR paragraphs related to the alleged but to be dismissed honest services scheme, we submit that the Court should exercise its discretion under Rule 32 and decide that it need not make a finding on the issue. *See* Fed. R. Crim. P. 32(i)(3)(B) (giving the Court discretion to "determine that a ruling [on a disputed matter in the PSR] is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing"). The parties, as well as Probation in the PSR, agree that the guidelines level and the issue of restitution will not be affected by such a determination. *See, e.g.,* PSR ¶ 124 (Government acknowledgment that it cannot prove any real losses to John's then-employer thus no effect on restitutions); PSR ¶ ¶ 151-159 (focusing <u>solely</u> on alleged loss amount – before reductions for acceptance – to determine the applicable guidelines level)[3]. Respectfully, we submit that the Court should determine Mr. Simonlacaj's sentence by focusing on the crime to which he did plead guilty and the 3553(a) factors.

Finally, for all of the reasons stated in this submission, we respectfully submit that the Court should not follow the recommendation of 10 months incarceration and adopt the defense request for a sentence of time served and probation with strict conditions of home confinement and community service – a sentence that is more than sufficient to satisfy the purposes of the sentencing statutes.

---

[3] These cited paragraphs of the PSR omit reference to the undisputed additional 2 point reduction for global resolution under U.S.S.G. § 2K2.0. That additional 2 point reduction is later referenced in paragraph 210 of the PSR.

AFDOCS/23856509.3

<u>**Argument**</u>

I.      **The Court Must Make an Individualized Assessment and Impose a Sentence No Greater Than Necessary to Achieve the Goals of Sentencing**

As this Court is aware, in *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the system of mandatory Sentencing Guidelines violated the Sixth Amendment. Following Booker, district courts are no longer required to impose Guidelines-range sentences. Rather, "*Booker* rendered the Guidelines 'effectively advisory,' and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (quoting *Booker*, 543 U.S. at 245).

The Supreme Court has since made clear that a sentencing court is to analyze the factors set forth in 18 U.S.C. § 3553(a) and impose a sentence that is sufficient, but no greater than necessary, to accomplish the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). The sentencing court cannot even "presume that the Guidelines range is reasonable" and must instead "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.").

II.     **The Court Should Impose a Probationary/Non-Incarceratory Sentence**

A.      **Analysis of The Section 3553(a) Factors**

After analyzing the 3553(a) factors, this Court has the discretion to fashion the sentence it deems is just, so long as the sentence is no greater than necessary to accomplish the purposes of the sentencing statute. We respectfully submit that the 3553(a) factors strongly support a sentence of probation with a condition of strict home confinement, a sentence which is no greater than necessary to accomplish the purposes of the sentencing statute.

23

1.     **Section 3553(a)(1): Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

    a.     **John's History and Characteristics**

John's history and personal characteristics are detailed in the Statement of Facts, *supra*, and in the letters submitted herewith, all of which demonstrate that John is a selfless, kind, and hardworking person devoted to doing right by his family, friends, and community. As John's friend, Bridget, summarizes best: "John's life and his presence in the lives of others offers the greatest gift[] that money cannot buy. All who know John, gain a support system that is loyal, trustworthy, and thoughtful. . . . He is a 'stand-up guy' who puts the love of his family and friends first. He will always be there for you and you can always count on him to lift you up on your darkest days. He just has that light within him and when you see it, you realize you are blessed to know this incredible human being that gives more than he receives." Letter of Bridget Jankovic, Exhibit 13. Quite simply, John's crime is not a reflection of the type of person that he is – hardworking, devoted to family, and dedicated in giving back to his community.

John's health issues play a key role in evaluating the characteristics of the defendant under section 3553(a). John's cardiologist, Dr. Naik, notes that John is at a higher risk of suffering serious complications, including death, should he be exposed to and contract COVID-19. Letter of Dr. Sanjay D. Naik, Exhibit 25. Undeniably, the conditions in prisons exacerbate this possibility, given the increased risk that a prisoner has of contracting COVID-19 in the high-density prison environment, particularly where there is limited cleaning supplies and PPE, poor ventilation, and difficulties in social distancing. *See, e.g.,* Letter from Federal Public and Community Defenders Legislative Committee to the Honorable Dick Durbin and Chuck Grassley dated May 4, 2021 available at

https://www.fd.org/sites/default/files/news/2021.05.04_letter_from_federal_defenders_to_sjc_0.

