U.S. Department of Justice

United States Attorney
Eastern District of New York

KDE/KCB
F.#2015R00270

271 Cadman Plaza East
Brooklyn, New York 11201

June 9, 2021

By ECF and E-mail

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. John Simonlacaj
                Criminal Docket No. 19-575 (AMD)

Dear Judge Donnelly:

      The government respectfully submits this letter in advance of the defendant John Simonlacaj's sentencing, which is scheduled for June 16, 2021, at 10:30 a.m. In light of the factors set forth in 18 U.S.C. § 3553(a), the government requests, in accordance with the recommendation of the Probation Department, that the Court impose a sentence of 10 months' imprisonment and a fine of $20,000.

I.    Background

      "This will never happen again." That is what the defendant promised the Honorable Vincent L. Briccetti, United Stated District Judge for the Southern District of New York, on September 16, 2016, at his sentencing for aiding and abetting the filing of a false tax return. (See Ex. A (Sept. 16, 2016 Sentencing Tr.), at 53)). The defendant claimed he was "ashamed of what [he] did" and needed to "apologize" to both the court and the government. (Id.). In light of all the facts and circumstances of that case, Judge Briccetti sentenced the defendant to just three months' imprisonment, well below the 12-to-18-month Guideline range.

      As it turns out, it did happen again, and then some. On January 12, 2021, Simonlacaj pleaded guilty to Count 21 of the above-referenced indictment for knowingly and intentionally failing to declare as income free work performed on his residence by, among others, CWC Contracting Corp. ("CWC"), a carpentry company operated by Gambino organized crime family captain Andrew Campos that had extensive business with Simonlacaj's

then-employer (described in the Presentence Investigation Report ("PSR") as "Construction Company #1").

Specifically, beginning at least as early as 2016 and through 2019, CWC, together with others, performed free work – including the provision of labor, materials, and rental and delivery of equipment – at Simonlacaj's residence in Scarsdale, New York, the value of which totaled over $100,000. (See PSR ¶ 49). Of this amount, approximately $56,000 in work was completed in calendar year 2018 and not declared as income in Simonlacaj's March 2019 filing. For instance, as part of this scheme, Mark "Chippy" Kocaj, a principal of CWC and co-defendant and relative of Simonlacaj, directed a subcontractor (the "Owner") to perform work at Simonlacaj's residence, which he did in 2018. Kocaj told the Owner to bill CWC for this work by providing an invoice that falsely stated it was related to a construction project managed by Construction Company #1 on which CWC worked. (PSR ¶ 51). The Owner was paid for this work by, among other things, two $20,000 checks issued by CWC dated October 31, 2018, and November 28, 2018. (See id.).

These extensive, free benefits were not an unreported gift from the Gambino crime family to their friend, Simonlacaj. These benefits were not undeclared income from a side business or a payment to someone in need. Rather, they were bribes – extensive in-kind benefits to Simonlacaj, then Construction Company #1's Managing Director for Development, calculated to secure and maintain Simonlacaj's support for CWC, in violation of Simonlacaj's fiduciary duties to his employer.[1] See generally United States v. Skelos, 988 F.3d 645, 655 (2d Cir. 2021) (explaining that to prove an illegal quid pro quo, the government "does not have to prove an explicit promise to perform a particular act made at the time of payment so long as the general nature of the act to be taken was understood at the time of the payment" (internal citation marks omitted)).

Indeed, while the free work on Simonlacaj's house was being performed, CWC principals often commented about how they enjoyed special privileges with Simonlacaj and Construction Company #1. In fact, CWC secured multiple projects with Construction Company #1, so many that Campos directed that they form a new corporation, Eastern Interiors LLC (nominally operated by co-defendant and Gambino crime family soldier James Ciaccia) to avoid the appearance of having so many projects with the same company. (PSR ¶ 39). As Kocaj recounted in a lawfully recorded conversation on November 8, 2018, "What do you think I am around for? If it was not for my cousin [i.e., Simonlacaj] you guys would not be where you are today. . . . . When this company started it started because of me." (PSR ¶ 55).

---

[1] As explained herein and in the PSR, the government's decision to permit Simonlacaj to plead guilty to one of the two charged offenses as part of a global disposition is not "a recognition that the Government could not prove that count at trial." June 2, 2021 PSR Obj. Ltr. at 1. As the government stated at the plea proceeding for Kocaj, who pleaded guilty to the wire fraud conspiracy in which Simonlacaj was also charged, this offense included "fraudulently paying for work that was performed at the residence of an employee of Construction Company Number 1." (Ex. B, Jan. 15, 2021 Plea Hr'g Tr. at 59).

And there are multiple instances in which Campos, Kocaj and co-defendant (and Gambino crime family soldier) Vincent Fiore sought Simonlacaj's assistance in, among other things, securing payment and approving change orders, which Simonlacaj did – including while the free work at the home was being performed. (See, e.g., PSR ¶¶ 55-56 (describing, among other things, a $330,000 change order for CWC's benefit dated May 3, 2019 with the notation "Per John Si," and other requests for payment to CWC, including in May 2019 in which Kocaj texted Simonlacaj, "I'm getting a lot of pressure from my office about the funding. I reached out but no one is getting back to me. Help!!!!")).

Other co-conspirators also were explicit about the illicit relationship with Simonlacaj. For instance, on January 31, 2019, in a recorded conversation, Fiore, one of the principals of CWC, spoke with another individual about obtaining work and bragged about the illicit relationship they had with Simonlacaj. Fiore stated, "I'll bring Mark [i.e., Kocaj] with me, his name is Chippy, he's uh, the cousin, so you know but keep it to yourself, the cousin of [Construction Company #1], this director, John [i.e., Simonlacaj]. There's a beautiful in there. There's things we can do with Chippy there, he whispers what he needs to whisper and we get things done." (PSR ¶ 54).

