G9gisims ag                          SENTENCE

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        16 Cr. 384 VB

5   JOHN SIMONLACAJ,

6                  Defendant.

7   ------------------------------x

8                                        September 16, 2016
                                         9:40 a.m.
9                                        White Plains, N.Y.

10  Before:

11                 HON. VINCENT L. BRICCETTI,

12                                       District Judge

13                        APPEARANCES

14  MARY ANNE F. CARNIVAL
    HELEN CHRISTODOULOU
15       United States Department of Justice

16  CAHILL GORDON & REINDEL
         Attorney for Defendant
17  ANTRUDH BANSAL
    SAMANTHA LAWSON
18
                          SENTENCE
19

20

21

22

23

24

25

G9gisims ag                    SENTENCE

1      THE COURTROOM DEPUTY:  United States v. John

2   Simonlacaj.  Will counsel please note their appearances for the

3   record.

4      MS CARNIVAL:  Mary Anne Carnival and Helen

5   Christodoulou, United States Department of Justice, for the

6   government.

7      MR. BANSAL:  Anirudh Bansal and Samantha Lawson for

8   Mr. Simonlacaj.

9      THE COURT:  Good morning.  Have a seat, everybody.

10  This matter is on for sentencing today, the defendant having

11  pleaded guilty to one count OF aiding and assisting in the

12  preparation of a false federal income tax return in violation

13  of 26 United States Code 7206(2).  I reviewed the following

14  materials in preparation for sentencing.  The presentence

15  report is dated August 26, 2016 prepared by probation officer

16  Walter Quinn.  I've also reviewed a plea agreement dated June

17  3, 2016.  I've reviewed defense counsel's sentencing memorandum

18  dated September 2, 2016 as well as the letters and materials

19  attached thereto.  And finally the government's sentencing

20  memorandum dated September 13, 2016.  Has anything else been

21  submitted that I failed to mention?

22      MS CARNIVAL:  No, your Honor.

23      MR. BANSAL:  No, your Honor.

24      THE COURT:  Okay.  Mr. Bansal, you had submitted to me

25  an unredacted version of your memorandum which I have had filed

G9gisims ag                    SENTENCE

1    under seal so it's not in the public docket.  But you do need

2    to docket on ECF the redacted version.  Will do you that?

3             MR. BANSAL:  We will do that, your Honor.

4             THE COURT:  All right.  Thank you.  Mr. Bansal, have

5    you read the presentence report and discussed it with your

6    client?

7             MR. BANSAL:  Yes, your Honor.

8             THE COURT:  Mr. Simonlacaj, have you read the

9    presentence report?

10            THE DEFENDANT:  Yes, your Honor.

11            THE COURT:  Have you discussed it with your attorney?

12            THE DEFENDANT:  Yes, your Honor.

13            THE COURT:  Ms Carnival, have you read the presentence

14   report?

15            MS CARNIVAL:  Yes, your Honor.

16            THE COURT:  The presentence report calculates the

17   sentencing range as follows.  The base offense level is 16

18   under guideline Section 2T1.4(a)(1) and 2T4.1(f).  There's a

19   three-level downward adjustment for acceptance of

20   responsibility under 3E1.1 such that the final offense LEVEL is

21   13.  Defendant has no criminal history points so his Criminal

22   History Category is I.  And therefore according to the PSR, the

23   sentencing range is 12 to 18 months imprisonment.  Supervised

24   release range is up to one year.  And the fine range, according

25   to the PSR, is three thousand dollars to $264,000.  And I note

G9gisims ag                          SENTENCE

1   that that is slightly different than what the parties agreed to

2   in their plea agreement but I think that Probation is right and

3   the parties are wrong.  The parties say that the 2014

4   guidelines apply which is true.  And the default is that at

5   level 13, the fine range would be three thousand to 30 thousand

6   dollars.  But actually what 5E1.2(c)(4) says is that the

7   maximum fine table does not apply if the defendant is convicted

8   under a statute authorizing maximum fines greater than

9   $250,000.  In such cases the court may impose a fine of up to

10  the maximum authorized.  The statute does authorize fines in

11  excess of $250,000 because it's up to twice the gross pecuniary

12  gain or twice the pecuniary loss which the parties have agreed

13  is $132,000.  So therefore in my view, and I just want to make

14  sure everybody agrees with this, the fine range is actually

15  $3,000 to $264,000.  Did you follow my analysis?  You agreed

16  that that's not what it was so I want to make sure you

17  understand.

18          MR. BANSAL:  I agree with your Honor's analysis.

19  Sorry for not catching it.

20          MS CARNIVAL:  Double the loss and double the gain.

21  And that is also consistent in the plea agreement that we had

22  pointed that out, your Honor.  And whether I had miscalculated

23  in terms of applying the 2014 to get to the 3,000 to 30,000 I

24  apologize.

25          THE COURT:  I probably see this a lot more often than

G9gisims ag                     SENTENCE

1    you do on a regular basis because the fine table changed in

2    2015 and there's a provision in there that says if the offense

3    is committed prior to that date, prior to November 1, 2015 the

4    old fine table applies and it's a different fine table so we

5    have to make that adjustment a lot.

6           Does the government have any objection to the factual

7    statements in the presentence report?

8           MS CARNIVAL:  No, your Honor.  Other than one very

9    minor clarification on the presentence report which is the

10   identification --

11          THE COURT:  Give me a paragraph number.

12          MS CARNIVAL:  Paragraph 8.  Paragraph 8 has the

13   correct identification of individual 1 as being the defendant's

14   sister.  And in the justification portion of the PSR, I believe

15   that's the last page, your Honor, the second to last page, when

16   Officer Quinn is providing his justification for the

17   probationary sentence, and he identifies individual 1 as his

18   sister-in-law.  It's a very minor clarification.

19          THE COURT:  I see that.  On page 17.

20          MS CARNIVAL:  Correct, your Honor.

21          THE COURT:  I missed that.  No question that we're

22   talking about his sister not his sister-in-law.  Is that right?

23          MS CARNIVAL:  Correct, your Honor.

24          THE COURT:  Mr. Bansal?

25          MR. BANSAL:  Correct, your Honor.

G9gisims ag                         SENTENCE

| | |
|---|---|
| 1 | THE COURT:  Understood.  Other than that, do you have |
| 2 | any objections to any of the factual statements in the PSR? |
| 3 | MS CARNIVAL:  No, your Honor. |
| 4 | THE COURT:  Does the defendant have any objection to |
| 5 | any of the factual statements in the PSR? |
| 6 | MR. BANSAL:  No, your Honor. |
| 7 | THE COURT:  There being no dispute as to the fact the |
| 8 | Court adopts the factual statements in the PSR as the Court's |
| 9 | own findings of fact for purposes of this sentencing.  Does the |
| 10 | government have any objections to the guidelines calculation |
| 11 | itself or anything else for that matter that you haven't |
| 12 | already told me about in the PSR? |
| 13 | MS CARNIVAL:  No, your Honor. |
| 14 | THE COURT:  And the same question for the defendant, |
| 15 | does the defendant have any objections to the guidelines |
| 16 | calculation or anything else in the PSR? |
| 17 | MR. BANSAL:  No, your Honor. |
| 18 | THE COURT:  Okay.  One question I have before -- let |
| 19 | me just state what the guidelines range is and then I have a |
| 20 | question.  Based on the parties' agreement as set forth in the |
| 21 | plea agreement as well as my review of the presentence report |
| 22 | and my own evaluation of the guidelines, I adopt the guidelines |
| 23 | calculation in the PSR and conclude that the final offense |
| 24 | level is 13, Criminal History Category I, which yields a |
| 25 | sentencing range of 12 to 18 months imprisonment.  There's been |

G9gisims ag                    SENTENCE

1    no motion for any guidelines-based departure from the

2    applicable range.  The government does suggest in its memo that

3    the defendant is seeking a departure.  I didn't read your

4    memorandum that way.  I thought you were not seeking a

5    departure, you were just seeking a below the guidelines

6    sentence based on the factors of 3553(a).  Are you seeking a

7    departure?

8             MR. BANSAL:  No, we're not.  We actually dropped a

9    footnote --

10            THE COURT:  Say no more.  I didn't understand you to

11   be asking for a departure.  So you're not, that's the bottom

12   line.

13            MR. BANSAL:  Correct, your Honor.

14            THE COURT:  The question I have is this.  It's not

15   crystal clear from what was submitted but the question is does

16   the government agree that the defendant made the payment to the

17   IRS in connection with the filing of his amended personal tax

18   return for 2010 as described in the defendant's memorandum.

19   Talking about the federal payments now which is really all I

20   care about for purposes of sentencing.  I'm told that

21   Mr. Simonlacaj filed an amended return for himself, that he

22   paid an additional $148,850 as tax payments for the 2010 year.

23   He paid interest of 27,442 and penalties of 36,963 so that he

24   paid a total of $212,255.  Now in fact has that been paid?

25            MR. BANSAL:  Yes, your Honor.  In fact, I brought with

G9gisims ag                          SENTENCE

1   me and I'm happy to pass it to the Court after showing it to

2   the government, the letters from the accountant to the IRS

3   enclosing checks in the amounts you stated as well as the state

4   checks even though I recognize that's not relevant.  I have

5   certified mail receipts.  I don't know whether the IRS has

6   cashed those checks.

7            THE COURT:  Has government counsel seen that?

8            (Handed to counsel)

9            THE COURT:  I want to confirm that the payments have

10  been made.  I don't doubt that they have.  I trust you.  But I

11  just want to confirm that on the record.

12           MS CARNIVAL:  Your Honor, we are not, as I indicated

13  in our papers, I'm not contesting and I accept the

14  representation that the payment has been made.  And the reason

15  that I was asking for deferring the restitution for a period up

16  to 90 days is that the IRS, although they may have well gotten

17  the amended return, until it's processed and the calculations

18  that were done were of course done by the defendant's

19  accountant, I have learned from experience the IRS does what

20  the IRS does.  So we don't know.

21           THE COURT:  Hold on.  This is a criminal courtroom.

22  This is restitution which is a penalty, a punishment.  This is

23  not tax court.  I'm not tax court.  So my only question for

24  now, and we'll talk more about this at the appropriate time, my

25  own question for now is did he pay this money with respect to

G9gisims ag                    SENTENCE

1   2010 for his own personal taxes and you're saying to me he has

2   paid the money.  You're just saying to me that you're not

3   conceding that his return is accurate, you're not conceding

4   that that's the correct amount of money that he owed in terms

5   of additional tax payments, interest and penalties, but he has

6   paid the money.  That part you're willing to confirm.  If not

7   we'll have a hearing.  We'll mark it as an exhibit --

8              MS CARNIVAL:  I just don't know if it's been received.

9              THE COURT:  Let me see it.  If you can't confirm what

10  to me seems the most simple black and white fact, then fine,

11  we'll waste some more time.  It's okay.  I got plenty of time.

12          I'm looking at a document that has been submitted to

13  me which among other things has a copy of a bank check payable

14  to the United States Treasury for $212,255 which is the total

15  of the numbers that I mentioned a moment ago.  There's also a

16  communication from I guess it's from BDO, I assume that's

17  Mr. Simonlacaj's accountant.

18             MR. BANSAL:  Right, your Honor.

19             THE COURT:  To him giving him instructions about how

20  to file and pay both his federal and state taxes with respect

21  to the amended 2010 return.  Two separate instruction letters

22  you might say from BDO.  There's also an official check, bank

23  check also dated September 2, 2016 payable to the Commissioner

24  of Tax and Finance for $2,480 which I take it is with respect

25  to the so-called MTA tax.

G9gisims ag                    SENTENCE

1     MR. BANSAL:  Correct, your Honor.

2     THE COURT:  And then third there's another instruction

3  sheet talking about how to file and pay taxes, penalties and

4  interest with respect to the New York State personal return,

5  the amended personal return for 2010 and a bank check in the

6  amount of $68,482 dated September 2, 2016.  There's also, I'm

7  also reviewing certified mail receipts indicating on September

8  2, 2016 packages were mailed to the Department of Treasurer,

9  the New York State processing center and the, I'm not sure if

10 this says MCPMT processing center.  I guess that's with respect

11 to the so-called MTA tax?