AFDOCS/23856509.3

pdf (hereinafter "Durbin/Grassley Letter) ("Although the Biden Administration has taken significant steps to beat back COVID-19 in the community, individuals in BOP custody remain at high risk"); *see also id.* ("Even now, despite the increased availability of vaccines across the country, COVID-19 remains a life threatening risk to those in BOP custody. The death count of incarcerated individuals continues to mount, and conditions in federal detention facilities remain dire.").  The risk to inmates from COVID-19 remains all too real and shows no signs of abating. Indeed, BOP Director Michael Carvajal testified before a Senate committee that only 51% of BOP staff had accepted vaccination.  *See id.*  As noted in the Durbin/Grassley Letter, "[t]he high refusal rate by BOP staff is particularly alarming because, as BOP has acknowledged, staff present a higher potential vector for transmission." *Id.* (quotations omitted).

Of course, John has the option of getting vaccinated.  However, because of his history of anaphylaxis and severe allergic reactions, the risk of the vaccine to him is far greater than many others and the stress of not knowing how the vaccine might endanger him a weighty burden.  As of now, he has not been vaccinated because of that risk to his health and well-being.  As Dr. Fauci has stated "[t]he public understandably has been concerned about reports of rare, severe allergic reactions to the Moderna and Pfizer-BioNTech COVID-19 vaccines." https://www.webmd.com/vaccines/covid-19-vaccine/news/20210408/nih-looking-into-rare-allergic-reactions-to-covid-vaccines (last visited May 7, 2021).  Should this Court agree that John should be sentenced as requested herein to probation with a condition of home confinement, he will not have to make the Hobson's choice of risking severe allergic reaction to the vaccine and the potential deleterious health effects that would arise *or* risking exposure to COVID-19 in prison and the attendant potential severe health consequences of being a person with a heart condition who contracts the virus.

25

### b.      The Nature and Circumstances of the Offense

As set forth above, the offense for which John is to be sentenced is a technical crime focused **not** on whether he reported all the relevant non-cash income from the house renovations and paid all tax due on that non-cash income but rather on the **timing** of a small portion of the reporting and payment.  The public was not harmed by John's crime, particularly where he has paid the entirety of the taxes that he owed (and likely a lot more) with his 2019 tax filing.[4] Therefore, the nature of the offense also supports imposition of a non-incarceratory sentence.

### 2.      Section 3553(a)(2): The Need for the Sentence Imposed

In Section 3553(a), Congress made it clear that courts shall impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a)(2).  *See Kimbrough*, 552 U.S. at 101.  The purposes of sentencing, as set forth in Section 3553(a)(2), include ensuring that a sentence: (1) reflects the seriousness of the offense, promotes respect for the law, and provides just punishment; (2) affords adequate deterrence to criminal conduct; (3) protects the public from further crimes of the defendant; and (4) provides the defendant with needed training or treatment.  Each of these purposes are served by imposing a sentence of probation with a condition of home confinement and community service.

Respect for the law and deterrence from future criminal conduct are more than adequately afforded by a probationary sentence with a condition of home confinement and community service.  John's high profile arrest and indictment, along with the intense and sensationalized media coverage associated therewith, have already served as a sufficient deterrent.  Indeed, John has already been punished and suffered substantially as the Government

---

[4] The PSR erroneously asserts that John amended or corrected his tax returns after being indicted. *See* PSR ¶ 110. John was indicted in December 2019 *before* the tax year 2019 was even over and long before tax returns for 2019 were due.  John simply made payments and filed tax returns for 2019 when due.

(and of course, the resulting press) continues to falsely label him as a Mafia associate – a

moniker that had caused him tremendous stress, cost him friendships, respect in the community,

employment prospects and more.  Indeed, despite the fact that John plead guilty to filing a false

tax return by virtue of reporting a small amount of non-cash income in the wrong tax year, the

Government issued a press release entitled "Captain and 10 members and Associates of Gambino

Crime Family Plead Guilty . . ." not so subtly implying that John admitted being an associate of

organized crime when of course, **John admitted no such thing as it simply is not so**.  *See*

*https://www.justice.gov/usao-edny/pr/captain-and-10-members-and-associates-gambino-crime-*

*family-plead-guilty-crimes* (last visited May 6, 2021).[5]

      Furthermore, imposing a sentence of imprisonment here would reach far beyond the need

to provide just punishment due to the severe conditions of confinement currently imposed during

the COVID-19 pandemic.  Specifically, all prisoners who enter a BOP facility during the

pandemic are required to first quarantine **both** at the start and end of their incarceration.