Fiore also described the free benefits being provided to Simonlacaj. In another conversation on March 2, 2019, Fiore complained about Campos's decision to agree to do more work at a Construction Company #1 project, stating, "I don't give a fuck what John [i.e., Simonlacaj] say, he don't give a fuck, he gets his, win, lose or draw. He gonna give it back if we lose? He gonna say sorry guys, you lose, throw it in?" And Simonlacaj himself made clear the importance of the work being performed on his home, writing in a text message to Kocaj, "Please tell Benny [i.e., co-defendant Benito Dizenzo who performed much of the work] stop crying all the time. Need to finish. This is my house not a fucking job site tell him. Or will just call someone else he he [sic] can go fuck himself." (PSR ¶ 52).

As noted above, CWC's performance of work on Simonlacaj's residence was not legitimate work, and as such, CWC did not have a project on its books that referred to Simonlacaj's residence. Rather, CWC, including Campos, Fiore, Kocaj and others, fraudulently accounted for the expenditures by claiming that they related to legitimate Construction Company #1 projects. For instance, on March 15, 2019, Fiore told Campos that CWC owed money to a subcontractor for "John Si's house." (PSR ¶ 57). Later that day, Fiore told a co-conspirator to fraudulently account for the payments on CWC's books, stating, "I just got off the phone with Andrew [Campos] a couple minutes ago. . . . [The street of Simonlacaj's residence. The subcontractor's] owed eight days over there. . . . Put that against [i.e., account for it as an expenditure related to] 76 11[th Avenue, a project managed by Construction Company #1]. Chippy knows about that as well. That's, um, John Si's house." (Id.) In addition to proving that CWC committed tax fraud by accounting for these costs as legitimate business expenses, this also shows the illegality of the scheme – the benefits to Simonlacaj had to be hidden so as not to appear in its financial statements.

3

If there were any doubts as to the true nature of the benefits provided to Simonlacaj, Kocaj eliminated them in a recorded conversation on February 25, 2019, with another individual ("Individual-1"):

| | | |
|---|---|---|
| Individual-1: | | Who did all the work up there [i.e., at the Simonlacaj residence]? Did we do it? |
| Kocaj: | | We did it. |
| Individual-1: | | Who, Benny [i.e., co-defendant Benito Dizenzo]? |
| Kocaj: | | Benny. And your guys. |
| Individual-1: | | My guys? |
| Kocaj: | | [Unintelligible ("UI")] and all them. |
| Individual-1: | | I thought they were at Larkin [Plaza, another CWC project]? |
| Kocaj: | | No, they took them there. A couple days here and there. They know, Andrew [i.e., Campos] knows. |
| Individual-1: | | I'm sure he knows. |
| Kocaj: | | Right . . . [UI] pay for it. |
| Individual-1: | | Who paid for it, him? He [Simonlacaj] paid for it out of his own pocket? |
| Kocaj: | | No, he put it – he made him put a change order in. |
| Individual-1: | | Oh. |
| Kocaj: | | I'm just saying, he didn't have to do that. It should have been pro bono. |
| Individual-1: | | Right. |
| Kocaj: | | Write it off. |
| Individual-1: | | I guess. |
| Kocaj: | | They do 50 million a year in business. No? |
| Individual-1: | | Right, worth 200 grand. |
| Kocaj: | | Whatever, a hundred, hundred and fifty, whatever it was. You don't think it's worth it to do some of the paperwork? |
| Individual-1: | | He had to do it with everybody. |
| Kocaj: | | Yea. |
| Individual-1: | | So he got it for free. I can't even get a fucking, I can't get [materials from the Owner's company]. |
| Kocaj: | | Even [the Owner's materials], 50,000. |
| Individual-1: | | [The Owner] paid for it? |
| Kocaj: | | No. . . . put in a change order. |

(PSR ¶ 50). In other words, Kocaj confirmed that it was "worth it" for CWC to perform "a hundred, hundred and fifty" thousand dollars in free work at Simonlacaj's residence because Construction Company #1 does "50 million a year in business." In fact, Kocaj admitted that the work performed by CWC should have been done "pro bono," i.e., paid for by CWC but instead that Simonlacaj directed that the work was to be fraudulently paid for by Construction Company #1 through a "change order," i.e., an adjustment to the contract for work purportedly performed by CWC on a legitimate Construction Company #1 project.

4

Simonlacaj was arrested on December 6, 2019. Thereafter, in August 2020, Simonlacaj took it upon himself to approach a possible witness in this case, the Owner described above, with sensitive material disclosed pursuant to Federal Rule of Criminal Procedure 16. Simonlacaj stated, in sum and substance, that he (Simonlacaj) did not believe the Owner had been paid for the work the Owner performed at his house – which had been completed two years prior and which the Owner had been paid for by CWC – and offered to pay the Owner. The Owner demurred and referred Simonlacaj to his counsel. (See PSR ¶ 51).

II.     Applicable Law

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220, 258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III.   Guidelines Analysis

   A.   The Government's Estimate of the Guidelines

The government respectfully submits that the PSR's calculation of the Sentencing Guidelines is correct. Specifically, approximately $56,000 in free work that was paid for and performed in 2018 and undeclared on Simonlacaj's tax return corresponds to a tax loss of at least $15,000 and a base offense level of 12. See U.S.S.G. §§ 2T1.1(a)(1), 2T4.1(d). Two points are removed for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a), which would yield a total offense level of 10 and a Guidelines range of 8 to 14 months in prison as Simonlacaj is in Criminal History Category II from his prior tax conviction. As all the defendants pleaded guilty pursuant to a global agreement, the government agreed to request that the Court provide another two-level reduction pursuant to U.S.S.G. § 5K2.0, resulting in a final offense level of 8 and a Guidelines range of 4 to 10 months' imprisonment.