12    MR. BANSAL:  Correct, your Honor.

13    THE COURT:  And Mr. Bansal has advised me that these

14 payments have in fact been paid by bank check.

15    MR. BANSAL:  Correct, your Honor.

16    THE COURT:  So I think I can reasonably conclude,

17 unless the government is prepared to give me some information

18 or evidence that would persuade me otherwise, that these

19 payments have been made.  That's not the same as saying that

20 the returns have been approved and that the IRS thinks they're

21 right.  I'm not saying that at all.  I'm just asking if the

22 amount has been paid.  That's the only question I have.

23    MS CARNIVAL:  I would agree with that statement.

24    THE COURT:  All right.  So I'm going to hand these

25 back to counsel.  For purposes of this proceeding, I'm going to

G9gisims ag                    SENTENCE

 1   assume that these payments that I've just described have been

 2   made.

 3          Okay.  Does the government wish to be heard on

 4   sentencing?  Keep in mind I have reviewed your memorandum.  But

 5   you're welcome to say anything you want.

 6          MS CARNIVAL:  Thank you, your Honor.  Actually, in

 7   light of the foregoing, in terms of the payment, your Honor,

 8   there is actually only one, I just want to discuss that a

 9   little bit with the Court.  Which is when I first saw in their

10   papers that this payment had been made and I said that's all

11   well and good and I was certainly not contesting or suggesting

12   that they had not in fact made the payment and were making any

13   sort of a misrepresentation.  But I had to bring myself back

14   to, wait a minute, which Mr. Bansal had indicated in his papers

15   that the defendant made these payments and it was not required

16   by the plea agreement which is entirely true.  And the reason

17   being that the underlying, the offense here, the aiding and

18   abetting the tax return that was materially false in the first

19   instance was not Mr. Simonlacaj's 2010 tax return.  It --

20          THE COURT:  It was his sister.  Schedule C, I guess

21   the company involved here is not a corporation or maybe it's a

22   S corporation.  You didn't say in your papers.  Neither side

23   told me that.  Why was it passed along directly to the

24   individual in the first place?

25          MR. BANSAL:  Well --

G9gisims ag                    SENTENCE

1          THE COURT:  In 2010.

2          MR. BANSAL:  Meaning why was the claim on Ms Radoino's

3    tax return.  That's a good question.  I wasn't there.  I don't

4    know.  What I do know is that the beneficial recipient of that

5    income was my client, Mr. Simonlacaj.  So after consulting with

6    BDO, highly reputable accounting firm, as well as tax counsel,

7    I know somebody who is experienced in this area, I concluded

8    that it would be more correct to have Mr. Simonlacaj claim the

9    income on his own return.  He really wants to just make this

10   right.

11         THE COURT:  I'm going to hear from you.  The point is

12   that for whatever reason it was reported on the sister's return

13   but it wasn't her money.  It was his money.  And so it should

14   be reported on his return.  That's what you're saying.

15         MR. BANSAL:  That is right.

16         THE COURT:  The government agrees that he's the

17   beneficial recipient of the money, right?  That's your whole

18   theory, right, that he sort of orchestrated this ruse by which

19   he was able to obtain net of taxes far more than he would have

20   otherwise obtained if he hadn't grossly exaggerated the

21   expenses associated with this company in 2010.  Isn't that

22   really it?

23         MS CARNIVAL:  Well, the aiding and abetting, I had

24   indicated to the Court, going back to the beginning of the

25   investigation that we had an investigation involving the New

G9gisims ag                    SENTENCE

1    York Power Authority and certain contracts that they had let.

2    In the course of that investigation, one of the contracts that

3    was awarded by the New York Power Authority was Cortlandt which

4    was Mr. Simonlacaj's sister's company or d/b/a I guess.  But

5    there was a bid awarded by NYPA to that entity.  And that

6    entity was hers not Mr. Simonlacaj's.

7            In terms of the aiding and abetting, we have

8    established that he was actually in control of that company, it

9    was he that actually set the events in motion in terms of

10   getting -- he hired the accountant that was used in 2010 for

11   that tax return, he provided through someone who worked with

12   him the information that the accountant relied upon to file in

13   the tax return and create the Schedule C.  And the expenses on

14   that Schedule C were inflated.

15           The government was able to, we could prove that a

16   certain amount of the money had gone to Mr. Simonlacaj as I

17   indicated in our papers.  But absent the defendant's admission

18   now in his sentencing memorandum that I was the effective

19   beneficiary, we could not prove that beyond a reasonable doubt

20   that he actually was getting the Cortlandt income.  The

21   Cortlandt income, the payments from NYPA, went to a bank

22   account that individual 1 had opened.  That bank account --

23           THE COURT:  The sister.

24           MS CARNIVAL:  The sister.  That's correct, your Honor.

25   Once the monies were received into the Cortlandt bank account,

yes, the money went out to various people in various ways

including the defendant who, there was a company that he was

the sole owner of and there were payments from Cortlandt or

transfers from Cortlandt to that entity as well as at least one

payment that went from Cortlandt to the defendant's own bank

account and to a joint bank account that he had with his

sister.  That is the backdrop as to how we got to where we were

in terms of an aiding and abetting.

        The government is not contesting that at this point

Mr. Simonlacaj has paid or amended his 2010 tax return and the

basis being that he is the effective beneficiary.  I'm not

contesting that.  It's just I want to explain to the Court that

we couldn't have proven that at the time.

        THE COURT:  Let me ask you this.  If in fact he was

the beneficiary, let's just assume that for the moment, then if

she, the sister, that is, were to file an amended return for

herself and claim all this extra income, that would be the

unusual materially false tax return but false in a way that

benefits the government but not hurts the government.  In other

words, it would be grossly overstating her net income.  Because

she didn't get it, it didn't go to her, it went to him.

Wouldn't that be a false return?

        MS CARNIVAL:  It's for -- no, I -- she still needs --

        THE COURT:  Assuming, please just assume what I just

said, that he was the beneficial recipient, in other words the

G9gisims ag                    SENTENCE

1   company, the sister, whatever you want to call it, the two of

2   them combined were strawmen.  They were not the real recipient

3   of the money here.  It was a pass-through to Mr. Simonlacaj.

4   And if that's the case, then wouldn't it be filing a false

5   return for her to file a return to pick up all this extra

6   income and wouldn't it -- let me just change the hypothetical

7   slightly.  If in fact he was not the beneficiary of this, then

8   didn't he just file another false federal tax return by picking

9   it up on his return?  You can overstate your income falsely

10  just like you can understate it.  You laugh, but false is

11  false.  I'm just trying to figure out -- you see neither side

12  did a very good job in my opinion.  You submitted voluminous

13  material about, for example, other cases, some of which are

14  mine, which to my mind has almost zero relevance here.  Maybe

15  what I've done in the past has some relevance.  You spent a lot

16  of time on that which was a waste of time in my opinion.

17  There's a tremendous amount of effort put into Mr. Simonlacaj's

18  personal background, his family situation, etc.  That's not

19  irrelevant, it's obviously relevant, no question about it.  But

20  the statute says considering the nature and circumstances of

21  the offense and then a bunch of other things.  To me that means

22  the first and most important consideration is, I'm not sure if

23  it's "is" or "are", the nature and circumstances of the

24  offense.

25          So what I care about is what happened.  That's what I

G9gisims ag                    SENTENCE

1    care about most importantly.  I also care about the defendant's

2    personal background.  I also care about restitution.  I do care

3    about those things.  Those are secondary.  But what really

4    happens what's necessary and neither side did a very good job

5    and that may be because of the negotiation of a guilty plea

6    which I believe I said when you first came in struck me as

7    somewhat unusual because in my experience the Antitrust

8    Division doesn't ordinarily conduct a tax investigation.  This

9    case arose as a result of some other investigation that you are

10   doing.  You don't tell me about any of that.  You don't explain

11   any of how Mr. Simonlacaj comes into this other than the fact

12   that he filed a false return.  But the filing of a false

13   return, it's just sort of the manifestation of what actually

14   happened.

15        What I want to know is what actually happened here.

16   Why is he a nominee.  Why didn't the money go to his sister.

17   Does his sister really own this company but is her name on it

18   because it made it easier to get a contract with this public

19   authority if the business was owned by a woman or minority.  I

20   don't know.  Nobody bothered to tell me about it.  And those

21   are the things I care about.  You know even now you're kind of

22   waffling around with what actually happened here.  Was this

23   company real, this Cortlandt Painting Company and actually

24   operated, you said it wasn't operating, even Mr. Simonlacaj

25   said it wasn't operated by his sister, that he controlled it,

G9gisims ag                    SENTENCE

 1   and I think you said that too, the government said that too.

 2                 MS CARNIVAL:  Your Honor, if I may, I will try to give

 3   the Court --

 4                 THE COURT:  You say that his sister did small painting

 5   jobs, specifically wall murals, and ran the company out of her

 6   home in the Bronx.  And then it says that Mr. Simonlacaj used

 7   his sister's company to obtain a contract.  That's very

 8   ambiguous.  When you say Mr. Simonlacaj used his sister's

 9   company to obtain a contract, that's a sentence only a lawyer

10   could write.  Because it is imprecise as to who really got the

11   contract.  Is it the company or is it Mr. Simonlacaj?  In other

12   words, who is benefiting from this, who is getting the money.

13   Contracts mean nothing.  What matters is money.

14                 MS CARNIVAL:  That's correct, your Honor.

15                 THE COURT:  So who got the money.  That's all I'm

16   asking.

17                 MR. BANSAL:  Maybe I can --

18                 THE COURT:  No.  I'll pick on you in a moment.  This

19   is Ms Carnival's moment.  Because I'm talking about her brief.

20   It says that they were awarded a facade restoration contract,

21   providing window repair, etc., the incoming expenses were

22   recorded on his sister's 2010 individual tax return and then

23   importantly you say Mr. Simonlacaj exercised control over

24   Cortlandt, oversaw performance of the work, engaged the

25   accountant.  All of that is narrowly tailored to what the

G9gisims ag                    SENTENCE

1    actual offense was.  But I'm still struggling with okay I get

2    it, he was guilty of committing the crime of aiding and

3    assisting the filing of a false tax return.  I'm still trying

4    to understand why.  Why did he do that?  The obvious reason he

5    would do it to me, maybe I'm wrong, is that this was a way to

6    funnel money to, it was money for him, his sister presumably

7    knew that.

8            Which raises another question, why wasn't she charged?

9    She's the one who signed the return which is, well, it's

10   materially false.  There's a million questions that come to

11   mind and none of which are answered.  Only a few of them are

12   answered I should say.  Let's focus on what happened.  You've

13   given me half, maybe even three-quarters of it.  Is there

14   anything else you want to tell me about that?

15           MS CARNIVAL:  Your Honor, the original company, which

16   is vastly overstating it to call it a company.  It was a

17   d/b/a --

18           THE COURT:  It's not vastly overstated.  There are

19   millions of small businesses in this country that are d/b/a.

20   My father ran a business that was a d/b/a until he was 80 years

21   old.  Put everybody through college and grad school.  So don't

22   minimize the significance of that.  A d/b/a is a real business.