Declaration of Joel Sickler dated June 1, 2021 ("Sickler Dec."), ¶ 7.  The current standard length

of quarantine is three weeks on each end.  Thus sentencing a defendant to a prison term means

the imposition of **six weeks** or more of incredibly serious punishment conditions.  *Id.* ¶ 11.  As

Mr. Sickler notes, "prisoners held in quarantine are almost always housed in an isolation cell in

the facility's Special Housing Unit (also known as the "SHU" or the "hole").  Such housing is, in

essence, solitary confinement."  *Id.* ¶ 8 (describing SHU cells as generally 8 x 10 feet, with no

windows except for a small, wire mesh window on the door, to permit observation of the

---

[5] The probation department asserts that a prison sentence is necessary to achieve deterrence due to John's prior
conviction.  For all the reasons stated herein, we respectfully disagree.  Specifically, it is worth noting that the
rationale espoused by probation was rejected in *United States v. Park*, 12 Cr. 344 (FB) (E.D.N.Y. October 3, 2014),
where the Court sentenced Park, who was convicted of a tax crime, to a term of probation despite the amounts at
issue being exponentially larger in that case than John's and the fact that Park had been previously convicted of and
served prison time for mail fraud and conspiracy to commit mail fraud in a case that involved investor losses of $7
Million (also exponentially larger than the amounts at issue in John's prior case).  *See Id.*, Dk. 20 & 21.

prisoner).  Prisoners held in the SHU are kept isolated in their cells 24 hours a day, 7 days a

week, except for, on average, three 15 minute periods for showers.  Thus, prisoners are typically

in their 8x10 cell for 167.25 of the 168 hours in a week.  *Id ¶* 8.  To make matters worse,

prisoners in quarantine often do not get medical screening or access to the their medication and

all too often are left in isolation not only without human contact but without books or other items

with which to occupy their time.  *See Id.* ¶¶ 9-10.

As noted above and as the Court is aware, the sentence to be imposed should be no

greater than necessary to accomplish the goals of the sentencing statute.  *See Kimbrough*, 552

U.S. at 101.  We respectfully submit that such difficult conditions and punishment is far more

than necessary and rather probation with a condition of strict home confinement and community

service is sufficient to accomplish the goals of the sentencing statute.

There is also no need to protect the public from John.  With very limited exception, he is

a law-abiding citizen of strong moral character who time and again goes out of his way to help

friend and stranger alike, thereby demonstrating that there is no need to imprison him in order to

prevent him from committing crimes in the future.  This is bolstered by the fact that the public

was not harmed by John's crime.  John's crime really boils down to the timing of his tax

payments, not whether the payment was actually made since, as set forth above, John paid the

entirety of the taxes owed (and likely more) with respect to the renovations on his residence.

With respect to the need for treatment, there is no need to burden the prison system with

John's various health conditions, which are best suited for monitoring and care through the

doctors and routines that he has established at home.  Moreover, as noted above, were he

sentenced to a term of incarceration and subjected to the mandatory quarantine, there is a serious

28

risk that John would not get the access to medical care or even the typical routine medical evaluation.  Sickler Dec. ¶ 10.

John is also not someone in need of educational or vocational training, or other correctional treatment.  If anything, the opposite is true.  John possesses the ideal combination of charitable disposition and skills that allow him to provide value through community service.  If a non-incarceratory sentence were imposed, John would be able to continue providing resources to the less fortunate, *inter alia,* by donating resources and time to his local church and community. John would also be able to continue to mentor and coordinate employment for those struggling and those who are just arriving in America.  As such, the combination of these factors support that a non-incarceratory sentence would adequately accomplish the purposes of sentencing.

### 3.       Section 3553(a)(3): The Kinds of Sentences Available

The offense to which John pled guilty does not preclude the imposition of a probationary sentence.  Therefore, a probationary sentence is an available option for the Court and, based on an analysis of the 3553(a) factors, that option should be imposed here.

### 4.       Section 3553(a)(4): The Advisory Guidelines Calculation

In the Plea Agreement, the Government estimated that the applicable Guidelines base offense level is 12 under U.S.S.G. §§ 2T1.1 and 2T4.1(D), with a two-level reduction for each of acceptance of responsibility under U.S.S.G. § 3E1.1(a) and global resolution under U.S.S.G. § 2K2.0, resulting in an adjusted offense level of 8.  With a Criminal History Category of II, the Government's estimate in the Plea Agreement predicts a Guidelines recommended sentencing range of 4-10 months imprisonment.