   B.   The Defendant's Objections to the Presentence Report and the Guidelines Calculation

In his June 2, 2021 letter to the Probation Department and his sentencing submission to the Court, see ECF Dkt. No. 300, Simonlacaj offers a litany of objections to the PSR, which the government categorizes and addresses below:

   1.   Context for the Case and Allegations Relating to Co-Conspirators

Simonlacaj objects to wide swaths of the PSR that describe co-defendants' crimes in which Simonlacaj did not participate, as well as allegations regarding the Gambino crime family. See June 2, 2021 PSR Obj. Ltr at 1-3. Of course, the government does not argue that the defendant should be sentenced for crimes he did not commit. But allegations relating to Simonlacaj's co-defendants – including Campos, Fiore, and Kocaj, with whom Simonlacaj was charged in Count Sixteen relating to the scheme to defraud Construction Company #1, and to which Kocaj pleaded guilty – provide proper context for the Court to consider in imposing sentence. At a minimum, Simonlacaj's conscious choice to do extensive business with members of the Mafia – and therefore a description of what the Gambino crime family is and how it operates – are relevant facts for this court to consider under 18 U.S.C. § 3553(a).[2]

---

[2] For the same reasons, Simonlacaj's overwrought complaint about the government's press release announcing the guilty pleas in this case – describing how a captain and 10 member and associates of the Gambino crime family were convicted – is simply off-base. See Def. Sentencing Mem. at 26-27 (complaining that the "Government (and, of course, the resulting press) continues to falsely label [Simonlacaj] a Mafia associate" because the press release "not so subtly impl[ied] that [Simonlacaj] admitted being an associate of organized crime when of course, ***John admitted no such thing as it simply is not so*** (bold and italics in original)). Simonlacaj's eleven co-defendants were alleged in the indictment to be a captain, soldier or associate of the Gambino crime family; the press release headline reported that those

2. Aliases

Simonlacaj also object to the "alias" section of the PSR, which reports that Simonlacaj was referred to as "John Si" and "Smiley" because "there is no evidence he uses those or any aliases." June 2, 2021 PSR Obj. Ltr. at 2. Whether or not Simonlacaj refers to himself by these names, others, including co-conspirators, clearly do, and therefore this is appropriate. (See, e.g., PSR ¶¶ 53, 56-57.)

3. Use of Fraudulent Invoices to Pay for Work

In both his PSR objection letter and his sentencing submission, Simonlacaj challenges the fact that Owner submitted a fraudulent invoice to be paid for work he performed at Simonlacaj's residence, for which the Owner was paid in two checks issued in 2018 (and therefore justifying the tax loss of at least $15,000). See June 2, 2021 PSR Obj Ltr. at 3-4; Def. Sentencing Mem. at 30-31. None of Simonlacaj's arguments have merit.

First, Simonlacaj claims that these facts (and the others relating to the fraud scheme described above and in the PSR) are categorically irrelevant because "they relate to an alleged crime that is to be dismissed at sentencing." June 2, 2021 PSR Obj. Ltr. at 3. Although Simonlacaj can challenge facts in the PSR, it is axiomatic that uncharged and even acquitted conduct, particularly crimes related to the offense of conviction, can and should be considered by a court at sentencing. See, e.g., United States v. Gotti, 767 F. App'x 173, 174-75 (2d Cir. 2019) ("[A] district court may consider acquitted conduct at sentencing." (citing United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that "district courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct" (internal citations omitted))); see also 18 U.S.C. § 3661 (expressly providing that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"). Simonlacaj's attempt to preclude the Court's consideration of such facts runs afoul of well-settled law.

Second, Simonlacaj's factual arguments are unpersuasive. Simonlacaj claims that the PSR "assumes without any support that those checks [from CWC to the Owner's company] relate to John's residence." Def. Sentencing Mem. at 31. But the PSR sets forth this as a fact, which the government can prove by a preponderance of the evidence. The PSR does need not delineate all the evidence that can be marshaled to prove that fact. Suffice it to say that, should Simonlacaj press his factual objection to this statement, the government can

---

individuals (and not Simonlacaj, the twelfth defendant) pleaded guilty. In any event, Simonlacaj's years-long business and personal relationship with the likes of Andrew Campos and Vincent Fiore, two well-known, long-time inducted members of the Gambino crime family with prior federal convictions and who have since admitted their membership in the Mafia by their guilty pleas in this case, is beyond dispute.

7

provide evidence, including, among other things, testimony, to show that, at Kocaj's direction, the Owner was paid for his work at Simonlacaj's residence by providing the referenced fraudulent invoice that resulted in the two 2018 checks—testimony that is amply corroborated by, among other things, the numerous lawfully recorded conversations excerpted above and in the PSR.

Simonlacaj's other factual challenges fail to acknowledge that the invoice was purposely fraudulent. So of course the invoice and the resulting checks do not explicitly reference Simonlacaj's residence and instead refer to other raw materials relating to an actual Construction Company #1 project.[3] This does not "cast[] further doubt" that the invoice related to Simonlacaj's residence, Def. Sentencing Mem. at 31, but instead is proof of how the scheme sought to conceal the fact that CWC was providing benefits to Simonlacaj and how they were to be paid for. Further, Simonlacaj incorrectly doubts that the "raw materials for kitchen cabinets alone would cost almost $50,000 – the approximate amount of the invoice tied to the $20,000 checks – thereby raising serious doubt that all that material was used in the Simonlacaj kitchen just to build some cabinets." Id. The invoice covered, among other things, all of the Owner's work at Simonlacaj's residence, both labor and materials. This work was falsely listed as solely raw materials relating to another project so as to conceal the nature of the payments.

Finally, Simonlacaj's reliance on internal investigations conducted by Construction Company #1 and an associated construction manager do not provide much, if any, probative value. Simonlacaj does not describe, nor is the government aware, of what specific steps these companies claim they took to try to identify specific harm. Regardless, these private companies do not have access to the same evidence as the government (and now the Court), including the recorded conversations and seized communications described above demonstrating that the purpose of the free work performed on Simonlacaj's home was not out of any personal affinity but instead to secure his official support as Managing Director of Construction Company #1. (See, e.g., PSR ¶ 54 (statement of Fiore that there's a "beautiful in" with Simonlacaj at Construction Company #1 and that Kocaj "whispers what he needs to whisper and we get things done"), ¶ 50 (statement of Kocaj that Simonlacaj directed that a change order be put in to pay for the work but that it should have been "pro bono")).