23           MS CARNIVAL:  That was out of deference to

24   conversations that I had with defense counsel in terms of

25   characterizing it as a company.  This d/b/a in 2005 she set up

G9gisims ag                    SENTENCE

1    Cortlandt Painting Company, d/b/a.  The purpose of that company

2    is that she was, she considered herself an artistic person in

3    that prior to 2005 she had been doing some small painting jobs,

4    painting murals for family members.  At some point she decided

5    that I want to pursue this business and decided that she needed

6    a d/b/a for whatever reason.  I don't know.  But decided to

7    have a d/b/a, Cortlandt Painting Company.  2010 there is an

8    opportunity, there is a contract that is let by the New York

9    Power Authority including a contract for what they call

10   building facade work which was window washing and essentially

11   recaulking windows.  The evidence --

12          THE COURT:  For $550,000.

13          MS CARNIVAL:  Yes, your Honor.  The project was let in

14   two phases and each would be was approximately $225,000.  But

15   it was Mr. Simonlacaj that -- individual one didn't know from

16   contracts or the New York Power Authority.  It was he that got

17   the contract or at least got the company to submit a bid in

18   that name to the New York Power Authority.  In fact, and I had

19   indicated this in the papers, the contract was submitted in the

20   name of Cortlandt Painting Company, d/b/a Cortlandt Painting

21   and Restoration.  The reason being that I'm sure that this was

22   a facade restoration contract, that was the nomenclature that

23   the New York Power Authority gave it.  I assume they thought it

24   would read better to add restoration.  I don't know that.  That

25   is conjecture on my part in terms of that.  In any event it was

G9gisims ag                    SENTENCE

1    the defendant that got that bid submitted and we're not talking

2    about what role if any he had in the award of it.  That's

3    separate and apart from this.  But in terms of the causality of

4    his involvement he certainly got the Cortlandt bid submitted to

5    the Power Authority.  And his sister was not running that

6    company.  She turned it over for whatever reason that she

7    didn't want to be involved that in fact she had wanted to close

8    the company.  And we understand that they had some discussions

9    and he indicated that he had some need for the company, don't

10   close it.  She agreed and basically all the evidence is that he

11   was running the company.

12          Then in terms of, and what I had indicated earlier,

13   yes, it was, the monies did go into a Cortlandt bank account

14   and the evidence is that it was his sister who had established

15   that bank account back in 2005 so it actually was a Cortlandt

16   bank account and an account opened by the sister not by the

17   defendant.  In terms -- so, Cortlandt got the money because it

18   went into that account.

19          Mr. Simonlacaj, the reason that we're all here and

20   what this charge was, is that the evidence was that the false

21   tax return, it was the Cortlandt, we'll call it the Cortlandt

22   tax return, that was the return that contained the material

23   misstatements.  His involvement in terms of getting that

24   materially false tax return filed was as we set forth in our

25   papers.  He provided the information essentially to the

G9gisims ag                      SENTENCE

1    accountant.  He secured the services of that accountant.  And

2    it was the defendant who inflated the expenses.  As I said, for

3    the first time there is an admission now in their papers that

4    he was the effective beneficiary.  We certainly --

5           THE COURT:  It's kind of logical, right.  Why would

6    someone go to all that trouble to file materially false tax

7    return, and big numbers, 403 thousand dollars with inflated

8    expenses which obviously creates a tax benefit to somebody.

9    Why would you do that unless you were the somebody who was

10   being benefited?  Otherwise there would be no other reason to

11   do it, or at least that you were one of the somebodies being

12   benefited.  Otherwise, why do it?  That would be the typical

13   motivation.  Why would people cheat on their taxes?  Because it

14   puts more money in their pocket and takes money out of

15   everybody else's pocket.  The taxpayers.  That's why you do it.

16   You don't do it just for fun or by mistake.  If you're acting

17   willfully which has been admitted.  Why would you do it

18   otherwise?

19          MS CARNIVAL:  I absolutely agree, your Honor.  I think

20   the Court is a hundred percent correct and that was certainly,

21   when we looked at what was going on here, that it had to be,

22   logic dictates that he did this not out of the goodness and

23   kindness of his heart but enlightened self-interest.  The money

24   is going to go to him.  All we could do is we did our

25   investigation.  We obviously combed through the bank records.

G9gisims ag                    SENTENCE

1    There was a very Byzantine structure in place.

2              THE COURT:  The whole thing is Byzantine.  How to get

3    the money is Byzantine and what you're saying is where the

4    money went is Byzantine too.  In other words, confused.

5              MS CARNIVAL:  There were check cashers involved.

6    There were other companies.  And tracing the money, of how much

7    of this money, if we could have traced that all, of the

8    Cortlandt income went to the defendant, the charge would have

9    been something else.  All we could do is we analyzed the

10   evidence and what we developed is that as I said we could only

11   proof beyond a reasonable doubt a portion of the money going to

12   Mr. Simonlacaj.  Yes, in light of of his admission that I was

13   the effective beneficiary, but that was certainly not a piece

14   of evidence that the government had and --

15             THE COURT:  I don't want you to confuse my question

16   with -- and I made a lame joke before when I said I was picking

17   on you.  I'm not picking on you.  I'm the last one to know this

18   stuff.  You know it, he knows it, meaning you, Mr. Bansal, the

19   various associates, the defendant himself.  I don't know what

20   the facts are.  I haven't been a lawyer on this case.  One of

21   the hardest things in being a judge is balancing this awesome

22   responsibility, figuring out what's the appropriate punishment

23   without knowing all the facts, at least all the relevant facts.

24   And it's hard sometime.  It seems crazy that I should be

25   required to make these important decisions about somebody's

1    life which affects that somebody and his family without knowing

2    all the relevant facts.  So I'm asking these questions because

3    it's essential to my doing my job.  That's why I'm asking.

4         If you're telling me, you're almost a little

5    defensive, the government couldn't prove this beyond a

6    reasonable doubt, don't be defensive, just tell me what you

7    know.  What you know is, without a doubt he was the one who

8    used an entity to obtain a contract, the value of which was

9    $550,000.  The money was paid to the company.  It went into the

10   company's account.  In ways that are not entirely clear the

11   money went out of that account.  Some of it went directly to

12   him.  Some of it went to a company under his control.  But you

13   cannot tell me now, we're talking about events that occurred

14   years ago, you cannot tell me now exactly where all the money

15   went.  But you can tell me for sure, in fact he's pleaded

16   guilty, that the return was false, (a), and (b), he's the one

17   who caused it to be false because he's the one who provided the

18   phony information, the overstated information.  Is that a

19   summary of kind of where you are on this?

20        MS CARNIVAL:  That is essentially correct, your Honor.

21   But if I may, because of, and this is because I really do want

22   to give the IRS full credit here, we can, the IRS can trace

23   probably to the penny where the money went.  It's just that

24   those names and those companies are not, they're not the

25   defendant.

G9gisims ag                    SENTENCE

1          THE COURT:  Or not obviously the defendant.

2          MS CARNIVAL:  I'm sorry, your Honor.

3          THE COURT:  You can trace where the money went.  So if

4     the money went to John Simonlacaj, it's pretty obvious where

5     the money went.  If it went to a company that you can show he

6     controls, and that's pretty clear where the money went.  If it

7     went to some other entities or names, at some point prosecutors

8     always follow the money.  But at some point, you know, you're

9     unable to determine ultimately who these people are and whether

10    they sent money back to Mr. Simonlacaj or how much.  There's a

11    limit to what you've been able to do on that sort of far end of

12    things.

13         MS CARNIVAL:  Well, I mean these people aren't just

14    random people and we do know and they do have certain

15    connections with the defendant.  But in terms of proving, if

16    there's a check going from Cortlandt to John Doe, and I know

17    that John Doe is a friend of the defendant but John Doe cashes

18    that check at a check casher, the trail ends at that point.

19         THE COURT:  Right.  I think you're agreeing with what

20    I just said.

21         MS CARNIVAL:  Absolutely, your Honor.

22         THE COURT:  Look.  Based on my experience as a judge

23    but probably more importantly based on my experience as a

24    prosecutor and criminal defense lawyer I know, well I know a

25    little something about how prosecutors decide what case to

G9gisims ag                    SENTENCE

1     bring and how the lawyers on both sides negotiate resolutions.

2     I know a little bit about that from my own personal experience.

3     And this struck me as highly unusual in one obvious respect

4     which just gives rise to all these other questions which is,

5     this was the sister's tax return.  Who signed the tax return?

6              MS CARNIVAL:  It was electronically filed.

7              THE COURT:  Electronically filed with an authorization

8     from the taxpayer, right?

9              MS CARNIVAL:  Correct, your Honor.

10             THE COURT:  In other words, the taxpayer, I pay my

11    taxes, when I do that electronically I am swearing under oath

12    that my tax return is accurate.  That's what I'm doing.  Even

13    without physically signing it.  Obviously I'm doing that.

14    Otherwise we would be, we would do away with this notion that

15    people have to accurately report their own taxes.

16             MS CARNIVAL:  The evidence is, your Honor, that the

17    2010 tax return, individual 120 tax return, she turned the

18    entire process over to her brother.  She did not file her own

19    2010 tax return.

20             THE COURT:  Her brother might have done it but she

21    filed it.  She's responsible for her own tax return.  It's got

22    her Social Security on it.  Is that her Social Security number

23    or his Social Security number?

24             MS CARNIVAL:  It's not his Social Security number.

25             THE COURT:  It's a 1040.  It's her return, a personal

G9gisims ag                    SENTENCE

1   income tax return.  Therefore she filed it, okay.  So here's my

2   question.  I'm not really, I don't know that there's an answer

3   to this, the question that arose naturally to me was, wait a

4   minute, she filed a return which was materially false and yet

5   the only person being prosecuted in connection with that is

6   Mr. Simonlacaj.  There's at least three people involved.

7   There's the sister, there's Mr. Simonlacaj and there's the

8   accountant.  You didn't prosecute the accountant, is that

9   right?

10          MS CARNIVAL:  Correct, your Honor.

11          THE COURT:  The accountant always says I just relied

12  on what I was told.  I know that prosecutors are sometimes

13  skeptical or suspicious of that.  You didn't prosecute the

14  sister, is that correct?

15          MS CARNIVAL:  Correct, your Honor.

16          THE COURT:  So the only one prosecuted in connection

17  with this transaction is Mr. Simonlacaj.  Correct?

18          MS CARNIVAL:  Yes, your Honor.

19          THE COURT:  That's what I gleaned from what you

20  submitted.

21          MS CARNIVAL:  Yes, your Honor, that's correct.

22          THE COURT:  And what was in the PSR.  So I naturally

23  ask myself the question why.  I can come up with an obvious

24  answer to the why question with respect to the accountant.

25  I.e. hear no evil, see no evil, etc.  I'm just relying on what

G9gisims ag                    SENTENCE

1    I'm being told by my client or customer, whatever the case may

2    be.  But it's not so obvious as to why the sister wasn't

3    prosecuted.  It was her return.  What do I draw from this?

4    Nothing you've said suggests that my inference is wrong,

5    especially when you combine my inference with what you describe

6    as the defendant's recent explicit acknowledgment that he was a

7    beneficiary of this transaction.  What I draw from this is that

8    the reason he did all of this, the reason he orchestrated this

9    contract, the money going to the sister's company, the money

10   going out of the sister's company's accounts to wherever it

11   went, the filing of a false tax return, the reason he did all

12   that is because he's the one who benefits from it.  That's the

13   nature of human beings.  That's what people do.  We all know

14   that's human nature.  We do things probably in the simplest

15   most basic element of human nature, self-interest.  That's why

16   we've risen to the top of the food chain.  We're really good at

17   self-interest.

18          Anyway, nothing you've said to me suggests otherwise.

19   All you're telling me is that you can't put a penny in his

20   pocket.  Put some of it in his pocket.  You know that he

21   orchestrated it but you can't put all the money in his pocket.

22   Is that a fair statement?

23          MS CARNIVAL:  That is correct, your Honor.  That's the

24   reason why the charge is aiding and abetting.

25          THE COURT:  Don't be defensive about it.  I just want

G9gisims ag                    SENTENCE

1    to know what actually happened.  Years ago when I was a young

2    prosecutor we used to use tax charges to prosecute organized

3    crime figures.  Obviously that wasn't really what it was about.