We respectfully disagree with the base Guidelines level that the Government estimated in the Plea Agreement and specifically dispute the base offense level.  The Government estimates that the base offense level is a 12 based on its allegation that the tax loss was more than $15,000.

29

However, we submit that that the temporary tax loss for the relevant year (2018) was likely in the range of more than $2,500 and less than $6,500 resulting in a base offense level of 8 under U.S.S.G.§2T4.1(B) and thus, after two point reductions for acceptance of responsibility and global resolution, the proper adjusted offense level is 4[6]. With a Criminal History Category of II, the resulting guidelines recommended range of imprisonment would be 0-6 months.

The Government bears the burden of proving, by a preponderance of the evidence, facts that support the application of the appropriate guideline range and any enhancement thereto. *See, e.g., United States v. Archer*, 671 F.3d 148, 161 (2d Cir. 2011). The Government has not and cannot meet its burden here. The legal and factual questions regarding what work for which there was no expectation to pay was sufficiently completed by the stroke of midnight on December 31, 2018 to trigger a legal tax reporting obligation *in 2018* as opposed to 2019 (a tax year for which John is not charged and for which the Government does not allege any underreporting or underpayment) are legion and hardly amount to the Government satisfying its burden of proof as the proper guidelines level. John admits and takes responsibility for consciously avoiding a likely obligation to report and pay some tax related to 2018, the Government simply has not met its burden of proving the higher amounts that would drive the guideline level to the one they assert should apply.

The PSR, for its part, provides no legal authority for its calculation of the alleged underreported income in 2018 and precious little factual authority, if any.[7] █████████████

---

[6] Under U.S.S.G. § 2T1.1(c)(1)(A), the tax loss under the guidelines is to be computed as 28% of the unreported income. Thus, as long as the unreported income (i.e., the value of the work that reached some as yet undetermined legal threshold for completion by December 31, 2018 *and* for which John knew contractors would not be paid) was less than $23,214, then the tax loss under the guidelines would be under $6,500 and the base offense level would be 8, not 12 and the final guidelines level after acceptance and global resolution would be 4.

[7] Since the material that the PSR appears to rely upon is stamped "Protected Witness Discovery Material", in an exercise of caution, the argument regarding this point is redacted from the public filing. Of course, we will be happy to provide the underlying material to the Court should the Court direct but we doubt the Government will contest the assertions about the material made herein.

AFDOCS/23856509.3



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

When one combines (a) the weakness of the alleged evidence of amount of income that should have been reported in 2018 instead 2019 (when it was reported) with (b) the legal uncertainty of how to determine what portion, if any, of construction work on a home done as part of a sizable renovation reaches a level by December 31 that requires reporting in the current tax year rather than the tax year when the project is completed (*i.e.*, 2018 instead of 2019), the result lays bare that the "proof" of the higher guideline level asserted by the Government is severely lacking and surely far short of meeting their burden of proof.

Irrespective of whether the Court finds that the advisory guidelines for John's consciously avoiding learning that some tax was likely due in 2018 rather than 2019 recommends a sentence of 0-6 months as we contend or 4-10 months as the Government contends, we submit that the totality of the 3553(a) factors warrant a non-incarceratory sentence, specifically a sentence of probation with a condition of strict home confinement and community service.

### 5. Section 3553(a)(6): The Need to Avoid Unwarranted Sentencing Disparities

A non-incarceratory sentence would not cause sentencing disparities between John and similarly-situated individuals. To the contrary, imposing a term of imprisonment would cause such a disparity. Non-incarceratory sentences routinely have been imposed on defendants who have committed far more severe, tax-related crimes with tax losses many multiples greater than even the Government's alleged and disputed tax loss figure. Indeed, in *United States v. Yun*, 1:19-CR-00131 (AMD), this Court sentenced the defendant to two years of probation after he plead guilty to willful failure to collect and pay ***over $600,000*** in employment tax. Thus, the amount at issue in *Yun* was approximately ***forty times greater*** than the amount the Government contends (and almost ***100 times greater*** than we contend) John failed to pay on time related to the renovations on his home.[8]

*United States v. Park,* 12 Cr. 344 (FB) (E.D.N.Y. October 3, 2014), provides another telling example. In *Park*, Judge Block, the District Judge who had presided over this case until it was transferred to Your Honor after the guilty plea hearings, rejected the Government's request

---

[8] *See also United States v. Scott*, 1:16-CR-00034 (AMD) (this Court sentenced three defendants to time served and supervised release after each plead guilty to conspiracy to commit bank fraud and/or bank fraud, a crime involving a monetary value of $245,000, an amount many multiples higher than the disputed tax loss the Government alleges here).

for an incarceratory sentence and instead imposed a sentence of three years' probation where (a) the tax loss was stipulated to be between $80,000 and $200,000 (thus, even at the low end of that range an amount *five times* greater than even the Government contends is at issue here and approximately *fifteen times* the amount we contend is at issue) *and* (b) the defendant had been previously convicted of and served prison time for mail fraud and conspiracy to commit mail fraud in a case that involved investor losses of $7 Million. *Id.,* Dk. 20 &21.