Tasked with reviewing invoices that are fraudulently crafted so as to obscure their true purpose – such as the invoice purporting to be for work performed at a Construction

---

[3] By contrast, the records that do explicitly reference Simonlacaj's residence were internal records of the Owner's and therefore did not have to be fraudulently accounted. (That these records reference Simonlacaj's residence is proof that the Owner did in fact perform work at the residence, which is not in dispute.) The invoice, by contrast, which falsely stated that it related to a Construction Company #1 project, could not reveal the true nature of the payments without revealing the existence of the fraudulent scheme because it was to be submitted to Construction Company #1 to be paid for as a "change order," as Kocaj stated during a recorded conversation. (PSR ¶ 50).

8

Company #1 project but instead was used to pay the Owner for work done at Simonlacaj's residence – the failure to pinpoint such fraudulent charges actually paid out in a multi-million dollar project does not "speak[] volumes," as Simonlacaj claims. Def. Sentencing Mem. at 22. It instead shows how the defendants were able to conceal the nature of the payments from their intended victim. And the government's decision not to prove that Construction Company #1 actually sustained financial harm should not materially affect the Court's calculus as (a) Simonlacaj's crime of conviction, filing a false tax return, does not allow for restitution to Construction Company #1, and (b) the conspirators certainly intended there to be loss to Construction Company #1, as reflected by, among other things, Kocaj's guilty plea to Count Sixteen, with which Simonlacaj was also charged.

4. Simonlacaj's Visit to the Owner in August 2020

Simonlacaj also purports to clarify an "improper impression" from the PSR's description of his visit to the Owner in August 2020, which is set forth in paragraph 51 of the PSR. June 2, 2021 PSR Obj. Ltr. at 3. As the PSR states, and which Simonlacaj does not appear to factually dispute, in August 2020, without counsel present, Simonlacaj visited the Owner "on multiple occasions" and showed the Owner records relating to his company that had been provided to Simonlacaj as discovery pursuant to Federal Rule of Criminal Procedure 16 (and marked as the most sensitive material that was not to be taken out of Simonlacaj's home by him). PSR ¶ 51; see ECF Dkt. No. 158 (defense letter filed on consent of the government, which was later endorsed by the Court, providing that "Protected Witness Discovery Material" may only be reviewed by defendants outside of the presence of counsel "in their personal residences" and may not be "cop[ied] . . . nor share[d] with, or disseminate[d] to, any other person"). During these conversations, Simonlacaj told the Owner, in sum, substance and in part, that he (Simonlacaj) "did not believe the Owner had been paid for the work performed at the Simonlacaj Residence (although the Owner had) and offered to pay the Owner." (PSR ¶ 51). The Owner demurred and ultimately referred Simonlacaj to the Owner's counsel.

Through counsel, Simonlacaj now claims that, "aware that the Government was basing the alleged amount of tax underpaid in 2018" in part on the work performed by the Owner's company, his "main reason for the visits" was to obtain the company's records related to any work performed at his residence. June 2, 2021 PSR Obj. Ltr. at 3. This is nonsensical. Simonlacaj had been provided with dozens of pages of records relating to the Owner's company in discovery and went to the Owner offering to pay for the work done – which had been completed and paid for (by CWC) nearly two years prior. In fact, the whole basis for Simonlacaj's guilty plea is that he understood that he did not have to pay for the work performed at his house (which was income for him), rendering his offer to pay for the work in August 2020 illogical. If Simonlacaj really wanted additional records, then his counsel could have sought a subpoena or made such a request. There was no legitimate reason, however, to offer to pay the Owner additional money for work previously performed if the "main reason" was simply to obtain records. And certainly there was no legitimate reason for Simonlacaj to do so on his own without counsel or even an investigator present, unannounced, and while possessing sensitive discovery material. That the Owner and his counsel thereafter did not

9

voluntarily comply with additional requests speaks more to the true nature of Simonlacaj's intent rather than "cast[] doubt on the supposed tie between two vague checks and Mr. Simonlacaj's residence." June 2, 2021 PSR Obj. Ltr. at 3.

        5.      Simonlacaj's Payment of Taxes Before and After the Indictment

Throughout his sentencing submissions, Simonlacaj repeatedly downplays the nature of his crime, calling it an issue of timing in failing to report a "small" amount of income incurred in 2018. E.g., Def. Sentencing Mem. at 26 ("[T]he offense for which John is to be sentenced is a technical crime focused ***not*** on whether he reported all the relevant non-cash income from the house renovations and paid all tax due on that non-cash income but rather on the ***timing*** of a small portion of the reporting and payment." (bold and italics in original)). Simonlacaj goes so far as to dispute that the amount of his income in tax year 2018 "was 'substantially greater' than reported." June 2, 2021 PSR Obj. Ltr. at 4 (quoting PSR ¶ 110). This approaches, if not constitutes, a failure to fully accept responsibility for his actions, and it is directly contradicted by Simonlacaj's sworn statement at his plea proceeding:

> THE COURT:    Mr. Simonlacaj, Count 21 charges you that on approximately March 15th of 2019, you and others knowingly and willfully made and subscribed a false and fraudulent 1040 for the tax year 2018 that was made under the penalties of perjury and filed with the IRS in which you falsely reported a total income of $534,915 when, as you knew, <u>your total income was substantially greater than that amount</u>. Did you, in fact, commit those acts?
> 
> DEFENDANT
> SIMONLACAJ:    Yes, Your Honor.

(See Ex. C, Jan. 12, 2021 Plea Tr. at 47 (emphasis added); see also Ind. ¶ 106 (alleging that the defendant "did knowingly and willfully make and subscribe a false and fraudulent Form 1040 for the tax year 2018 . . . which tax return SIMONLACAJ did not believe to be true and correct as to one or material matters, in that the return falsely reported a total income of $533,915, whereas, as SIMONLACAJ then and there well knew and believed, his total income was <u>substantially greater than the reported amount</u> (emphasis added))). Therefore, unless Simonlacaj's prior sworn statements to Judge Mann were incorrect and he now claims he did not commit the elements of the offense alleged in the indictment, Simonlacaj should not be heard to complain that his income in tax year 2018 was "substantially greater" than actually reported.