4    They were storing money and running gambling and running drugs

5    and killing people.  But sometimes the case you could prosecute

6    would be a tax charge.  And that was the favored charge of

7    prosecutors.  It really didn't tell you the whole story.  That

8    wasn't really what the investigation was about.  It was about

9    organized crime.  See what I'm saying.  I'm not saying that

10   Mr. Simonlacaj is a member of organized crime.  I'm not saying

11   that at all.  But what I am saying is when I see a 7206(2)

12   charge I know that's kind of the top and there's a lot of stuff

13   underneath that's not clear.  And I'm trying to find out what

14   that is.  Because I'm the one that has to decide what sentence

15   to impose.  That's all.  I'm not a prosecutor here.  I'm not a

16   defense lawyer.  I'm only trying to do my job, period.

17            Have a seat.

18            Mr. Bansal, do you want to be heard about this?  You

19   do say in your brief, your submission, just one second, let me

20   just find exactly what you said.  I wish you didn't wait until

21   page 12 to start talking about the offense conduct.  The next

22   time you have a case in front of me I prefer that you spend

23   time on the offense conduct on page 1.  It is the most

24   important factor.  I understand as a defense lawyer it's the

25   factor that is hardest to work with because you wouldn't be

G9gisims ag                    SENTENCE

1    here unless your client was guilty of a crime.  You do talk

2    about it though.  You say starting on page 12, defense conduct

3    is accurately stated in the PSR.  The problem is it's just the

4    tip of the iceberg that I'm trying to get at.  It may be

5    accurate but it's not complete.  At least that's my view of it.

6         Here it is, here's the key sentence on page 13.  In

7    the amended return, meaning Mr. Simonlacaj's amended return for

8    2010, because Mr. Simonlacaj was the beneficiary of Cortlandt's

9    2010 income from the New York Power Authority project, he

10   claimed this income.  Maybe there's nothing more that you have

11   to add.  That's a pretty direct statement.  He got the money,

12   therefore he's going to file a return saying I got the money.

13   I need to pay it back.  It's my obligation.  It's my money, my

14   income, my tax obligation.  That's what you're saying.

15        MR. BANSAL:  It is, Judge.  It's a little curious that

16   Mr. Carnival is saying that this brief is the first --

17        THE COURT:  Don't even go there.  I don't really care

18   whether it's the first or the last or 15th.  I just want to

19   know what happened.  Please, I don't really care about your

20   discussions.  Not to say that that's not important at some

21   level but it's not important to me.  I just want to know what

22   happened.

23        MR. BANSAL:  Sure, Judge, and I only mention that

24   because I don't want you to think that we're in any sense

25   hiding this ball from anyone.

G9gisims ag                    SENTENCE

1      THE COURT:  I don't think of it this way.  This is a

2 difficult business, specifically when it's hard to know exactly

3 what happened.  You try to do the best you can with what you

4 got and I have no doubt that both sides, both you and

5 Ms Carnival have done exactly that.  Even though nobody -- I'm

6 always amazed when people say that trials are a search for the

7 truth.  I don't mean to be cynical here.  I'm not a cynical

8 person.  They're obviously not a search for the truth.  They're

9 a search for evidence, evidence sufficient to prove, to carry

10 the party that has the burden of proof -- burden of proof.

11 That was butchered.  It's a search for evidence sufficient to

12 prove whatever it is that the party who has the burden of proof

13 is seeking to prove.  That's what this is about.

14      And it's often, in fact I would almost, I wouldn't say

15 always but it's often difficult to know really what the

16 complete truth is.  I don't know if you're a religious person

17 but you might say that God is the only one who knows that.  But

18 here on Earth we're limited.  This is a classic example of

19 that.  I don't know if anyone knows exactly what happened here.

20 Go ahead.

21      MR. BANSAL:  I don't know how much iceberg there is

22 here.  Clearly the Antitrust Division did not come into this

23 looking for tax evidence.

24      THE COURT:  What were they looking for?

25      MR. BANSAL:  They were looking for an offense

1  involving the rigging of an NYPA contract which as they said in

2  their many press releases on this matter --

3          THE COURT:  I haven't read any press releases.

4          MR. BANSAL:  I don't think you should have.  That's

5  something that the government has acknowledged explicitly and

6  publicly.  And that is how, because Mr. Simonlacaj was a

7  successful bidder who completed to the satisfaction of NYPA the

8  contract to paint their White Plains facility, that is how he

9  got roped into this thing.  After many discussions with the

10 government we informed them and were able to I think persuade

11 them that that contract was fairly obtained and that there was

12 no bid-rigging investigation to be had.

13         THE COURT:  And there was no DBE fraud, you know what

14 I mean by that.  And WDBE local minority or women owned or

15 disabled own business business enterprises.  There was no such

16 thing in this case.

17         MR. BANSAL:  Mr. Simonlacaj did not apply for this

18 contract as a minority or woman-owned business.  Whether there

19 was a box to that effect, I have a vague recollection there may

20 have been but it wasn't checked.  I'm going to be corrected I'm

21 sure if I'm wrong about that.  That is not the reason that

22 Cortlandt was in this.  And I think it's probably also more

23 than I know to say that the way that the funds were disposed of

24 was Byzantine or somewhat designed -- clearly the whole thing

25 was designed not to look porous and to conceal the income.

G9gisims ag                    SENTENCE

1          THE COURT:  To whose benefit?

2          MR. BANSAL:  To Mr. Simonlacaj's benefit.  I've been

3     up front with the government on that from day one.

4          THE COURT:  By the way, if he had been up front about

5     it he could have started his own company and called it New

6     Cortlandt Painting d/b/a or something and then submit the bit

7     and get the contract and put it in his own account and then pay

8     taxes correctly and so forth.

9          MR. BANSAL:  Let's talk about that.  No one here,

10    Mr. Simonlacaj least of all, is disputing that this was handled

11    properly or that he wasn't attempting to evade his taxes.  He's

12    accepted that.

13         THE COURT:  He hasn't accepted that he was attempting

14    to evade taxes.  Don't admit to a crime that he hasn't plead

15    guilty to.  He pled guilty to aiding and abetting.

16         MR. BANSAL:  The result of which was to reduce his

17    taxes incorrectly.  The purpose of the Cortlandt Painting

18    Company in this entire contract and the bidding process, it

19    wasn't set up for this purpose.  Ms Carnival has pointed out

20    that it was set up for a legitimate purpose by Mr. Simonlacaj's

21    sister who was involved in mural painting, had no interest in

22    this area.  It turned out that she didn't do that.  And when

23    the contract came to Mr. Simonlacaj's attention, he decided to

24    submit the bid using this d/b/a, this company, if that's what

25    you can call it.

1          THE COURT:  Which was an existing company controlled

2     by his sister, someone presumably who would be willing to

3     follow his lead on this.

4          MR. BANSAL:  I don't know how much involvement she

5     really had on this.

6          THE COURT:  Probably none.  Whatever you want, John.

7     Fine with me.  That's all.

8          MR. BANSAL:  I think that's kind of what it was.

9          THE COURT:  It's pretty stupid but it doesn't mean

10    it's criminal.

11         MR. BANSAL:  I don't know if she has a level of

12    sophistication to understand what was even going on here.

13         THE COURT:  Come on.  Really?  We're not going there.

14    It's fine.  Keep going.  I don't mean to interrupt.

15         MR. BANSAL:  I'm not her lawyer.  But the reason that

16    it was used, the company was used in this case, it was a

17    painting contract.  Mr. Simonlacaj runs a company called Center

18    Line Construction.  He probably could have submitted the bid

19    under Center Line Construction.  He decided, because Cortlandt

20    had painting in the title, and I vaguely remember that there

21    may have been some other restoration work or painting work that

22    he had done using Cortlandt, that this would have maybe more

23    credibility, I suppose.  I'm hypothesizing here.  That is all.

24    It was not a vehicle to hide the fact that it was his because

25    it was always on her Schedule C.  He didn't put it there for

G9gisims ag                    SENTENCE

1    that purpose.  If he had put it on his return, in the way that

2    the -- what I'm saying is that that was not a part of the tax

3    scheme.  I'm not sure the government is alleging otherwise.

4    That's just where Cortlandt's income had always been through

5    the arrangement between Mr. Simonlacaj's sister and the

6    accountant.

7              As far as the rest of the disposition of the income,

8    it's five, six years ago now.  I sat with the government's IRS

9    agent who did a terrific job of outlining for me where he

10   understood the income went and I never disputed that and I told

11   him he's done a terrific job.  I don't think that anyone is

12   suggesting that anyone other than Mr. Simonlacaj was the

13   beneficiary of the income.  And the way it gets disposed of is

14   the way that people dispose of their income.

15             THE COURT:  Spend it on stuff.

16             MR. BANSAL:  Right, Judge.  There were expenses for

17   the job.  There were people to be paid.  And there were

18   expenses, equipment to be purchased I suppose so there are some

19   of those expenses and the agent was very fair in making clear

20   that they were counting those expenses as legitimate.  So I

21   don't know how --

22             THE COURT:  I just curious -- now we're spending more

23   time than we have to -- if it was overstated by 400,000 and the

24   total contract was 550, stop right there, that would suggest a

25   difference or a profit of 150 but there must have been

G9gisims ag                    SENTENCE

1   legitimate expenses so the 403 was above what was claimed as

2   legitimate.

3           MR. BANSAL:  The 403 is what was overstated.

4           MS CARNIVAL:  Correct, the chart that we set out with

5   the 400,000 approximately, those are the inflated.

6           THE COURT:  What were the real expenses?  I'm just

7   curious.  Approximately.  I don't need to know it precisely.

8   Somebody has to be paid to go up on the scaffold and do the

9   work, right?  They're not going to do it for free.  And you got

10  to buy the equipment and buy the supplies and so forth.  I'm

11  just curious.  What did it cost?

12          MS CARNIVAL:  I know the actual expenses, your Honor.

13          THE COURT:  Just give me a rough number.

14          MS CARNIVAL:  I don't want to mislead the Court.

15          THE COURT:  It doesn't matter --

16          MR. BANSAL:  You asked the wrong people.

17          THE COURT:  You're saying that the inflated part was

18  403,000.

19          MR. BANSAL:  That seems right.  The government is much

20  more familiar with this than I am.

21          THE COURT:  That's what your client pleaded guilty to.

22  I interrupted.  This is important to me.  It kind of was

23  spurred by this whole restitution issue which led me to think

24  well, who should be paying the restitution.  Should it be the

25  sister?  After all it's her tax return.  And then I'm thinking,

1     not the restitution, who should be filing the return, shouldn't

2     it be the sister, it's her return that was false.  And then I

3     thought well, but wait a minute if in fact she was not the

4     beneficiary of this then if she would have filed a return

5     claiming it then that would be a false return.  Right?  And

6     that would have to be a false return.  If she was not the

7     beneficial recipient.  So that wasn't making any sense for her

8     to do that.

9            Then I thought well, why would Mr. Simonlacaj do it.

10    Because he is the beneficial recipient.  That makes sense.  And

11    then at the end of the day who gets the actual cash.  The IRS.

12    Meaning the taxman.  Not real cash.  You know what I mean.  The

13    payment itself.  Who gets it.  It goes to the IRS.  And it's

14    traced correctly back to this false tax return that was filed

15    on 2010.  That was my thinking but I wanted more information

16    about it.

17           You may not have finished what you were going to say.

18    I'm going to give Mr. Bansal an opportunity.  If there's

19    anything else you would like to say in connection with

20    sentencing this would be the time for it.

21           MS CARNIVAL:  Your Honor, I don't want to spend, I

22    don't want to shed more heat than light but I just wanted to

23    come back to something that you just said to Mr. Bansal in

24    terms of don't plead to a crime that you haven't been charged

25    with.  I'm looking at the allocution, and your Honor, if I may,

1   can I read what the defendant allocuted to?

2          THE COURT:  I suppose.  There's no issue about the

3   fact that he admitted guilt here.  Go ahead.