*United States v. Nikc*, 20 CR. 00173 (NSR) (S.D.N.Y. 2020), Dk. 18 & 22, is also instructive. In *Nikc*, the court sentenced the defendant to probation with condition of home confinement despite his having plead guilty to concealing income over a *four year period* of time and admitting to failing to pay tax due of *$395,745*. John's case, which involves only one tax year and, even under the Government's calculations, a tax loss of hundreds of thousands of dollars less than that at issue in *Nikc*, should not result in a disparately higher sentence. *Yun, Park and Nikc* are hardly the only relevant examples. There are many other cases in which tax defendants whose crimes involved exponentially more tax than involved in John's case received probationary sentences. *See, e.g., United States v. Shokler*, No. 12-CR-415 (JBW), 2013 WL 4851695 (E.D.N.Y. Sept. 10, 2013) (sentencing defendant to *two years' probation* after he pled guilty to a 6-count indictment, including to one count of aiding in filing false tax returns related to a *tax loss of over $592,000*); *United States v. Villela*, No. 07 Cr. 287-02 (RWS), 2007 WL 2845290 (S.D.N.Y. Sept. 25, 2007) (sentencing defendant to *60 months' probation* after he pled guilty to one count of tax evasion related to *a tax loss of $111,000*); *United States v. Floyd*, No. 1:10-CR-00309 (VM) (S.D.N.Y. Apr. 2, 2013) (sentencing defendant to *three years' probation* after he pled guilty to one count of conspiracy to defraud the IRS related to a *tax loss of $103,829*); *United States v. Taffaro*, 919 F.3d 947 (5th Cir. 2019) (upholding a sentence of 60

AFDOCS/23856509.3

months' probation for defendant who was convicted at trial of six counts of tax evasion, five counts of filing false income tax returns, and one count of failing to file a tax return); *see also United States v. Cohen*, 19 CR. 741 (WHP) (S.D.N.Y. 2020) Dk. 44 & 47 (imposing probationary sentence in securities fraud case involving $260,000 loss amount and stipulated guidelines range of 30-37 months imprisonment).

A sentence of probation with a condition of strict home confinement and community service will be sufficient to satisfy the goals of the sentencing statute and will avoid unwarranted sentencing disparities.

### 6. Section 3553(a)(7): The Need to Provide Restitution

The Plea Agreement provides that restitution shall be made in "the full amount of each victim's losses as determined by the loss to the International Revenue Service as determined the Court." However, John has paid the all of (and probably more than) the tax owed in connection with unearned income in the form of unpaid improvements made to his home. Indeed, as the PSR notes, the Government has confirmed that John has paid restitution in full. PSR ¶ 206.

### B. The 3553(a) Factors[9] Demonstrate That a Probationary/Non-Incarceratory Sentence Should be Imposed

Society will not be safer if John is imprisoned. If anything, the opposite is true. A good man made a mistake, has expressed remorse, and is committed to making amends. Given the nature of the crime, the severe health risks and level of punishment (including substantial solitary confinement) inherent in incarceration today, and the many defendants given non-incarceratory sentences for much larger and long-lasting tax offenses, no more than a probationary sentence

---

[9] 18 U.S.C. § 3553(a)(5) regarding policy statements does not provide substantial information related to John and thus is not evaluated in detail herein.

with a condition of strict home confinement and community service is necessary to effectuate the goals of the sentencing statute.

## Conclusion

For the foregoing reasons, we respectfully request that the Court impose a sentence of probation with a condition of strict home confinement and community service.

Dated: June 2, 2021

Respectfully submitted,

ARENT FOX LLP


By: s/Glenn Colton
Glenn C. Colton
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
Tel: (212) 484 3900
Fax: (212) 484-3990
glenn.colton@arentfox.com

*Attorneys for Defendant John Simolacaj*

AFDOCS/23856509.3