Simonlacaj also repeatedly argues that the offense of conviction is not terribly serious, and he should not be imprisoned, because he ultimately paid all the taxes owed in

2020—after the indictment was returned in December 2019. See, e.g., Def. Sentencing Mem. at 26 & n.4 (stating that the PSR "erroneously asserts that John amended or corrected his tax returns after being indicted"). To be sure, Simonlacaj was not required in December 2019 to report the full value of his income in tax year 2019. But Simonlacaj appears to argue that he intended all along to report the full amount of the free work on his home – worth well over $100,000 – in 2020 and was simply mistaken that some of this was reportable for tax year 2018 and therefore should have been declared in 2019. This too defies logic.

For one thing, there is no indication that, absent the charges in this case, Simonlacaj would have reported the full amount of free work for tax year 2019 aside from the fact that he did so after being arrested and indicted. There are no text messages, recorded conversations, statements by an accountant or any other hint that, if the instant charges had not been filed, Simonlacaj would have reported the full amount of free benefits in 2020 and only would have been incorrect about how much should have been reported for tax year 2018 versus 2019. To the contrary, as described above, there is ample evidence that the free benefits were secretive, fraudulently accounted for in co-conspirators' records, and part of an illicit relationship tied to Simonlacaj's employment. All of this occurred after Simonlacaj's prior federal tax felony for aiding and abetting a false tax return. The only logical conclusion is that Simonlacaj was not incorrect about timing but instead never intended to report any of this income but, once arrested, realized it was in his best interest to do so. Therefore, Simonlacaj's repeated attempts to minimize his misconduct should be wholly rejected.

6.     <u>Prior Convictions</u>

As described above, Simonlacaj was previously convicted of aiding and abetting the filing of a false tax return. Although Simonlacaj only appears to address this conviction in a footnote, see Def. Sentencing Mem. at 27 n.5, he does not claim that it is irrelevant. He does argue, however, that his youthful offender conviction in 1987 – when Simonlacaj, then age 17, together with others, "repeatedly struck [a victim] about the head, arms, and body with bats, causing bruising to the head, legs, and back and a broken left elbow" (PSR ¶ 161) – is "irrelevant and should be stricken" because he does not have any subsequent violent (versus financial) convictions. June 2, 2021 PSR Obj. Ltr. at 5. But there of course is no rule that a criminal conviction cannot be considered by the Court after some unspecified period of time. To the contrary, the Court is to consider all facts and circumstances of the case, including the defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1); see id. § 3661. The Court is certainly able to assess the probative nature of this conviction, considering both its age and its violent nature, and apply the appropriate weight (if any). But wholesale exclusion of such conviction is improper.

7.     <u>Defendant's Purported Allergies</u>

In his submissions, Simonlacaj claims that he has a "reported penchant for significant allergic reactions and the need to use an epi-pen when such reactions occur," June 2, 2021 PSR Obj. Ltr. at 5, which supports his plea for home incarceration because he cannot

11

safely receive the COVID-19 vaccine, see Def. Sentencing Mem. at 17-18 (claiming that the vaccines "pose a much greater risk to someone who is prone to allergic reactions").

These bare assertions, without any supported medical documentation, should be rejected. Simonlacaj does not state what his allergies are – environmental, food-based, or to the ingredients in vaccines (mRNA or otherwise) – when and how often he has had to use an Epi-pen, the results of such use, and whether any medical professional believes that this supposed history renders the COVID-19 vaccines unsafe for him. Cf. Def. Sentencing Mem. at 17 (claiming Simonlacaj is "prone to serious anaphylactic allergic reactions which have at various times required that he seek immediate treatment and/or self-administer emergency epinephrine"). In fact, Simonlacaj provides a letter from Dr. Sanjay Naik, a cardiologist, who notes that if Simonlacaj were to contract COVID-19, he would be at higher risk of suffering severe complications. See ECF Dkt. No. 300-25. But Dr. Naik does not state that Simonlacaj is medically ineligible for the vaccine, and Simonlacaj's uncorroborated statements to that effect should not be credited – or at least should not be used as a basis to conclude that imprisonment is improper.

Indeed, the U.S. Centers for Disease Control and Prevention ("CDC") recommends that all adults receive the COVID-19 vaccine unless certain limited circumstances apply, including being allergic to an ingredient in the vaccine (or other similar chemicals) or having an allergic reaction to a prior vaccination. See "COVID19 Vaccines For People With Allergies," https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html. Indeed, the "CDC recommends that people get vaccinated even if they have a history of severe allergic reactions unrelated to vaccines or injectable medications—such as food, pet, venom, environmental, or latex allergies. People with a history of allergies to oral medications or a family history of severe allergic reactions may also get vaccinated." Id. And even for people in some of those categories, the CDC recommends that the individual at least consult with a doctor and/or seek out the other type of COVID-19 vaccine, not that inoculation is always inappropriate. See id. Therefore, Simonlacaj's request that the PSR include bare allegations of some type of allergic reaction is inappropriate or, in any event, does not warrant the relief sought.[4]

---

[4] Simonlacaj also quotes Dr. Anthony Fauci as purportedly "recogniz[ing] the stress that can be caused by such [allergic] reactions [to the vaccines]." Sentencing Mem. at 17-18. But Dr. Fauci's comment was made in a news release announcing the study of people who suffered a "systemic allergic reaction" or a "mast cell disorder" as a result of the COVID-19 vaccines, which are extremely rare. See, e.g., "Allergic Reactions Including Anaphylaxis After Receipt of the First Dose of Pfizer-BioNTech COVID-19 Vaccine — United States, December 14–23, 2020," https://www.cdc.gov/mmwr/volumes/70/wr/mm7002e1.htm (documenting an average of 11.1 cases of reported anaphylaxis per 1,000,000 Pfizer COVID-19 vaccines, i.e., approximately 0.001%). Dr. Fauci did not state that individuals with generic allergies should not be vaccinated, and the CDC guidance is to the contrary.