4          MS CARNIVAL:  Well, your Honor, it's very short.  Your

5   Honor -- Mr. Bansal, would you like the page?

6          MR. BANSAL:  I'm trusting you'll read it accurately.

7          MS CARNIVAL:  "Your Honor, in 2010 I was running

8   Cortlandt Painting Company, a painting company of which my

9   sister was legal sole proprietor.  Prior to April 2011, I

10  provided an accountant with information about Cortlandt's

11  revenue and expenses which I knew would be used in preparation

12  of my sister's individual tax return form 1040 including a

13  Schedule C which was filed on or about April 14, 2011.  I knew

14  that a number of the business expenses I provided to the

15  accountant were materially inflated which would lower

16  Cortlandt's taxable income.  I knew what I was doing was wrong

17  and I'm very sorry for it."

18         THE COURT:  That's a sufficient factual predicate for

19  a guilty plea.  But it's incomplete.  That's all.

20         MS CARNIVAL:  No, your Honor, that was just in terms

21  of, as I said, it is a very recent development that we have the

22  statement that he was the beneficiary.

23         THE COURT:  I just told Mr. Bansal I really don't care

24  about that.  Look, to me, the inescapable conclusion from this

25  including the statement I was running Cortlandt Painting, etc.,

G9gisims ag                    SENTENCE

1    etc., the inescapable conclusion from all of this is that

2    Mr. Simonlacaj was in fact the recipient of the proceeds of

3    this contract.  He was.  Not only the beneficiary.  But he was

4    also the beneficiary of the tax loss, if you will, the effect

5    of his false statements or the effect of the information he

6    provided that created false tax returns with respect to money

7    of which he was the beneficiary was simply to reduce his taxes.

8    That's the effect of it.  Because if he had done it correctly

9    he would have reported the money on his own tax return and

10   would have paid a lot more in taxes and the number that we all

11   agreed on is 132,000.  Simple as that.

12            Anyway, anything else?

13            MS CARNIVAL:  No, your Honor.

14            THE COURT:  Okay.

15            Mr. Bansal, do you wish to be heard further on

16   sentencing?  You're welcome to say anything you want although I

17   have read your brief.  That should be fairly obvious.

18            MR. BANSAL:  I'm going to keep this brief and I'm

19   going to try to respond to some of the things that I saw in the

20   government's sentencing submission.  Judge, I think that the

21   government's application for a guideline sentence boils down

22   to, in so many words, there's nothing extraordinary about

23   Mr. Simonlacaj.  And I dispute that.  It is not the correct

24   standard because I think the Court has recognized that the

25   government has used a lot of pre*Booker* downward departure

G9gisims ag                    SENTENCE

1    standards and that's not the standard and it's not what we're

2    asking for.  What we're asking for is that the Court impose a

3    sentence that is no greater than necessary to achieve the

4    objectives of sentencing.  And that's the standard that the

5    Probation Department used when they reached the conclusion that

6    a sentence of probation meets that standard.  That in itself is

7    out of the ordinary, that the Probation Department says that in

8    my experience on both sides of this.

9            THE COURT:  There's more and more in the last few

10   years.  It took them about ten years to get the point of *Booker*

11   but they finally got around to saying oh, wait a minute, the

12   court, we are the court, we work for the court, doesn't have to

13   impose a sentence in the guidelines.  So saying it's out of the

14   ordinary, it's more ordinary now than you would think.  If you

15   were like me seeing these every single day it's pretty

16   ordinary.  I would say that at least in this courthouse it's no

17   longer ordinary for the Probation Department to recommend a

18   sentence within the guidelines believe it or not.  That's

19   neither here nor there.  They did recommend what they

20   recommended.  No question about it.

21           MR. BANSAL:  One of the things that they recognized,

22   Judge, is that there are extraordinary things about this

23   defendant.  It is decidedly out of the ordinary for someone to

24   go so far out of their way to so profoundly improve the lives

25   of dozens and dozens of people seeking absolutely nothing in

G9gisims ag                    SENTENCE

1    return.   Time and again when Mr. Simonlacaj was approached by

2    someone in need he helped in ways that really changed their

3    lives, Judge.   The gallery is full on the right side with

4    people that have come here from as far as Michigan to be here

5    to support Mr. Simonlacaj because that's who he is.   Letter

6    after letter provided to your Honor provides firsthand

7    testimonials in which Mr. Simonlacaj, in the words of one of

8    them, gave them access to the American dream.   That does seem

9    pretty extraordinary to me among people, even people that the

10   Court sentences.

11          What's the government's response to this?   They say

12   that it's "hardly overwhelming."   That's a quote.   Hardly

13   overwhelming from their brief.   And they say it's hardly

14   overwhelming because it's not overwhelming when compared to the

15   hundred million dollars that Ty Warner paid to charity.   I'm

16   not sure that that's where they're setting the bar.   But it

17   misses the point.   I'm not just saying that it misses the point

18   by dismissing a lifetime of charity and generosity because

19   Mr. Simonlacaj is not a billionaire.   It misses the point

20   because as Judge Patterson recognized, as Judge Scheindlin

21   recognized, as Judge Seibel recognized last week in sentencing

22   Steven Sheridan for an offense that was more serious because

23   there was payroll fraud involved, and the loss was higher, the

24   aggregate loss was higher.   His guidelines were higher, his

25   range was 15 to 20 months.   But Judge Seibel recognized in

G9gisims ag                    SENTENCE

1    sentencing him to probation that giving of yourself is much

2    more important, says much more about your character.

3         THE COURT:  Let me stop you.  That was not reflected

4    in the presentence report.  The presentence report will tell

5    you about related cases, and sometimes the sentencing in

6    related cases, but that's all, not the guideline range or loss.

7    That's all.  In your brief you do mention this other case.  And

8    it was another thing that I sort of shook my head at when I

9    read it because I'm thinking you said regarding Steven

10   Sheridan. I never heard of Steven Sheridan.  I know nothing

11   about the case.  I haven't talked to Judge Seibel about the

12   case.  He pleaded guilty to a two-count information charging

13   him with violating 18 United States Code 1349 for conspiring to

14   defraud NYPA and 26 U.S. Code 7206(1) for subscribing to a

15   false return which is a little bit different than aiding and

16   assisting the filing of a false return.

17        But you didn't tell me anything about the lawsuit

18   involved or the guideline range or whether he has a criminal

19   history or not or anything.  Why not?  Why wouldn't you do

20   that?  Were you afraid that if you told me his guideline range

21   was higher and then the fact that Judge Seibel did not impose a

22   jail sentence that that would benefit the defendant?  All I'm

23   asking you, do you confirm what Mr. Bansal said that the

24   guideline range, of course it's an advisory guideline range,

25   was 15 to 21 months?

G9gisims ag                    SENTENCE

1          MS CARNIVAL:  Your Honor, it is correct --

2          THE COURT:  Yes or no.

3          MS CARNIVAL:  Yes.

4          THE COURT:  Okay.  And what in a nutshell, Mr. Bansal,

5     and make sure you tell me exactly, did Mr. Sheridan do?

6          MR. BANSAL:  I have the sentencing transcript and a

7     lot less ability than Ms Carnival who was actually there.  It

8     seems like he committed payroll fraud which is saying you're

9     paying a prevailing raid and not paying it in a cost plus

10    contract which makes it cost more to NYPA because if you

11    overstate what you paid then you cost the government more

12    money.  So that's a version of fraud.  And he also admitted tax

13    fraud.

14         THE COURT:  He didn't admit tax fraud.  He admitted

15    subscribing to a false return.  That's not fraud.  That's a

16    difference between a felony that carries a maximum penalty of

17    two or three years and a felony that carries a higher maximum

18    penalty.

19         MR. BANSAL:  Judge Seibel said that the combined loss

20    from the fraud and the tax offense is just shy of $250,000.

21         THE COURT:  Say that one more time.

22         MR. BANSAL:  The combined loss from the fraud and tax

23    offenses is just shy of $250,000.  So that's nearly twice the

24    loss that was caused --

25         THE COURT:  The problem with that is the problems with

G9gisims ag                    SENTENCE

1   the guidelines since they were enacted which is I think this

2   misbegotten idea that these fine distinctions in loss is a good

3   way to determine the seriousness of the offense, the

4   culpability of the defendant.  Maybe it is -- well, an example

5   under 2T1.1, you have how many different categories of loss.

6   Or 2T4.1 I guess it is.  Hold on a second.  You have about 15

7   different categories.  I would prefer it if they had three,

8   zero loss, a lot of loss, or a real lot of loss.  And then that

9   would give you an indication.  So if you rip somebody off to

10  the tune of millions of dollars, that's obviously more serious

11  than ripping somebody off to the tune of one hundred thousand

12  dollars.  But 132 versus 250 or 240, whatever it is, it's

13  harder for me to conclude that those are meaningful

14  differences.

15        In any event, you could say, and I think based on what

16  you've just told me, that although the offenses were different

17  in some respects, they're similar in that they involved fraud,

18  they involved this NYPA and they involved taxes and they

19  involved losses of more than a hundred, more than even

20  $200,000.  They're all in the same category.  That case and

21  this case are more similar than they are different.  I think

22  that's a fair argument that you could make.  And then you go

23  onto say from that that he received a nonjail sentence which

24  you're saying, it doesn't bind me of course, is something I

25  ought to consider.

G9gisims ag                    SENTENCE

1          MR. BANSAL:  I think so Judge.  You're stating it

2    succinctly and correctly.  If I could add something else from

3    Judge Seibel that could add to your consideration of the

4    relative seriousness of the offenses, sometimes the loss tables

5    drive these guideline ranges much more than other factors --

6          THE COURT:  You said it better than I did but I agree

7    with that.

8          MR. BANSAL:  This is from Judge Seibel.  "It's a

9    pretty appalling crime of greed on the part of somebody who had

10   plenty of money.  Even if this were just a tax crime, I just

11   find it inexcusable that people who are as lucky as

12   Mr. Sheridan and who accumulated as much material wealth as he

13   did would cheat the government.  And the tax crime wasn't just

14   the byproduct of the fraud.  It wasn't just well, I can't

15   report my dirty money or I'll reveal the fraud.  It was clean

16   money that Mr. Sheridan apparently didn't report either.  And

17   it's just that that's just greed, that's just putting yourself

18   ahead of your community.  And as the government points out,

19   what people are counting on is they're not going to --" I skip

20   over a little bit, and she says, she regards tax crimes

21   seriously.  She says: "This is worse.  Because this is

22   combined with a fraud as well.  And it wasn't an impulsive

23   thing.  It was done over and over again.  It required

24   recruiting other people.  It required sordid cash transactions.

25   If your friends tell you you know, by the way, this isn't

G9gisims ag                     SENTENCE

1   exactly legit, if in that moment you don't have the strength to

2   say I'm out, you do have the opportunity," and then she says

3   "Mr. Sheridan didn't do that.  He helped Mr. Delaney underpay

4   his workers, deceive his former employer for whom he worked in

5   a position of trust and he put cash in his own pocket as a

6   result.  And Mr. Sheridan was a police officer."

7              THE COURT:  Can I see the transcript?

8              MS CARNIVAL:  I was not there.  But the transcript is

9   accurate.

10             MR. BANSAL:  I thought she was.

11             THE COURT:  Ms Christodoulou was there, is that right?

12             MS CHRISTODOULOU:  Yes, that sounds accurate, although

13  we don't have the transcript yet.

14             THE COURT:  Just give me a moment, please.

15             (Pause)

16             THE COURT:  I've read the portion of the sentencing

17  transcript in U.S. v. Sheridan, 16 Cr. 237 in which Judge

18  Seibel gives her reason for the sentence that she imposed and

19  that is probably of more relevance to me than virtually every

20  other case that either of you or both of you cited.  Although

21  it's not the same as this case it arises out of the same

22  investigation and there are in my view more similarities than

23  there are differences.  It's not binding on me, of course.  But

24  they both involve fraud and they both involve people, to the

25  tune of a hundred plus thousand dollars, and they both involve

G9gisims ag                    SENTENCE

1   people who have lived otherwise exemplary lives and so forth.