8. Other Penalties, Including Applicable Fine

The government agrees with Simonlacaj's objections to the statutory and Guidelines penalties other than incarceration, including that probation with a condition of home confinement is legally permissible (but, as argued herein, the government contends is unwarranted), and that the maximum possible fine is $100,000 and the Guidelines range for a fine is between $2,000 and $20,000 (under the government's calculation) and between $500 and $9,500 (under the defendant's).  See June 2, 2021 PSR Obj. Ltr. at 5-6.

9. Coverage Paragraph

Simonlacaj argues it is "egregious" and "blatantly erroneous" to cite the government's agreement not to further pursue the wire fraud conspiracy charge alleged in the indictment as possible grounds for a possible upward departure.  June 2, 2021 PSR Obj. Ltr. at 5.  The government defers to the Probation Department's practice to do so, especially as in some cases (although not as to this defendant), a coverage paragraph is the subject of negotiation between the parties.  In any event, and consistent with the plea agreement, the government does not move for an upward departure under the Guidelines nor does it rely on the agreement's coverage paragraph as proof of the facts asserted herein and in the remainder of the PSR.

IV. The Section 3553(a) Factors Weigh in Favor of a Sentence of Ten Months In Prison

For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 10 months' imprisonment and a $20,000 fine.  Such a sentence is appropriate given the nature and characteristics of the offenses, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public.

A. Nature and Circumstances of the Offense

The nature and circumstances of the defendant's crimes are very serious and warrant a substantial term of imprisonment.  As described above, Simonlacaj received over $100,000 in free benefits in connection with his work as Construction Company #1's Managing Director of Development.  This work was provided by CWC, a company operated by multiple members and associates of the Gambino crime family, including a captain (Campos), a soldier (Fiore), and multiple associates (including Kocaj).  CWC had substantial business with Construction Company #1, and Simonlacaj was instrumental in helping secure that work.  (See, e.g., PSR ¶ 55 (statement of Kocaj that "If it was not for my cousin [i.e., Simonlacaj] you guys would not be where you are today")).  As Fiore put it, there was a beautiful "in" with Simonlacaj, and that Kocaj could "whisper what he needs to whisper and we get things done."  (Id. ¶ 54).  Simonlacaj failed to declare that over $50,000 of the work was performed and paid for (by others) in 2018, and all indications are that he would not have declared any of these benefits as income absent the instant charges.  As there is no analogue

13

to "intended loss" under the tax Guidelines as they only account for the portion undeclared in 2018, the overall nature and circumstances of the offense warrant a significant sentence.

Accordingly, although Simonlacaj stands guilty of a tax offense, the full nature and circumstances show that his misconduct was broader, receiving illicit benefits from a subcontractor whom he supported in his employment. Such misconduct corrupts the construction industry in ways that are extremely hard to detect. By agreeing to pass along the costs of such work to Construction Company #1, even though, as Kocaj put it, it should have been done "pro bono" (PSR ¶ 50), this would cause Construction Company #1 or its investors or lenders harm. Also harmed are the American taxpayers who pay their fair share, unlike the defendant and his co-conspirators, who cheat the system to line their own pockets.

The nature and circumstances are even more serious as Simonlacaj is a wealthy man who was motivated by greed, not need. (See Ex. A at 60-61 (statement of Judge Briccetti that Simonlacaj "didn't need the money, he's given it back, he took it because he was greedy. That's what this is about. It's about greed and about screwing the rest of the populace who pays their taxes basically every two weeks")). He has a reported net worth of over $1 million, and at the time of the instant offense, was earning more than $500,000 (and later $650,000) a year. (PSR ¶¶ 184). He owns multiple properties, bank accounts, retirement accounts, insurance policies, vehicles, and jewelry. (PSR ¶¶ 187-89). He did not fail to declare a gift from a friend or income from a legitimate side business. Rather, as Simonlacaj put it himself in a text message, "This is my house not a fucking job site tell [a co-defendant]. Or will just call someone else he he [sic] can go fuck himself." (PSR ¶ 52). He failed to report a substantial amount of illicit payments that co-conspirators sought to conceal, fraudulently accounting for them on their books and in invoices seeking payments.

This misconduct occurred after Simonlacaj's prior federal tax conviction in the Southern District of New York, after he promised a federal judge that "[t]his will never happen again," further revealing the severity of the instant conduct. Indeed, he received some benefits in 2016 and, as relevant here, the charged wire fraud conspiracy began in approximately June 2018, just three months after his prior term of supervised release ended. (See PSR ¶ 162). That Simonlacaj so quickly resumed illegal activity weighs further in favor of the requested sentence.

Finally, Simonlacaj's sentence is all the more serious because it involved his receipt of bribes from the Gambino crime family, a pernicious criminal organization whose substantial influence in the construction industry and the New York City community more generally persists. Simonlacaj helped award valuable, multi-million dollar contracts and payments to CWC, thereby enriching the Mafia all while robbing the American taxpayer. (See Ex. A at 57 ("I think it is a big deal. It undermines confidence in the system. It feeds the notion that the system is rigged in favor of the rich . . . It's offensive, and appalling and just not right and there's no excuse for it.")).

Accordingly, the nature and circumstances of the offense counsel in favor of a term of imprisonment of 10 months.

14

B.  Defendant's History and Characteristics

The defendant's history and characteristics also weigh in favor of the requested sentence. Although Simonlacaj addresses his prior conviction just once, in a footnote, his inability to comport with the law so shortly after receiving a substantial break from Judge Briccetti speaks volumes to Simonlacaj's true character. Indeed, the facts and circumstances of his prior conviction are similar to those here. As Judge Briccetti explained, Simonlacaj there used his sister's company to obtain a $550,000 contract with the New York Power Authority and then caused her company to fail to pay over $400,000 in income taxes by falsely inflating expenses. (See Ex. A at 55-56). He was the "architect" and true beneficiary of the scheme and used his sister as a "nominee" to obtain the work. (Id.) And there, as here, Simonlacaj was motived by "one thing, which is personal financial gain." (Id.) The defendant's history of repeatedly violating the tax laws therefore warrants a substantial sentence, especially in light of the defendant's prior violent crime when he was 17 years old. (See PSR ¶ 161).