2   So in that sense they're similar.

3          So I forget the question that I was going to ask you

4   before.  Do you agree that the guideline range in that other

5   case was 15 to 21 months and that the loss was what Mr. Bansal

6   identified earlier?

7          MS CARNIVAL:  That is correct, your Honor.

8          THE COURT:  All right.  Anything else?

9          MR. BANSAL:  Judge, I agree that they're comparable in

10  many ways.  In many ways they're comparable in a way that I

11  think makes this situation, I don't want to say less serious,

12  but the other situation more serious.  One thing I did not see

13  in the other sentencing was mention of something that I think

14  that this Court really needs to balance against the goal of

15  general deterrence.  By the way, the goal of general deterrence

16  is the only thing that the government has cited in favor of a

17  guideline sentence.  Specific deterrence, recidivism, need for

18  punishment, these are not things that the government thinks are

19  needed in this case.  They're talking about deterrence to the

20  general public, period.  That goal was no less important to the

21  many other judges that have imposed probationary sentences in

22  tax cases, no less important in the Sheridan case and perhaps

23  more important in the Sheridan case because he was a police

24  officer and somebody who acted in a position of trust and as

25  Judge Seibel said really should have known better.

G9gisims ag                        SENTENCE

1           One thing I didn't see in that transcript was any need

2    to balance that goal of general deterrence against the harm

3    that is going to be done, and I know that sentences do this all

4    the time.  But it is important for the Court in every situation

5    and this one in particular to balance the goal of general

6    deterrence against the harm that is going to be done to a young

7    and innocent family.  A five year old girl.  The emotional harm

8    to a five year old girl for losing a father for what could be a

9    fifth of her life.  A 13 year old girl who is going through a

10   challenging series in her life.  An 18 year old boy whose

11   educational options may be limited because of the father, his

12   father's incarceration.  The loss of a family's livelihood.

13          Here's another thing that with all due respect the

14   government gets wrong.  They say that the question is whether

15   Mr. Simonlacaj's family can weather the loss of the father's

16   income during the course of his incarceration.  The question is

17   whether the family can weather the loss of Mr. Simonlacaj's

18   career.  As we spelled out in our sentencing brief, that is

19   what is very likely to happen.

20          THE COURT:  You didn't give me any evidence to support

21   that.  You gave me two letters from people he worked for and

22   neither of those letters said anything about loss of career.

23   What they said was that he was irreplaceable.  I take that

24   back.  This is Mr. Meir.  He says to lose him would be

25   catastrophic to our company.  One could reasonably conclude

G9gisims ag                    SENTENCE

1    from that that if they lost him for a while and then got him

2    back they'd be delighted because otherwise it could be

3    catastrophic for their company.  I don't see anything in there

4    that says if he goes to jail we're never going to hire him

5    back.  You say that in your brief but it's not in the letter.

6    Maybe I missed it.

7              MR. BANSAL:  I guess he didn't say that, Judge.  It's

8    something that was told to Mr. Simonlacaj by Mr. Meir.  We

9    obviously don't control what the content of these letters is.

10   If the Court thinks it's important that Mr. Meir affirm that,

11   I'm sure we could obtain something to that effect.  All I have

12   right now is the representation that that would occur.

13             THE COURT:  What you say is, on page 6 and 7, HFZ has

14   informed him, meaning Mr. Simonlacaj, that while they have

15   supported him through his guilty plea and kept him on so his

16   work could continue uninterrupted, if his work were interrupted

17   by a prison sentence they would have to terminate him and could

18   not hire him back.

19             MR. BANSAL:  That's correct.

20             THE COURT:  You do have two letters from the managing

21   principal.  He doesn't say that.  And there's another one,

22   that's Exhibit 4 in your brief, and there's one other one

23   somewhere.  The general counsel and COO of HFZ, Ms Golub, she

24   does say very positive things about him but really doesn't say

25   anything about, Exhibit 14 of your brief, about whether they'd

G9gisims ag                    SENTENCE

1   hire him back.  Neither of those things are mentioned.  But it

2   is in your brief.  That's your brief.  I'm going to impose a

3   sentence based on what I've been provided.  By the way both of

4   you had plenty of time to do this.

5          Anyway, I didn't mean to interrupt but I did notice

6   that discrepancy.  In other words, the statement in the brief

7   is not supported by the letters directly; inferentially, but

8   not directly.  Not even inferentially because it says to lose

9   him would be catastrophic.  If that's true, that's a true

10  statement, then they're not going to want to lose him.

11         MR. BANSAL:  If they lose him and then they survive

12  for a period of time without him maybe they can fill that job.

13  Look, this is what he was told by his employer.  I just wanted

14  to point out that I think that the government is probably

15  understating the impact that this is going to have on

16  Mr. Simonlacaj's family.  That is again a factor that I didn't

17  see Judge Seibel having to balance against Mr. Sheridan's

18  sentencing and the need for deterrence which was at least as

19  important.

20         THE COURT:  What's this other business that he had?

21  It says he had another construction business.

22         MR. BANSAL:  He's done work through a company called

23  Center Line.

24         THE COURT:  Is he doing work?

25         MR. BANSAL:  No, not right now, Judge.

G9gisims ag                    SENTENCE

1          THE COURT:  But has in the past?

2          MR. BANSAL:  Has in the past.

3          THE COURT:  All right.

4          MR. BANSAL:  So Judge, for all the reasons that we

5    cited in our brief, and in particular I think as we've seen

6    here today, it would be disproportionate to similar sentences

7    to impose a jail sentence here.  I know that the, the Court

8    knows about the Libous case than I do.  But one of the things

9    that I read in the Libous case is that the defendant came to

10   court not having even accepted his responsibility for his

11   offense, that he disputed his accountability for certain of the

12   charged tax years.  Obviously did not plead guilty.  Again, his

13   guideline range was higher and the only distinction that the

14   government points out is that his loss was lower and as we've

15   already said, sometimes that's an accident of how the tables

16   work.

17          THE COURT:  Just so you know, his loss was lower but

18   that was a nonjury trial and I acquitted him of the most

19   serious charges in that case.  And the reason I acquitted him

20   is because I believe that his defense of good faith reliance on

21   his accountant, CPA, who was by everybody's agreement a total

22   idiot but nonetheless managed to be a CPA, had given him tax

23   advice regarding what to do about personal expenses that have

24   been paid for by his company, what the impact would be on his

25   own taxes.  It was completely wrong advice.  He was a young man

G9gisims ag                    SENTENCE

1    at the time.  He wasn't a sophisticated businessman.  He was a

2    young fellow who was a law school graduate, that's true.  But I

3    don't think anyone would call him a lawyer.  But he was a law

4    school graduate.

5           And you see, that's the thing.  When you get into

6    trying to compare one case to another, you really are on a

7    fool's errand because the cases are just so different.  Some of

8    what happened in the Libous case, because it was a tax case, is

9    relevant.  Some of the things that I said I said.  Obviously I

10   believed them if I said them.  But when you get down to the

11   nitty gritty it's really difficult because you're not taking

12   into account things like what he was acquitted of and advice

13   that he received from people who led him astray and his age and

14   sophistication at the time.  Those are other important

15   factoids.

16          One important factoids is that he didn't plead guilty.

17   The government wanted me to punish him for going to trial and I

18   don't do that.  That seems unconstitutional to me.  But what I

19   will do is reward someone who pleads guilty.  And of course in

20   your client's case the reward is reflected in the guideline

21   range.  If he hadn't pleaded guilty and had been convicted of

22   exactly what he pleaded guilty to, his guidelines range would

23   have been 21 to 27 months.  Any way, there you have it.  Don't

24   spend more time on the Libous case.  That's enough time on

25   that.  There are just too many differences.  Some similarities,

1    but there's too many differences.

2              MR. BANSAL:  Sure, Judge.  One of the things that I

3    think the Court has also to recognize is that here

4    Mr. Simonlacaj has gone above and beyond accepting his

5    responsibility in some ways in that he didn't wait for an

6    assessment, he didn't wait for anyone to send him a tax bill,

7    he got out ahead, he paid his state taxes, he paid all the

8    penalties, there could be additional penalties I suppose but he

9    paid the penalties and interest such as were calculated by his

10   accountant resulting in payments that were more than twice what

11   the government calls his tax loss.  So I find that

12   extraordinary.

13             I just turn back to what happened last week in Judge

14   Seibel's courtroom across the hall.  It seems like it would be

15   unfair, and I realize that every case stands on its own, every

16   person stands on his own, but every distinction in the Sheridan

17   case, and this one weighs in favor of treating Mr. Simonlacaj

18   with greater mitigation than Mr. Sheridan.

19             THE COURT:  Ms Carnival, if there's anything you want

20   to say, you should do that now.

21             MS CARNIVAL:  No, your Honor.  Just for clarity, based

22   on what the crime was that was here and why, and what the

23   defendant said who is about to be sentenced for this crime, the

24   tax loss and the tax loss that we estimated was his sister's,

25   not his.  I just wanted to make that clear on the record.

G9gisims ag                    SENTENCE

1          THE COURT:  It gets back to where we started from.  If

2     his sister didn't get the money then she didn't owe any taxes

3     on it.  Although the return was false.  Anyway, have a seat.

4          Mr. Simonlacaj, do you have anything you would like to

5     say or any information you would like to present before I

6     impose sentence?  To be clear, you are not required to do so.

7     I would not hold it against you or punish you in any way, shape

8     or form if you chose not to say anything.  But this is your

9     opportunity to say I something if you'd like.

10          THE DEFENDANT:  I'd like to apologize to you and to

11     the government for the crime I committed.  I know what I did

12     was wrong and at the time I knew better.  I'm ashamed of what I

13     did and what I put my family through.  This will never happen

14     again.  I look forward to continuing to work hard and raise my

15     family.  Thank you, your Honor.

16          THE COURT:  Okay.  Thank you very much.  Have a seat.

17          Let me say first that in deciding the appropriate

18     sentence in this case I've considered all of the statutory

19     factors set forth in Title 18 United States Code Section

20     3553(a).  I've also considered all of the materials submitted

21     in connection with sentencing and all of the arguments and

22     statements made by both counsel as well as Mr. Simonlacaj

23     today.

24          I happen to be someone who does not believe in keeping

25     a defendant in suspense.  I hated that when I was a lawyer.  I

G9gisims ag                    SENTENCE

1    wanted to hear up front what the sentence was and then hear

2    what the reasons are rather than the other way around.  So I'm

3    going to tell you up front what the sentence is going to be.

4            And the sentence that I intend to impose is three

5    months imprisonment to be followed by one year of supervised

6    release as well as a $25,000 fine.  And I believe that that

7    sentence is sufficient but not greater than necessary to comply

8    with the purposes of sentencing set forth in the statute.

9            My reasoning is as follows.  There's no question that

10   the defendant enjoys the strong support of his family and his

11   friends and that he has a long history devotion to his family

12   and community.  That is a lot.  Most of what is discussed in

13   the defendant's sentencing memorandum and also in the

14   government's response deals with that issue.  And I really

15   don't, I don't have to get into the question of whether it's

16   extraordinary or it's just really good or whatever it is.

17   There's no question that he has a long history of devotion to

18   his family and to his community.  I don't know how else to put

19   it.

20           But as I said earlier, the most important sentencing

21   factor is the nature and circumstances of the offense.

22   Particularly so in a white collar context where nearly every

23   defendant, maybe even every defendant but certainly nearly

24   every defendant has a positive work and family history and

25   where incarceration always creates a hardship for the

G9gisims ag                    SENTENCE

1    defendant's family and business activities.  And that's the

2    case certainly in every white collar case.  That's why I

3    believe it's more important to focus on what the defendant did

4    and less so on who the defendant is.  Although that is

5    certainly relevant.  It's just not as relevant as the nature

6    and circumstances of the offense.

7              I asked a lot of questions about this today and it

8    essentially confirmed what I believed from what I read.  Here

9    as I understand it the defendant exercised control over a

10   company owned by his sister called Cortlandt Painting Company.