Simonlacaj's behavior after his arrest in this case also demonstrates why prison is appropriate. While on pretrial release, he chose to unilaterally, on multiple occasions, approach an individual whom he knew the government believed had relevant information about the charged offenses. Simonlacaj went there under the guise of offering to pay the Owner for work long ago performed and paid for – even though not having to pay for the work was the object of the fraud and tax crimes – while possessing sensitive Rule 16 discovery. Although he now claims to have made these trips to obtain records from the Owner (even though they were already provided to him in discovery), this conduct shows a recklessness that warrants punishment. Indeed, Simonlacaj now attempts to blame the Owner and his counsel for not complying with subsequent voluntary requests (not any subpoena or court order), not realizing how this shows the impact of Simonlacaj's actions.

In urging a probationary sentence, Simonlacaj spills much ink describing various good deeds he has done in the community.[5] See Def. Sentencing Mem. at 1-17. To be sure, such acts are relevant and should be considered by the Court. (Cf. Ex. A at 28 (statement of Judge Briccetti: "I wish you didn't wait until page 12 to start talking about the offense conduct. The next time you have a case in front of me I prefer that you spend time on the offense conduct on page 1. It is the most important factor.")). This is true even though at least one of Simonlacaj's letters is from a fellow federal felon who was convicted of fraud and tax offenses arising out of the same investigation as Simonlacaj's prior case. Compare Def. Sentencing Mem., Ex. 39 (letter of Steven A. Sheridan), Def. Sentencing Mem. at 11 (relying on Sheridan's opinion of Simonlacaj as "honorable," among other things), with United States v. Sheridan, 16-CR-237 (CS) (S.D.N.Y.), ECF Dkt. No. 24 (judgment noting conviction for

---

[5] Simonlacaj does not specify if any of his charitable deeds were the result of the sentence imposed by Judge Briccetti, which included 100 hours of community service as part of his one-year term of supervised release.

15

wire fraud conspiracy and filing a false tax return), and Ex. A at 40, 42 (statement of counsel for Simonlacaj at his prior sentencing that Sheridan's "offense . . . was more serious [than Simonlacaj's] because there was payroll fraud involved, and the loss was higher," and Sheridan committed a "version of fraud" by overstating expenses in submissions to the New York Power Authority). And although the government does not criticize anyone from writing to support a friend or family member, it is telling that many of these same individuals wrote letters on behalf of Simonlacaj at his first sentencing, urging the same leniency now sought. All told, these mitigating facts do not outweigh all of the other Section 3553(a) factors to warrant a non-incarceratory sentence.

Simonlacaj's health conditions are not to the contrary. As he admits, and his cardiologist confirms, Simonlacaj's bicuspid aortic valve is a congenital condition he has dealt with since birth that he is "currently able to manage." Def. Sentencing Mem. at 17. More specifically, Simonlacaj "is currently not prescribed medication for this, but takes an aspirin daily for this condition." (PSR ¶ 178). Even if the valve needs to be replaced "eventually" (which his doctor does not say), there is no reason that this procedure cannot be done in 10 months at the end of any term of imprisonment. And although Simonlacaj appears to have suffered kidney stones, at times requiring surgical intervention, there is no indication that this is the sort of extremely serious medical condition that cannot adequately be handled by the Bureau of Prisons (should this ailment happen to recur during a period of incarceration).

Finally, as noted above, there is no basis to believe that Simonlacaj medically cannot receive the COVID-19 vaccine such that he must face a "Hobson's choice" between receiving the shot or increasing his risk of contracting the novel coronavirus while in prison. Def. Sentencing Mem. at 18. Simonlacaj has not offered the opinion of any medical professional stating that his as-yet-unspecified allergy, which appears not to relate to any vaccine (else Simonlacaj surely would have stated so), means he cannot safely receive the vaccine. All indications, including the CDC's recommendation, are to the contrary. Therefore, Simonlacaj should not be heard to complain that a term of imprisonment is so unduly harsh where he has not established that he cannot receive the vaccine and enjoy substantial protections against suffering from any serious complications should he even contract the disease.

In short, all of these facts and circumstances prove that Simonlacaj is a recidivist whose history and characteristics compel a substantial prison sentence.

C. <u>Affording Deterrence and Protecting the Public</u>

A sentence of 10 months' imprisonment and a fine of $20,000 is also necessary to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) and (C).

1. <u>Specific Deterrence</u>

In this case, specific deterrence and incapacitation are critical. Although Simonlacaj essentially ignores his prior conviction in his voluminous submissions, <u>see</u> Def. Sentencing Mem. at 28 (stating "with very limited exception [sic], he is a law-abiding citizen"), he cannot escape the fact that a prior term of imprisonment – three months – which was a substantial downward variance from the then-applicable Guidelines range did nothing to deter him from committing the instant offense. To the contrary, Simonlacaj began receiving free benefits from CWC in 2016, which increased substantially in middle of 2018 – just months after his prior term of supervised release ended. Simonlacaj's promise to Judge Briccetti that "This would never happen again" proved false, and so if a three-month term of imprisonment was not enough to deter Simonlacaj the first time, a higher sentence is required here.