11   The defendant was also the beneficiary of Cortlandt's 2010

12   income from a $550,000 facade restoration contract that the

13   company had with the New York Power Authority.  And even though

14   the defendant was the beneficiary of this net income, I'll say,

15   the income and expenses from that contract were reported on the

16   defendant's sister's personal income tax return, not on the

17   defendant's tax return.  Because the sister was, at least for

18   purposes of this transaction, the nominal owner of the company

19   as distinguished from the beneficial owner, which is really

20   Mr. Simonlacaj, the defendant provided information regarding

21   Cortlandt's income and expenses to an accountant that he

22   retained.  The accountant prepared the sister's 2010 tax return

23   based on that information.  And the information that the

24   defendant provided inflated Cortlandt's expenses by more than

25   $400,000 which meant that Cortlandt's profits and thus the

G9gisims ag                    SENTENCE

1    sister's taxable income were substantially underreported.  When

2    I say the sister's taxable income that's because the sister

3    reported this income.  That gets back to what we discussed

4    earlier, which is who is the real beneficiary here.  There's no

5    question, even though there's some open issue as to exactly

6    where the money ultimately went, there's no question in my mind

7    that Mr. Simonlacaj was the ultimate beneficiary.  In short,

8    the defendant was the architect of a scheme that resulted in

9    the filing of a materially false federal income tax return and

10   a tax loss to the IRS of about $132,000.

11        His motivation for doing this can only be one thing,

12   which is personal financial gain.  That's why people cheat on

13   their taxes or aid and assist other people to cheat on their

14   taxes or aid and assist the filing of a false tax return in

15   order to reduce your tax liability.  Especially if the tax

16   liability really belongs to you and not to the person who filed

17   the return.  Especially when you go to this much trouble

18   through these various entities to commit this offense.

19        What does that tell me?  It tells me you're doing it

20   for personal gain.  Who is the loser for that?  If this is a

21   zero sum game, right, somebody gains, somebody loses.  Who

22   loses?  Here's who loses.  The vast majority of taxpayers who

23   just go to work every day, get paid every two weeks, pay their

24   taxes and file accurate income tax returns.  That's who loses.

25   That's who you're stealing from.  You think it's okay because

G9gisims ag                         SENTENCE

well, there's 300 million people in the country and I'm only
stealing $132,000.  What's that, a few cents per person?
What's the big deal?  I think it is a big deal.  It undermines
confidence in the system.  It feeds the notion that the system
is rigged in favor of the rich, that the rich are the ones who
get away with stuff that the rest of us can't get away with.
How can someone who is a w-2 taxpayer who every two weeks gets
a check and the taxes are taken out there, how could a person
in that position cheat on their taxes.  It's not impossible but
it's difficult.  People like that, there you go, another rich
guy, loaded, makes plenty of money, doesn't pay his taxes every
two weeks like I do.  Then apparently it's not enough to make a
few hundred thousand dollars a year and have assets of several
hundred thousand dollars.  That's the guy who wants to steal
from me.  That is the message.  It's offensive, and appalling
and just not right and there's no excuse for it.

        This wasn't some innocent mistake that the defendant
made about how the tax laws work.  And people can make innocent
mistakes because the tax laws are complicated.  But this is not
that case.  Rather, this case, what Mr. Simonlacaj did was the
result of deliberate, knowing and willful conduct.

        Plus the magnitude of the loss was huge.  It wasn't
million of dollars, but overstating expenses by more than
$400,000, that's a lot.  That's not 50 dollars or five thousand
dollars.  $400,000 in a single year.  And the result of course

G9gisims ag                    SENTENCE

1    is that the magnitude of the loss to the public fisk was

2    significant, well over $100,000.  So there's no question that

3    the defendant's willful favor, the magnitude of the lie and the

4    significance of the loss combined make this a serious crime.

5         The defendant has tried to make this right and that's

6    to his credit by filing his own amended tax return for 2010 in

7    which he claimed the correct amount of the income resulting

8    from the 2010 painting contract or facade restoration contract

9    which was really his contract, his company, his money.  That's

10   what it is.  Cut through the baloney.  That's what happened

11   here.  Because it's all those things it makes sense for him to

12   file an amended return.  It was really his return that grossly

13   understated his income and taxes.  Even though the one that was

14   actually filed was his sister's return.  He's the beneficiary,

15   not his sister, so that's why he filed his return and it makes

16   perfect sense.

17        The flip side of that is that would make no sense for

18   the sister to claim the income on her own return.  If she did

19   so she would be filing a materially false tax return because

20   she didn't receive the income.  And as we discussed earlier,

21   there's no dispute that the defendant has paid to date $147,850

22   in additional taxes which is higher than the $132,000 tax loss

23   calculated by the government.  He's also paid about $27,000 in

24   interest and $40,000 in penalties, which is fine.  But the real

25   number that matters is the 147,000 number which is directly

G9gisims ag                    SENTENCE

related to the tax loss.  In total he's paid over $200,000.
But the relevant number is the 147,850.  That's the number that
exceeds the 132 thousand dollars tax loss calculated by the
government.  He's also paid additional state taxes, interest
and penalties.  Again this is a federal crime so what I'm
trying for focus on has he made good on his federal tax
obligations, at least with respect to the tax laws.

          In my view there's no question that the defendant has
made full restitution and for that reason I don't see any
purpose to be served by deferring the entry of a restitution
order for 90 days while the IRS processes an amended return.
The IRS has every right to process the amended return and if
after they process the return the IRS thinks the defendant owes
more in taxes, penalties and interest, then they certainly have
remedies available to them to collect those monies.  By the
way, if the IRS thinks the defendant overpaid his taxes,
penalties and interest then I would expect them to refund the
difference.  It seems to me it cuts both ways.  That's up to
the IRS.  They have the right to review the return.  If they
think there's even more that's owed, fine, tell Mr. Simonlacaj,
and if he agrees he'll pay it and if he doesn't agree there are
ways for that process to get adjudicated.  And I just don't see
any point in delaying the entry of a restitution order when in
my view he's made restitution.  Done it.  It's already over.

          That still begs the question of what sentence to

G9gisims ag                    SENTENCE

1   impose in the case.  Payment of restitution before entry of

2   judgment is a good thing and it certainly is a mitigating

3   factor.  The flip side, the defendant is obligated to repay the

4   money he obtained unlawfully.  It's not as if he's doing

5   something beyond what he's already required to do.  He's doing

6   it earlier perhaps than maybe he would do otherwise.  But

7   basically it's the timeliness of it that's important not the

8   fact that he did.  That's the point I'm trying to make.  And he

9   did do it in a timely fashion.  And for that he deserves

10  credit.

11          Plus, in this case Mr. Simonlacaj is fortunate that he

12  had the resources to make restitution.  Not everybody does.

13  But he has a net worth of, according to the PSR, around

14  $500,000 and yearly income of around $300,000.  That's what's

15  set forth in the PSR.  So the good news is that he did this in

16  a timely fashion.  If he hadn't done it, that would have been

17  an aggravating factor frankly because he does have these

18  resources, and if he hadn't made this payment before sentencing

19  that would have redounded probably more to his detriment.  It

20  would have redounded to his detriment, no question about it,

21  because he had the ability to make these payments.  How do we

22  know that?  Because he did, done.

23          But again, I guess the larger point here is that he

24  didn't need the money, he's given it back, he took it because

25  he was greedy.  That's what this is about.  It's about greed

1    and about screwing the rest of the populace who pays their

2    taxes basically every two weeks.  That's what this is about.

3         None of the cases cited by either side in their

4    sentencing submissions is particularly helpful.  Every case is

5    unique, including this one.  Both sides site the sentence that

6    I imposed in the Matthew Libous case.  That has a more

7    persuasive impact on me because it is my case and the words I

8    used in that case are my words.  But that case is very

9    different, I described some of the differences a moment ago to

10   Mr. Bansal.  So it really, with one exception, has very limited

11   precedential value.  But the exception is kind of important.

12   Not kind of important, it is important.  I said in that case

13   and I'll say again here that jail sentences in tax cases, even

14   short jail sentences, do have a general deterrent effect.  And

15   I believe, based on my 35 years of experience or so in the

16   federal criminal justice system, I believe that the general

17   deterrent effect of a jail sentence in a tax case is more than

18   in just about any other type of case.  I think it is

19   particularly relevant in a tax case.

20        Many people are tempted to cheat on taxes.  Why?

21   Because they don't like paying taxes.  They earn the money,

22   they'd like to keep it.  And they forget that the roads have to

23   be built and maintained and the police force has to be paid and

24   the men and women that are willing to put their lives on the

25   line for us have for to be paid and their efforts to keep us

G9gisims ag                    SENTENCE

1    safe have to be paid for and financed.  Again, people's human

2    nature is about self-interest, that's rule 1 when it comes to

3    human nature.  People say I don't care about anybody else, I

4    only care about myself so therefore I'm tempted to cheat on my

5    taxes.  If you're a w-2 taxpayer it's hard to do it.  But still

6    people are tempted to do it.  And the following that if you

7    commit a tax crime, no matter how rich and successful and no

8    matter how much you're loved and no matter how much of an

9    impact it's going to have on your family, your business, your

10   employment, the knowledge that if you commit a tax crime like

11   this and get caught and go to jail even for a short period of

12   time gets people's attention.  And it certainly makes people

13   think that tax fraud is just not worth it.

14        So in my view, a jail sentence here is necessary to

15   satisfy the sentencing factors in Section 3553(a).  But under

16   the circumstances, I don't believe the sentence needs to be

17   within the guidelines range, which of course is only advisory,

18   for the following reasons.  First of all, this is a nonviolent

19   offense, and other than an offense that Mr. Simonlacaj

20   apparently committed when he was a teenager, 16 or 17 at the

21   time, which would have been about 30 years ago and which is not

22   countable for determining the defendant's criminal history

23   category, the defendant has no prior criminal record.  So for

24   my purposes he has no prior criminal record because people who

25   are children who are 16, especially boys who are 16 or 17 often

1    do incredibly stupid, irresponsible things.  And sometimes they

2    get caught.  And what they've done is a criminal offense but

3    you're 16.  I had to cut that person, who has then gone 30

4    years without doing something like that again, I've got to cut

5    that person a break.  As far as I'm concerned, that's

6    irrelevant here.

7            Also, and this is important as I said, the defendant

8    has made full restitution prior to sentencing which is

9    important because it demonstrates sincere remorse.  He had the

10   ability to make restitution and he did it.  And that's

11   important.  He also has, as I mentioned earlier, although this

12   is not the most important factor, he's demonstrated a history

13   of service to the community and generosity to others.  And the

14   defendant's family, particularly his parents, will suffer some

15   hardship during a period of incarceration.  But honestly, this

16   is the least significant mitigating factor because the hardship

17   that family members will suffer is always a consequence of

18   committing a serious criminal offense.  There's nothing unique

19   about this case in that regard.  As a matter of fact, in every

20   case in which I've imposed a jail sentence the family of the

21   defendants have suffered some degree of harm.  That's true

22   whether the defendant is wealthy or successful or poor and

23   desperate.  It doesn't matter.  It's the same thing.  The

24   families are impacted by that in an adverse way.

25           If I were to impose a five-year jail sentence, then

1    obviously the impact would be much greater.  If I were to

2    impose a two-year jail sentence, it's less than fire years but

3    still a lot greater.  If I were to impose a twelve-month jail

4    sentence, the impact on the family would be much greater.  So

5    it is relevant and I'm not imposing a twelve-month sentence,

6    I'm imposing a three-month sentence, and I'm confident that

7    this is a family, given their financial wherewithal and given

8    their cohesiveness, they can withstand that.  Although it's not

9    going to be fun.  But that's between the family and

10   Mr. Simonlacaj.  That's on him, it's not on me.  Someone to

11   bear the brunt of disappointment, anger or disapproval,

12   whatever you want to call it.  I would hope that that would be

13   directed at this defendant, not at the Court.  Because I'm just

14   doing what I believe the law requires and is necessary in the

15   circumstances.