In urging otherwise, Simonlacaj asserts without analysis that he "poses no danger to society." Def. Sentencing Mem. at 2. While he may not be likely to commit acts of physical violence in the future (notwithstanding his participation in a brutal assault many years ago), he does pose a danger of future economic harm. After his first conviction, Simonlacaj went right back to the construction industry working at Construction Company #1, thereafter abusing his position as a powerful executive to enjoy the free benefits described above. Here too, Simonlacaj states that has had "several people reach out to [him] about possible employment" after his instant arrest. (PSR ¶ 190). Should he not be sentenced to a term of incarceration, Simonlacaj believes, "these opportunities will likely allow [him] to obtain work quickly." (<u>Id.</u>). Not only does this show that Simonlacaj will likely be back in a similar position that facilitated his commission of the instant offense, this also shows that his arrest, resulting press coverage, and his second felony have not been such a "punishment" as to preclude his ability to obtain new employment. Def. Sentencing Mem. at 26-27.

2. <u>General Deterrence</u>

The need for general deterrence, which Simonlacaj does not address, also weighs heavily in favor of a term of incarceration. At Simonlacaj's prior sentencing, Judge Briccetti put it best:

> I believe, based on my 35 years of experience or so in the federal criminal justice system, I believe that the general deterrent effect of a jail sentence in a tax case is more than in just about any other type of case. I think it is particularly relevant in a tax case. . . . And the following that if you commit a tax crime, no matter how rich and successful and no matter how much you're loved and no matter how much of an impact it's going to have on your family, your business, your employment, the knowledge that if you commit a tax crime like this and get caught and go to jail even for a short period of time gets people's attention. And it certainly makes people think that tax fraud is just not worth it.

17

(Ex. A at 61-62). This comports with the instructions in the Guidelines that "because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." U.S.S.G. § 2T1.1, intro. comm. It is also consistent with the principle that white-collar criminals are more likely to be deterred from others' sentences, counseling in favor of a term of incarceration. See United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (affirming the district court's decision that the sentence was needed where the defendant decided insider trading was "a game worth playing" because unlike other crimes, such crimes frequently "require[] high sentences to alter that calculus"); see also United States v. Brown, 880 F.3d 399, 405 (7th Cir. 2018) ("[W]hite-collar criminals 'act rationally, calculating and comparing the risks and rewards before deciding whether to engage in criminal activity.'" (quoting United States v. Warner, 792 F.3d 847, 860-61 (7th Cir. 2015)).

In addition, a substantial term of incarceration and fine are necessary to deter others who may seek to associate with organized crime. Other executives in the construction industry must be deterred not to do business and commit crimes with members and associates of the Mafia, enriching them and facilitating their continued threat to our community. The government urges the Court to send a message that committing such crimes with people associated with organized crime will be met with substantial punishment.

D. Reflecting the Seriousness of the Offenses, Promoting Respect for the Law and Providing Just Punishment

For many of the same reasons, a ten-month term of incarceration and fine of $20,000 is necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment. Anything less would send the message that one can time and time again break federal tax laws, including in connection with other offenses as part of doing business with the Gambino crime family, and move on to your next job with little consequence.

E. Avoiding Unwarranted Sentencing Disparities

Finally, there is no need to impose a non-incarceratory sentence to avoid unwanted sentencing disparities, as Simonlacaj claims. Of course, each case has its own distinguishing characteristics, and this is no different. Not many tax crimes involve a repeat tax recidivist whose latest offense involves the receipt of over $100,000 in illicit benefits from a mob-controlled company in connection with the defendant's employment. For this reason, United States v. Yun, 19-CR-131 (AMD) (E.D.N.Y.), is plainly distinguishable. In that case, the government did not oppose a sentence below the Guidelines, which of course is not the case here. See Yun, ECF Dkt. No. 10, at 1. Most importantly, there, the defendant "immediately took responsibility for his conduct and, from the outset, fully cooperated with the government's investigation." Id. at 2; see also id. at 3 (noting the defendant's "otherwise law-abiding history"). The defendant also was a sole proprietor who failed to pay income from his business due to hardship and other extenuating circumstances. See Yun, ECF Dkt. No. 11, at 2-3. Here, of course, Simonlacaj, a wealthy man motivated by nothing more than simple greed, has not fully embraced the scope of his illegal conduct, even going so far as to claim

18

that he did not fail to report substantially more than his declared income contrary to his sworn statement at the guilty plea.

United States v. Park, 12-CR-344 (FB) (E.D.N.Y.), is similarly distinguishable. There, the defendant operated his business to use revenue to pay employees, thereby failing to report the full income of his business. See Park, ECF Dkt. No. 20, at 2-3. But the offense of conviction had occurred about eight years before sentencing, during which time he had already indicated his acceptance of responsibility. See Park, ECF Dkt. No. 18, at 2-3. The defendant also suffered from alcoholism, an abusive childhood and other extenuating circumstances. See id. These are all facts not present here. See also United States v. Nikc, 20-CR-173 (NSR) (S.D.N.Y.), ECF Dkt. No. 13 at 3 (defendant with no criminal history and who had suffered immense tragedy, specifically, the murder of his pregnant wife and unborn child and father, leaving the defendant and his two daughters, and causing PTSD and other health issues).

In fact, just recently, on June 7, 2021, the Honorable Rachel P. Kovner, United States District Judge for the Eastern District of New York, imposed a 20-month sentence for a defendant who had a prior state conviction for filing false documents, with a tax loss of over $700,000 for paying employees "off-the-books." See United States v. Denko, 20-CR-15 (RPK) (E.D.N.Y.). With a lower tax loss but with other aggravating factors – including association with organized crime, the receipt of unreported income as part of an illicit bribery scheme, a prior federal tax felony and improper conduct post-arrest – this case warrants nothing less than half of that sentence, or 10 months in prison.

V. Conclusion

Given all of the facts and circumstances discussed above, the government respectfully submits that any leniency toward the defendant is unwarranted and would not satisfy the statutory purposes of sentencing. Therefore, a sentence of 10 months' imprisonment and a $20,000 fine is appropriate.

Respectfully submitted,

MARK J. LESKO
Acting United States Attorney

By:     /s/
Keith D. Edelman
Kayla C. Bensing
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (AMD) (by ECF and e-mail)
Defense Counsel (by ECF and e-mail)
Lisa A. Langone, Senior Probation Officer (by e-mail)