16        In any event, in combination, the defendant's lack of

17   criminal record, his payment of full restitution before

18   sentencing, his history of community service and the effect on

19   the defendant's favor if he were to be incarcerated, in

20   combination warrant a downward variance from the sentencing

21   range to three months.  And I will add that I recognize that

22   that is jail versus no jail when you compare this to the

23   sentence that was imposed by Judge Seibel who to say the least

24   is an esteemed colleague of mine.  I just feel that in a case

25   like this there's got to be some jail, it's as simple as that.

1    So I guess in some sense I respectfully disagree with my

2    distinguished colleague.  Perhaps if she had this case maybe

3    she would come out a different way.  But it's my case and I

4    have to do what I think is right.

5          I will say, however, that I came into today's

6    proceeding intending to impose a sentence of six months in jail

7    and I'm persuaded by what was said today that if I did that,

8    that would be disproportionate.  Even though the cases are not

9    identical, we're already established that, it would be

10   disproportionate to an arguably similarly situated defendant

11   and I don't want to do that.  In the words of the statute, that

12   would be an unwarranted sentencing disparity.  But three months

13   is not an unwarranted sentencing disparity.  It's a disparity,

14   I get it, but it's not unwarranted.  That's the point.  It's a

15   warranted disparity.  In a case like this a jail sentence, even

16   a short jail sentence, is necessary and in particular three

17   months is sufficient but not greater than necessary.

18         Also I do intend to impose a one-year term of

19   supervised release with a special condition of 100 hours of

20   community service.  And every hour or every day that

21   Mr. Simonlacaj is performing that community service he will be

22   reminded of what he did that caused him to be in that

23   situation.  So there's two benefits there.  It benefits whoever

24   he's doing community service for.  But I think it will have a

25   therapeutic effect on his own outlook in life because it's

G9gisims ag                       SENTENCE

1   going to remind him of this over and over and over again.   And

2   he should be reminded of it.   I'm also going to impose a fine

3   in the amount of $25,000 which I think is appropriate under the

4   circumstances.

5            When you combine all of that together the bottom line

6   is that given the nature and circumstances of the offense,

7   history and characteristics of the defendant, the sentence I

8   intend to impose is sufficient but not greater than necessary

9   to reflect the seriousness of the offense, promote respect for

10   the law, and provide just punishment for the sentence; also, to

11   afford adequate deterrence to criminal conduct, that's the

12   single most important sentencing factor here, and to avoid

13   unwarranted sentencing disparity among similarly situated

14   defendants.

15            Does either counsel know of any legal reason why the

16   sentence should not be imposed as stated?

17            MS CARNIVAL:   Your Honor, just the mandatory special

18   assessment.

19            THE COURT:   I'll get to that.

20            MS CARNIVAL:   No, your Honor.

21            THE COURT:   Other than that, you don't have a legal

22   reason why I shouldn't impose the sentence which is the --

23            MS CARNIVAL:   No, your Honor.   The sentence is, we

24   have no objection, no reason to believe --

25            THE COURT:   The question is do you know of any legal

G9gisims ag                    SENTENCE

 1   reason why the sentence should not be imposed as stated.

 2            MS CARNIVAL:  No, your Honor.

 3            THE COURT:  Mr. Bansal, do you know of any legal

 4   reason why the sentence should not be imposed as stated?

 5            MR. BANSAL:  No, Judge, but I'm afraid I won't have

 6   the opportunity to mention it later and I think I'd be remiss

 7   if I didn't point out that home detention would be a legal

 8   sentence as well.

 9            THE COURT:  It would.  I'm fully aware that home

10   detention and even a nonincarceratory sentence would be legal,

11   permissible and maybe even reasonable.  But that doesn't mean

12   that this sentence is not reasonable or appropriate.

13            For all the reasons I explained in detail on the

14   record, I believe that this is the sentence which is sufficient

15   but not greater than necessary to satisfy the sentencing

16   objectives in the statute.  The answer is no, you don't know of

17   a legal reason.

18            MR. BANSAL:  No, your Honor.

19            THE COURT:  Mr. Simonlacaj, please stand.  It is the

20   judgment of this Court that you be committed to the custody of

21   the United States Bureau of Prisons for a total term of three

22   months to be followed by one year of supervised release.  The

23   standard conditions of supervised release 1-13 should apply.

24   The following mandatory conditions shall also apply, they're on

25   page 18 of the presentence report.  You have to bear with me,

G9gisims ag                    SENTENCE

1   I'm required to read them into the record.  The defendant shall

2   not commit another federal, state or local crime.  The

3   defendant shall not illegally possess a controlled substance.

4   The defendant shall not possess a firearm or destructive

5   device.  The mandatory drug-testing condition is suspended

6   based on the Court's determination that the defendant poses a

7   low risk of future substance abuse.

8          In addition, the following special conditions shall

9   apply.  1.  The defendant shall perform 100 hours of community

10  service as directed by the probation officer.  2.  The

11  defendant is to report to the nearest Probation Office within

12  72 hours of release from custody.  And 3.  The defendant is to

13  be supervised by his district of residence.  I'm not imposing

14  restitution because as far as I'm concerned he's already made

15  restitution based on all the discussions we had earlier.

16  Therefore, there's no need to impose any special conditions

17  regarding access to financial information and so forth.  I am

18  imposing a fine in the amount of $25,000 to be paid in full not

19  later than six months after entry of judgment.  That gives you

20  plenty of time.  If I were you I'd pay it tomorrow, maybe not

21  tomorrow, tomorrow is Saturday, I'd pay it as soon as possible.

22  But under the circumstances I'll give you six months to pay it

23  from the date of judgment.  As I said earlier, restitution is

24  not applicable here.  I am imposing the mandatory special

25  assessment of one hundred dollars which is due immediately.

1              The foregoing constitutes the sentence of the Court.

2              You may have a seat, sir.

3              You have the right to appeal your sentence subject to

4    any limitations on that right contained in your plea agreement

5    with the government.  If you're unable to pay the costs of

6    appeal you may apply for leave to appeal without payment of

7    costs.  The notice of appeal must be filed within 14 days after

8    the entry of judgment.  If you do wish to appeal, you must

9    inform your attorney to prepare and file a notice of appeal

10   immediately; or if you request, the clerk will prepare and file

11   a notice of appeal in your behalf.  Mr. Bansal, I would ask you

12   to have that conversation with your client today about his

13   appellate rights.  Maybe you've already had it but if you

14   haven't you should have it today because the worst thing that

15   could possibly happen is that the defendant wants to appeal,

16   I'm not saying he does, but if he does he's got to move quickly

17   on it, so please have that conversation today.  There are no

18   open counts.

19             Recommendation to to the Bureau of Prisons?  By the

20   way, I'm willing to give your client a surrender date if you

21   ask me for that.  Why don't we deal with that first.  Are you

22   asking for that, meaning that he would direct surrender to the

23   institution designated?

24             MR. BANSAL:  Yes, your Honor.  And the government has

25   agreed to that as well.

G9gisims ag                    SENTENCE

1          THE COURT:  Whether they do or they don't I would do

2     it.  He's not going anywhere obviously.  The typical time frame

3     for that is 45 days.  That comes out to October 31, 2016.  If

4     there's some reason why it should be less or more than that,

5     tell me now.  But that's usually enough.  The sooner you get

6     started the sooner you finish.  I think 45 days is plenty.

7     Frankly, if it were me I'd go in today but I can understand why

8     somebody would want to get things in order.

9          MR. BANSAL:  Let me have a moment, your Honor.

10         (Pause)

11         MR. BANSAL:  We'd ask for 14 days.

12         THE COURT:  He can't be designated in 14 days.  That's

13    just not enough time for the BOP.  If it is 14 days he would

14    have to surrender here to the marshals which is fine too.  It

15    just can't be done in 14 days.

16         MR. BANSAL:  If in the Court's experience 45 days is

17    the minimum that is required...

18         THE COURT:  There's a process involved.  But he's

19    welcome to surrender in 14 days.  It's just that it would have

20    to be here, Mr. Bansal, in the marshal's office.

21         MR. BANSAL:  If you're okay, we'd go with the 45 days,

22    we'll go with that.

23         THE COURT:  All right.  November 1 at two p.m.  The

24    institution to be designated, as you know, Mr. Bansal, both you

25    and your client will be informed.  But if you get close to that

G9gisims ag                    SENTENCE

1   date and you haven't heard anything you need to call the

2   probation officer, Mr. Quinn, and take it from there.

3   Recommendations.  Bail will be continued until then.  So all

4   the conditions upon which you've been released up until now

5   continue to apply until the date of surrender.

6        Recommendations to the BOP.  In similar cases,

7   relatively short sentences, I've been asked and I've agreed to

8   recommend that the defendant be incarcerated at the MDC which

9   is in Brooklyn.  It's a large facility.  They do have the

10  ability to house people for a relatively short time.  Of course

11  any recommendation I make is not binding on the BOP.  They'll

12  put him wherever they want to put him.  If you want me to

13  recommend MDC or something else, that's fine.  I'll recommend

14  it.

15       MR. BANSAL:  Judge, would you entertain a letter

16  seeking a recommendation.  I must tell you, I was not expecting

17  this to happen.  Perhaps Otisville might be better.  His family

18  is in Westchester.  MDC is a jail as well as a prison.

19       THE COURT:  Otisville is a jail too.  You can't go

20  home at night.

21       MR. BANSAL:  I've seen a holding facility for pretrial

22  inmates.  I might just do a little work on that.

23       THE COURT:  I'll hold up the judgment.  I can't file

24  the judgment until you give me such a request.  I'm not

25  unwilling to do it but I would think that you would have

G9gisims ag                          SENTENCE

1   thought about it.  The guideline range is 12 to 18 months.

2   It's not as if the guideline range is zero.  Would it be

3   satisfactory, I could say FCI Otisville.  I have no problem

4   doing that.  I'm not trying to be difficult.  I'm just trying

5   to make it as easy as possible.

6          MR. BANSAL:  I don't want to make a mistake.  I do

7   apologize for not having done this.

8          THE COURT:  If you get back to me by Tuesday of next

9   weeks with a letter, which is plenty of time, it doesn't take

10  long, the BOP website is very detailed.  It used to be before

11  the Internet age that there were books written that would tell

12  you about different places.  You don't really need to do that.

13  It's out there online and therefore it's information that's

14  easily obtained.  By Tuesday, which is the 20th, you're going

15  to write me on letter making whatever specific recommendations

16  to me that you think I should recommend to the BOP.  And as

17  long as it's reasonable I'll do it.  I don't have any problem

18  with that.

19         MR. BANSAL:  Thank you.

20         THE COURT:  If you ask for something that's

21  unreasonable, I'm not sure what would be unreasonable, but keep

22  that in mind.  I will recommend a specific place.  I will

23  recommend as close as possible to the New York area.  I'll do

24  any of those things.  So just let me know what you want.

25         MR. BANSAL:  Thank you, Judge.

G9gisims ag                    SENTENCE

1          THE COURT:  Anything else that we' need to do today?

2          By the way, just so we're clear on the record, the IRS

3    is not bound in any way, shape or form by anything that I did

4    today.  In other words, if they think that Mr. Simonlacaj owes

5    more taxes, penalties or interest they have the right to seek

6    such taxes, penalties or interest.  So nothing that I've done

7    today limits the IRS in any way, shape or form.  But for

8    purposes of restitution in this criminal case, restitution has

9    been made and therefore there doesn't need to be any specific

10   restitution order.  Anything further Ms Carnival?

11         MS CARNIVAL:  No, your Honor.

12         THE COURT:  Mr. Bansal.

13         MR. BANSAL:  No, thank you, your Honor.

14         THE COURT:  Thank you all very much.  Good luck to you

15   Mr. Simonlacaj.

16         THE COURTROOM DEPUTY:  All rise.

17         This Court will be in recess.

18         (Record closed; 11:40 a.m.)

19

20

21

22

23

24

25